**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| DREYON WYNN, | ) | Case No. 3:22-CV-01899 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF TOLEDO, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT UNIVERISTY OF TOLEDO'S NOTICE OF FILING DEPOSITION OF WENDY F. DAVIS**

Now comes Defendant and hereby gives notice of filing of the following deposition along with its exhibits in support of its Motion for Summary Judgment.

| **DEPONENT** | **DEPOSITION HELD** |
|---|---|
| Wendy F. Davis (taken in Case No. 3:22-cv-301) | February 21, 2023 |

Respectfully submitted,

DAVE YOST (0056290)
Attorney General of Ohio

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)
Scott H. DeHart (0095463)
Zashin & Rich Co., L.P.A.
17 South High Street, Suite 900
Columbus, Ohio 43215
Telephone:     (614) 224-4411
Facsimile:      (614) 224-4433
*dcp@zrlaw.com*; *shd@zrlaw.com*

*Attorneys for Defendant*

1

## CERTIFICATE OF SERVICE

This will certify that the foregoing was filed electronically on November 29, 2023.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Drew C. Piersall
Drew C. Piersall (0078085)
Zashin & Rich Co., L.P.A.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

WENDY F. DAVIS,                    )
                                  )
            Plaintiff,            )
                                  ) Case No. 3:22-cv-00301
    vs.                           ) Judge Helmick
                                  ) Magistrate Clay
UNIVERSITY OF TOLEDO,             )
                                  )
            Defendant.            )


- - -


DEPOSITION
OF
WENDY F. DAVIS


- - -


TAKEN AT:  The Law Office of Norman A. Abood
           136 N. Huron Street
           Toledo, Ohio  43604

DATE:      Tuesday, February  21, 2023

TIME:      10:05 a.m.

REPORTER:  Teri Genovese Mauro, RPR


- - -

_____

GENOVESE & RENO REPORTING SERVICE
414 N. Erie Street, Suite 100
Toledo, Ohio  43604
(419) 249-2705

# I N D E X

## DEPOSITION OF WENDY F. DAVIS

| Examination | Page |
|---|---|
| By Mr. Piersall | 4 |

- - -

**Defendant's Exhibits**

| | |
|---|---|
| A | 72 |
| B | 81 |
| C | 84 |
| D | 89 |
| E | 94 |
| F | 113 |
| G | 182 |
| H | 187 |
| I | 193 |
| J | 199 |
| K | 200 |
| L | 214 |
| M | 215 |
| N | 220 |
| O | 226 |
| P | 230 |
| Q | 231 |
| R | 232 |

```
    S                              233

    T                              239

    U                              242

    V                              247
```

- - -

## Objections

```
        By Mr. Abood               13

        By Ms. Sharkey             49

        By Ms. Sharkey             49

        By Mr. Abood               76

        By Mr. Abood               79

        By Mr. Abood               130

        By Mr. Abood               177
```

- - -

1    **APPEARANCES:**

2      **On behalf of the Plaintiff:**

3        **THE LAW OFFICE OF NORMAN A. ABOOD**
         136 N. Huron Street
4        Toledo, Ohio  43604  (419) 724-3701
         By:  **NORMAN A. ABOOD**
5        By:  **SUSAN K. SHARKEY**

6      **On behalf of the Defendant:**

7        **ZASHIN & RICH**
         17 South High Street, Suite 900
8        Columbus, Ohio 43215 (614) 224-4411
         By:  **DREW C. PIERSALL**

9
         **THE UNIVERSITY OF TOLEDO**
10       Senior Associate General Counsel
         University Hall, UH 3620, Main Campus
11       Toledo, Ohio  (419) 530-5393
         By:  **JANELLE M. SCHALLER**

12

13                        - - -

14                   **WENDY F. DAVIS,**

15   was by me first duly sworn, hereinafter certified,

16   testified and said as follows:

17                        - - -

18                    **EXAMINATION**

19   BY MR. PIERSALL:

20       Q    Good morning, Miss Davis.

21       A    Good morning.

22       Q    As you know, we met on Friday, my name is

23   Drew Piersall and I represent The University of

24   Toledo in a lawsuit that you filed against it.

25       A    Yes.

```
 1        Q    You've been deposed before, right?

 2        A    Yes.

 3        Q    How many times, approximately?

 4        A    Probably about three or four.

 5        Q    Can you remember which cases those

 6   involved?

 7        A    It would have been through The University

 8   of Toledo as the CHRO.  I don't recall the

 9   particular names.  It would have been in employment

10   cases.  I'm sorry.  I don't recall the specific

11   names.

12        Q    Were these actions that were filed in

13   court or were they administrative?  And by that,

14   meaning probably the Ohio Civil Rights Commission.

15        A    They -- I believe they were in

16   relationship to a lawsuit.

17        Q    Okay.

18        A    Yes.

19        Q    Do you remember the last time you gave a

20   depo, deposition?

21        A    It would have been -- it may have been in

22   2020.  Sometime in 2020.

23        Q    Was that the Krull matter?

24        A    That was one.

25        Q    Okay.
```

1        A    Yes.  Thank you.  And then there was --

2    I believe the name was Joanna Tyson.  And then there

3    was -- there was another employee, and I believe

4    they were a management employee.  Same type of

5    action.

6        Q    For those three individuals you just

7    identified, two by name, were you the appointing

8    authority that signed off on their termination

9    paperwork?

10       A    Yes.

11       Q    Let's briefly go over the ground rules.

12   As you've seen from the last few days, a verbal

13   response is required so that Teri can take your

14   testimony down thoroughly and accurately.  No nods

15   of the head or uh-huhs or huh-uhs, please.  I will

16   do this as well.

17            I will try not to talk over you as you

18   give your answer.  I'll do my best to wait until you

19   fully responded to my question before I begin my

20   next question.  And if you would, many times we know

21   where someone is going with a question, but, again,

22   for Teri's sake, please wait until I fully complete

23   my question before you begin your response.

24            If you do not understand my question,

25   please ask me to rephrase it; otherwise, we will

1   assume that you fully understood the question I

2   asked once you begin to give your answer.

3          If you need a break at any point in time,

4   just let me know and we'll take a break.  But as

5   you've heard before, the only caveat is if there's a

6   question pending on the table.  Does that sound

7   fair?

8          A    Yes.  I understand.

9          Q    Thank you.  I know you've testified in a

10  deposition before.  Have you testified in court?

11         A    No.

12         Q    Have you testified before the Ohio Civil

13  Rights Commission?

14         A    Yes.

15         Q    At an administrative hearing?

16         A    Yes.

17         Q    Who was that involving?

18         A    This was through my work at Lucas County

19  Children's Services.

20         Q    What was your position there at Lucas

21  County Children's Services?

22         A    I was director of human resources.

23         Q    Do you remember the individual's name that

24  brought the action?

25         A    I believe it was Rebecca Battles.

1      Q     And that was an Ohio Civil Rights
2    Commission hearing?
3      A     Yes.
4      Q     And it was presided over by the
5    administrative law judge to the best of your memory?
6      A     At that point, as I recall, that was at
7    the Ohio Civil Rights Commission, so it may not have
8    been a formalized hearing, but it was -- it was --
9    it probably was not a formalized hearing as I think
10   about it now.  It was more of a mediation.
11          But I was in a formalized hearing through
12   the State Personnel Board of Review for Robin Stone
13   case.  And that was sometime in 2020 -- may have
14   been 2021.
15     Q     And you say Robin Stone or Stones?
16     A     Stone, S-T-O-N-E.
17     Q     And what was the nature of the action that
18   was filed by Miss Stone at the State Personnel Board
19   of Review?
20     A     It was employment-related termination.
21     Q     I take it she was a classified employee?
22     A     I believe -- I believe, yes.  Sorry.
23     Q     Do you recall the outcome of that hearing?
24     A     No, I don't.
25     Q     Other than Miss Stone's case, have you

1   testified in other matters before the State

2   Personnel Board of Review?

3       A     Not that I recall.

4       Q     And have you ever testified before the

5   State Employment Relations Board?

6       A     No.

7       Q     And I know you are -- you said you have

8   testified in an Ohio Civil Rights Commission hearing

9   but you recall it may have been a mediation.  Did

10  you -- my question to you is do you recall ever

11  testifying in an Ohio Civil Rights Commission

12  hearing?

13      A     No, I don't.

14      Q     Did you testify in Matthew Krull's

15  administrative hearing?

16      A     I did not testify.  I was deposed in that

17  matter.

18      Q     Are you aware that there was a hearing

19  before the civil rights commission in that matter?

20      A     No, I'm not aware of that.

21      Q     Were you aware that there was a finding

22  entered by the Ohio Civil Rights Commission in

23  Mr. Krull's favor?

24      A     I recall reading something in the

25  newspaper.

```
 1          Q      Okay.

 2          A      Yes.

 3          Q      That was the only method of communication?

 4          A      Yes.

 5          Q      I'll be asking you a series of questions

 6    today and you'll need to answer those questions

 7    fully and completely to the best of your ability.

 8    Do you understand that?

 9          A      I understand.

10          Q      Are you presently under the influence of

11    any drug, substance that would make it difficult for

12    you to recall information from the past or to

13    testify truthfully and accurately?

14          A      No.

15          Q      And you do understand that you're under

16    oath and you're sworn to tell the truth and that the

17    criminal laws of perjury apply to your testimony

18    here today?

19          A      Yes.

20          Q      Have you ever served as a witness for

21    anyone who's filed a lawsuit?

22          A      No.

23          Q      And I presume you're aware that Mr. Wynn

24    has filed a federal lawsuit against the university?

25          A      Yes.
```

1          Q     And the same with Miss Kovacs?

2          A     Yes.

3          Q     To your knowledge, have you been

4    identified as a witness in either one of those

5    cases?

6          A     No.

7          Q     Other than this matter, have you sued

8    anyone before -- I should say anyone or any entity?

9          A     No.

10         Q     Have you been sued before?

11         A     No.

12         Q     Have you ever been sued in your individual

13   capacity in your various roles as a director of

14   human resources or similar titles?

15         A     I'm going to answer that probably.

16         Q     Okay.

17         A     Yes.

18         Q     Do you remember which matters, matter or

19   matters?

20         A     It may have been through the Joanna Tyson

21   case.  I recall while I was at The University of

22   Toledo receiving notification, you know, of a

23   potential lawsuit, and I was personally named in

24   that lawsuit.

25         Q     What was the outcome of that lawsuit, the

```
 1   Tyson lawsuit?

 2        A    I don't have any idea.

 3        Q    How long did you serve as an appointing

 4   authority for The University of Toledo?

 5        A    I started the position in November of

 6   2016, so it would have been from November 2016

 7   through the time of my notice.

 8        Q    And you received the notice in September

 9   of 2020, correct?

10        A    That's correct.

11        Q    And it was effective in December of 2020,

12   correct?

13        A    That's correct.

14        Q    To your knowledge, how many individuals --

15   well, let's back up a second.  Approximately how

16   many employees did you terminate during that roughly

17   four-year time period?

18        A    Me personally or -- can you clarify what

19   you mean by that --

20        Q    Sure.

21        A    -- please?

22        Q    Sure.  As appointing authority, you're

23   responsible for signing off on employment-related

24   actions on behalf of the university?

25        A    Yes.
```

```
 1        Q    And in that capacity as appointing

 2   authority, I presume you signed off on the

 3   termination of individuals' employment?

 4        A    Yes.

 5        Q    Approximately how many individuals did you

 6   terminate?

 7        A    Spanning the four- or five-year period?

 8        Q    Correct.

 9        A    I'm going to guess.

10             MR. ABOOD:  Objection.  You're not

11             required to guess.  If you know, answer.

12             THE WITNESS:  Okay.

13        Q    Well, I asked you for an approximation, so

14   give me an approximation, please.

15        A    Approximately 40.

16        Q    To your knowledge, how many of those

17   individuals challenged their termination?  And by

18   that, I mean filed a charge with the Ohio Civil

19   Rights Commission, filed a lawsuit, filed an appeal

20   to the State Personnel Board of Review.

21        A    Approximate answer is 20.

22        Q    Were you responsible for terminating

23   bargaining unit employees?

24        A    As an appointing authority, I would sign

25   off on those actions as well.
```

1    Q    Have you ever testified in an arbitration

2 appeal of an individual's employment termination, a

3 bargaining unit employee?

4    A    In another -- I mean, excuse me.  In

5 another position.  I don't believe while I was at

6 The University of Toledo.

7    Q    So to the best of your memory, you did not

8 testify at an arbitration proceeding in your

9 capacity as appointing authority for The University

10 of Toledo?

11    A    As best I can recollect, no.

12    Q    Approximately how many individuals

13 challenged their employment separation through the

14 State Personnel Board of Review of the approximately

15 40?

16    A    As far as I can recollect, it was very

17 few.  I would estimate maybe five.

18    Q    Through the State Personnel Board of

19 Review process, were any of those individuals

20 restored to their employment?

21    A    I don't recall.

22    Q    Of the approximately 40 individuals you

23 terminated in your capacity as appointing authority

24 for the university, how many individuals filed

25 charges of discrimination with the civil rights

```
 1    commission and/or Equal Employment Opportunity

 2    Commission?

 3         A    As best as -- an estimation, 10.  May I

 4    get a water?

 5         Q    Of course.

 6         A    Thank you.

 7         Q    Did you provide any affidavits or

 8    declarations in response to these approximately 10

 9    charges that were filed with either commission?

10         A    I don't recall.

11         Q    We talked earlier about Matthew Krull, and

12    you read in the newspaper -- I presume?

13         A    Yes.

14         Q    -- that he was reinstated to his position?

15         A    I don't recall exactly what I read.  I

16    remember reading about the case, just -- but don't

17    remember the particular -- the particulars about the

18    case, only that he received a back pay settlement is

19    what I remember.

20         Q    To your knowledge, the individuals you

21    terminated in your capacity as appointing authority

22    for the university, were any of those individuals

23    reinstated to their employment either through a

24    court or the administrative body?

25         A    I don't recall or recall how many.
```

```
 1        Q    Do you recall anyone is my -- at all?

 2        A    I don't recall anyone in particular.

 3        Q    Of those individuals that you terminated

 4   in your capacity as appointing authority for the

 5   university, were there any settlements with those

 6   individuals?

 7        A    I don't recall.  Often HR was not a part

 8   of the settlement.  That would have been a legal

 9   department.

10        Q    So you're not aware of any settlements?

11        A    No, I'm not aware.

12        Q    What is your race?

13        A    African American.

14        Q    What's your date of birth?

15        A    8/23/1966.

16        Q    Where were you born?

17        A    Columbus, Ohio.

18        Q    Describe your educational background for

19   me.

20        A    I have a bachelor's degree in human

21   resources and business management from Franklin

22   University.  I have a master's degree in criminal

23   justice from Tiffin University.  I have two senior

24   HR certifications, one from the Society of Human

25   Resources and one from the Human Resources
```

1    Certification Institute.

2              I am currently working on a PhD in

3    industrial and organizational psychology, and that's

4    through Liberty University.

5              And I also have a master's certification

6    in human resources from Eastern Michigan.

7         Q    Is there a difference between a master's

8    certification and a master's degree?

9         A    Yes.

10        Q    Could you explain that to me, please.

11        A    Yes.  The degree was through a four-year

12   university.  The certification is really more of a

13   certificate, so it's a series of classes, four or

14   five classes that you would take at a master's

15   level.

16        Q    And when did you obtain that master's

17   certification from Eastern Michigan?

18        A    My best recollection is 2013.

19        Q    Were those courses in person?

20        A    A few of them were, and some online.

21        Q    A hybrid model?

22        A    Yes.

23        Q    And your PhD that you're working on -- and

24   it's in industrial and organizational psychology?

25        A    Yes.

```
 1        Q    -- when did you begin working on that?

 2        A    I started working on that degree in August

 3   of 2020.

 4        Q    Did you take some coursework towards that

 5   at Bowling Green?

 6        A    Yes, I did.

 7        Q    How many courses did you complete at

 8   Bowling Green towards that degree?

 9        A    I completed five courses at Bowling Green.

10        Q    And then is it a transfer?  Did you

11   transfer to Liberty?

12        A    Yes.  I transferred to Liberty in -- my

13   best estimate is January of 2021, the first

14   semester.  And three classes transferred from

15   Bowling Green.

16        Q    Liberty, is that online or is that in

17   person?

18        A    It's online.

19        Q    Are you a full-time student or part-time

20   student?

21        A    I'm considered a full-time student.

22        Q    How many credit hours are you presently

23   taking?

24        A    Three.

25        Q    How far into your degree are you?  How
```

```
 1   much progress have you made?

 2        A    Thankfully I am considered as all but

 3   dissertation.  I've completed all the required

 4   coursework and am currently working on my prospectus

 5   which is the proposal development for the

 6   dissertation.

 7        Q    Do you have an anticipated date for

 8   presenting your dissertation?

 9        A    Hopefully December of 2023.

10        Q    The bachelor's from Franklin, when did you

11   obtain that?

12        A    I believe that was in 1995.  That's an

13   estimate.

14        Q    And that's Franklin in Columbus, I

15   presume?

16        A    Yes.

17        Q    Was that in person?

18        A    Yes.

19        Q    And the master's in criminal justice from

20   Tiffin, when was that obtained?

21        A    That was obtained, I believe, in 2001.

22        Q    Was that in person?

23        A    Yes.

24        Q    The two certifications in HR that you

25   mentioned, I didn't get their names.  Could you
```

```
 1    provide those to me again, please.

 2         A    Yes, it's a SHRM, SHRM/SCP, which is

 3    Society of Human Resources Management and senior

 4    certification -- certified professional.  That's

 5    through the Society of Human Resources.

 6         Q    And when did you obtain that?

 7         A    You have to recertify every three years,

 8    so the first time I obtained that was, I believe, in

 9    2007.

10         Q    What did you have to do in order to obtain

11    that certification in 2007?

12         A    You have to take a rigorous

13    three-to-four-hour examination through that

14    organization.  At that time, 'cause it was old, it

15    was paper and pencil the first time I took it.  And

16    that's how you become certified.  You receive a

17    specific score, that they are required, and that's

18    how you become certified.

19         Q    And is there -- are there any courses you

20    have to take in addition to this exam?

21         A    It's based on your experience in the human

22    resources field.  They have a set of requirements

23    that they require you to have so much experience,

24    and your experience really speaks for your knowledge

25    in HR.  So there are no required courses through
```

```
 1    them that you have to take.

 2         Q    Did you take any courses though?

 3         A    Well, I -- when I had taken that, I had a

 4    bachelor's degree from Franklin in human resources,

 5    so I did not take any courses that I can recall

 6    other than that.

 7         Q    Other than through the undergraduate

 8    program?

 9         A    Yes.

10         Q    The recertification process was every

11    three years?

12         A    Yes.

13         Q    Did you recertify every three years?

14         A    Every three years, yes.

15         Q    Describe the recertification process to

16    me.

17         A    You are required to have 30 hours of human

18    resources-related type -- you know, type things, and

19    that could be -- it could be a college course.  It

20    could be a training.  It could be lived experiences

21    such as if I were to not have a specific credential

22    or experience in something HR related, I could use

23    that as a certification credit.  But it is 30 hours

24    that you have to have.

25         Q    When's the last time you recertified in
```

 1    that?

 2         A    I -- let's see.  This is 2023.  I believe

 3    I recertified my SHRM certification in -- oh, boy,

 4    I believe in 2021, and I believe my human resource

 5    or HRCI certification is due at the end of this year

 6    to be recertified.

 7         Q    And you may have told me this, but what

 8    does HRCI stand for?

 9         A    That's the Human Resources Certified

10    Institute.

11         Q    And when did you first obtain that

12    certification?

13         A    Let me clarify.  That certification was

14    the one I received in 2007, and the SHRM

15    certification was -- it was new for SHRM to issue

16    it, so I was one of the first people to get their

17    certification.  It was then, I think, 2015.

18         Q    Let's take a step back then.  So the HRCI

19    certification was issued in 2007, right?

20         A    Yes.

21         Q    Does that have a three-year

22    recertification process?

23         A    Yes, it does.

24         Q    Okay.  So to short circuit this, what you

25    described for me before, was that the HRCI?

```
 1        A     That's the same thing, yes.

 2        Q     Okay.

 3        A     Sorry.

 4        Q     What's the recertification process for the

 5   SHRM?

 6        A     It's very similar.  There is -- I believe

 7   it's the same required number of hours that you have

 8   to have, and I said 30, but it's really 60 hours

 9   that you have to have every three years.  So they

10   give you over a three-year period to gain those 60

11   hours, and it's done the same way.  It's by a course

12   you might take, a training, a new HR experience, or,

13   you know, something like that.  They would take

14   those credits.

15        Q     Either certification, did either one lapse

16   at any point in time?

17        A     No.

18        Q     They're still active as we sit here today?

19        A     Yes.

20        Q     And I'm getting a little confused because

21   of the mix-up, but when is the last time you

22   recertified -- let's just -- when is the last time

23   you recertified in both?

24        A     I believe my SHRM was the one that I just

25   recertified in 2021, and my HRCI certification is
```

 1   due at the end of this year, and that's an estimate

 2   'cause I'm not real sure between the two, but

 3   thankfully I get notified by each one of them.

 4       Q    At any point in time since your separation

 5   from the university, did you go without medical

 6   insurance?

 7       A    It might have been just a short period of

 8   time, and what I mean by -- described as a short

 9   period of time, maybe a month or so.

10       Q    And did you transition to your husband's

11   medical insurance?

12       A    I did.

13       Q    Same question for dental; same answer?

14       A    Yes.

15       Q    Same question for vision?

16       A    Yes.

17       Q    Same answer, I presume?

18       A    Yes.

19       Q    Have you held any positions -- let me

20   strike that.

21            Have you been employed since your

22   termination from University of Toledo?

23       A    No.

24       Q    Have you earned any wages in any capacity

25   since your separation from the university?

```
 1       A     No.

 2       Q     Have you withdrawn any monies from any

 3   retirement accounts?

 4       A     May I go back to your first question about

 5   that?

 6       Q     Certainly.  Sure.

 7       A     I have earned wages.  I don't know if you

 8   would construe this as wages.  I filed unemployment

 9   shortly after -- after my exit from the university,

10   so I don't know if you would classify those as

11   wages.  I wouldn't but --

12       Q     And did the university challenge your

13   application for unemployment?

14       A     No.

15       Q     Did you receive the full amount?

16       A     Yes.

17       Q     And that's over a six-month time period,

18   I believe?

19       A     That sounds about right.

20       Q     How many jobs would you say you applied to

21   since your separation at the university?

22       A     An estimate would be about 60 or 65.

23       Q     And do you keep a log of those jobs?

24       A     Yes.

25       Q     Are they human resources-related positions
```

1    or are you searching outside of that area?

2        A    Mostly human resources-related position.

3        Q    Are you conducting a local regional

4    search, or is it nationwide?

5        A    I usually use indeed.com which is a

6    national housing for jobs nationwide as well as

7    usjobs.com.

8        Q    You said mostly are HR related, but what

9    positions have you applied for in the non-HR sphere?

10       A    I don't recall, so I would say that all of

11   them have been human resources.

12       Q    Have you received any offers of

13   employment?

14       A    No.

15       Q    Have you been interviewed for any jobs?

16       A    Yes.

17       Q    How many?

18       A    An estimate would be four.

19       Q    Do you remember any names?

20       A    Yes.  I was -- had a one-on-one interview

21   with the vice president of human resources with

22   Mercy Health Partners, and the position was director

23   of human resources strategy, something to that

24   effect.  I actually had two interviews with them.

25   They had a similar position that was -- one was for

1    their Toledo market and one was for their national

2    market, and it was a remote position, so I had two

3    with them.

4        Q    Two interviews for two different jobs?

5        A    Yes.  Yes.

6        Q    Other interviews that you can recall?

7        A    I'm sorry, but I'm drawing a blank on

8    those other ones.

9        Q    What -- why did you not receive the Mercy

10   Health position?  What did they tell you?

11       A    Well, we were in really deep discussions,

12   you know, with them.  I also had received a text

13   message from Dan Barbee who used to work for

14   The University of Toledo who now works for Mercy

15   Health Partners who indicated the VP of HR had

16   talked with him and he gave me a five-star-rating

17   review, which that was unsolicited by me.  It was

18   actually a shock that I got a text from him.  And

19   the very next day, discussions ceased with them.

20       Q    Were these discussions related to either

21   position or both?

22       A    It was related to the one in the Toledo

23   market.

24       Q    Did anyone at Mercy give you an

25   explanation as to why those discussions ceased?

1      A    I reached out to the recruiter and I

2   reached out also to the VP of HR.  Till this day I

3   have not heard from either one of them.  And what I

4   recall is an article coming out in The Blade about

5   my employment with The University of Toledo around

6   that same time.

7      Q    Approximate time frame?

8      A    It was -- when -- I'm sorry?

9      Q    When did the article come out which sounds

10  like it was around the same time that the

11  discussions ceased?

12     A    Yes.  It was -- I can't tell you the

13  particular date when it was, but I, you know,

14  actually had probably two interviews with the VP of

15  HR and then the article came out the next day.

16     Q    And I'm just looking for --

17     A    Yes.

18     Q    -- was it this year?  Was it --

19     A    That was in -- this is 2023.  It was not.

20  It was in -- I'm going to say 2022 or 20 -- late in

21  2021.

22     Q    The article in The Toledo Blade you're

23  referencing, what was the nature of that newspaper

24  article?

25     A    It just -- if I can remember, it discussed

1    that my employment had ended with The University of

2    Toledo, that the Ohio Civil Rights was involved and

3    investigated it, and then the university's comments

4    related to my performance.

5         Q    Who commented on behalf of the university?

6         A    I believe -- I believe it was a

7    communication person, Megan Cunningham.  I believe

8    she was the person that commented.

9         Q    At that point in time, had the Ohio Civil

10   Rights Commission rendered their decision on your

11   charge?

12        A    Yes.

13        Q    And that decision was referenced in the

14   article?

15        A    Yes.

16        Q    Did it reference any other employees that

17   had been terminated from the university or was it

18   just about you?

19        A    I believe I was the only named employee.

20        Q    Did The Blade reach out to you for

21   comment?

22        A    No.

23        Q    At any point in time has any media outlet

24   reached out to you for comment regarding your

25   separation from the university?

```
 1      A    No.

 2      Q    Other than that article that appeared in

 3  The Blade in late 2021 or early 2022, to your

 4  knowledge, have any other articles been released in

 5  a news medium?

 6      A    I have not seen any, and I'm not aware of

 7  any.

 8      Q    Did you reach out to The Blade once you

 9  saw that article appear in the paper?

10      A    No.

11      Q    And you previously worked for the

12  university or the medical center, perhaps?

13      A    Yes.

14      Q    When did you work for the medical center?

15      A    Oh, I relocated to Toledo in 1998.  The

16  then Medical College of Ohio was what it was called.

17  I -- it was my first job in Toledo.

18      Q    And how long did you work for the Medical

19  College of Ohio?

20      A    I believe just a little under three years.

21      Q    So that takes us to approximately 2001?

22      A    Yes.

23      Q    And what was your title at Medical College

24  of Ohio?

25      A    I believe it was labor relations
```

 1   specialist.

 2         Q    Who did you report to?

 3         A    John Starcher.

 4         Q    Were you promoted at any point in time in

 5   those three years?

 6         A    No.

 7         Q    After Medical College of Ohio, where did

 8   you go?

 9         A    I went to the Toledo Correctional

10   Facility, I believe.

11         Q    Through the Department of Rehabilitation

12   and Corrections?

13         A    That's correct.

14         Q    Why did you leave MCO to go to DRC?

15         A    I had previously worked for the State over

16   20 years in Columbus and I was familiar with DRC,

17   and they were opening the new prison, and I heard

18   about the opportunity that they were looking for a

19   labor relations manager.

20         Q    What was your first human

21   resources-related position?

22         A    My first human resources-related position

23   was through the Ohio Department of Transportation.

24   I worked in the office of equal opportunity, and

25   I believe that position was administrative

1    assistant.

2         Q    How long did you work for ODOT?

3         A    12 years.

4         Q    Can you give me roughly the years?

5         A    Yes.  I -- I remember distinctly because I

6    graduated high school June 2nd, 1984, and started

7    with ODOT in July 2nd of 1984 and worked there 12

8    years and then moved to the next position for --

9    through the Ohio Department of Administrative

10   Services, Office of Collective Bargaining.

11        Q    So you worked for ODOT from 1984 till

12   1996?

13        A    That sounds about right.

14        Q    And then you worked at DAS from 1996 to

15   1998?

16        A    That's correct.

17        Q    And you told me that you worked as an

18   administrative assistant in the office of equal

19   opportunity at ODOT?

20        A    Yes.

21        Q    How far into your tenure did you work in

22   that position?

23        A    There were -- there were a myriad

24   positions at ODOT.  That is not the first one that I

25   went into.  That was probably one of maybe three or

 1   four while I was at ODOT.  I'm trying to -- I'm

 2   sorry, did you ask me the dates?

 3        Q    Just an approximate.  How far into your

 4   tenure at ODOT did you start working in the office

 5   of equal opportunity?

 6        A    I had probably been at ODOT maybe eight or

 7   nine years before going to that department.

 8        Q    Were you interested in working in a human

 9   resources capacity?

10        A    Yes.

11        Q    I assume you were pursuing education to

12   that end?

13        A    Yes.

14        Q    Did you work at any other human resources

15   capacities at ODOT?

16        A    As best I can remember, it seems like

17   there was one more in their labor area.  Back then,

18   HR had separate areas.  So you had your HR, but then

19   you had labor relations over here, and you would

20   have EEO in another department.  So I recall -- my

21   mind is not -- can't go back that far, but working

22   in the labor relations area of ODOT and also the EEO

23   area of ODOT.

24        Q    Let's do this:  Did you ever work in a

25   supervisory capacity at ODOT?

```
 1        A    I don't recall, but I do not think so.
 2        Q    And then you began working at DAS, and you
 3   may have told me your position, but what was it?
 4        A    I worked for the Office of Collective
 5   Bargaining.  They're the chief negotiators for the
 6   State of Ohio, and I was a labor relations -- I'm
 7   going to say a labor relations specialist.
 8        Q    Was that considered a supervisory
 9   position?
10        A    No.
11        Q    Did you supervise any employees?
12        A    No.
13        Q    Did you supervise any employees at ODOT?
14        A    Not that I recall.
15        Q    What were your job duties as a labor
16   relations specialist at DAS?
17        A    I was basically the liaison between the
18   Office of Collective Bargaining for assigned
19   agencies.  So State of Ohio has 66 agencies, and
20   they have labor relations specialists who worked for
21   OCB, which is the Office of Collective Bargaining,
22   and I was assigned probably six or seven agencies
23   that I was the liaison to.
24             So part of my role was to assist them in
25   grievance handling, arbitrations, settlement
```

 1   agreements, things of that nature.

 2        Q    Did you have any background or experience

 3   in labor prior to that position with DAS?

 4        A    I believe I had worked in the ODOT's labor

 5   department, but I think it was an administrative

 6   job.  It might have been like a secretary or

 7   something.  So no.

 8        Q    And why did you relocate to Toledo from

 9   Columbus in 1998?

10        A    I married my husband who was born and

11   raised here.

12        Q    And in the three years you worked for MCO,

13   do you believe you experienced any racial

14   discrimination?

15        A    I'm sorry.  Can you repeat that?

16        Q    Sure.  The three years you worked at MCO,

17   from 1998 to 2001, do you feel as though you

18   experienced any racial discrimination?

19        A    Yes.

20        Q    Describe.

21        A    There were -- at that time I worked in the

22   human resources department.  I felt that my salary

23   was not comprehensive to my background, and I felt

24   at that time that Caucasian similarly-situated

25   employees were paid higher salaries.

```
 1        Q    And you said -- you testified you reported
 2   to John Starcher?
 3        A    Yes, while at -- I had two supervisors
 4   when I was there.  John Starcher left, and
 5   I believe -- gosh, he used to work for UT.  His name
 6   is Bill -- Bill Logie.  Sorry.  L-O-G-I-E.
 7        Q    I know Bill.
 8        A    Okay.  Sorry.  Ooh, I can't remember.
 9        Q    Did you ever -- let's strike that.
10             Who was the CHRO at that time?
11        A    For Medical College of Ohio?  I believe it
12   was Bill Logie.  Prior to that, it was another man,
13   but I could see his face but I can't think of his
14   name.
15        Q    Did you report any of your concerns
16   regarding race discrimination?
17        A    No.
18        Q    Did you tell anyone at the university
19   about your concerns regarding race discrimination?
20   I should say at the Medical College or university.
21        A    I don't recall if I did.  I ended up
22   leaving because I was offered a -- you know, a more
23   progressive opportunity, I would say, or a
24   higher-level opportunity so I left.
25        Q    Did you ever ask for an increase in
```

```
 1    compensation?

 2         A    Yes.

 3         Q    To whom?

 4         A    I believe it was John Starcher and Bill

 5    Logie, both.

 6         Q    Were they receptive to your request?

 7         A    Yes, they were.  But at the time I believe

 8    it was something related to, you know, we'll work on

 9    getting you that.  That never happened.

10         Q    And who at MCO do you believe possessed

11    this racial animus?  Was it Mr. Starcher or

12    Mr. Logie?

13         A    Neither one.

14         Q    Do you believe anyone possessed any racial

15    animus towards you when you worked at MCO from 1998

16    to 2001?

17         A    I -- yes.

18         Q    Who?

19         A    It was the previous supervisor that I had

20    before John and Bill, and I believe his name was

21    Greg, first name.  Sorry.  I do not have a last

22    name.

23         Q    All right.  Let's back up then.

24         A    Okay.

25         Q    So when you started working at MCO in
```

```
 1    1998, you initially reported to someone named Greg?

 2        A    Well, he was the CHRO.

 3        Q    Okay.

 4        A    John reported to him.  John Starcher

 5    reported to him, and I reported to John Starcher.

 6        Q    Understood.  So there was a layer in

 7    between you and the CHRO?

 8        A    Yes.

 9        Q    All right.  And explain to me why you

10    believe Greg possessed racial animus towards you?

11        A    I don't know that I would characterize it

12    as animus.  I think he was just unwilling to pay me

13    more money.  I mean, animus sort of sounds like --

14    you know, I don't know.

15        Q    Did you ever make any requests to Greg

16    directly for increased compensation?

17        A    No.  I utilized the chain of command.

18        Q    When you asked for a raise -- and it

19    sounds like those conversations were with Starcher

20    and then with Logie; is that correct?

21        A    Yes.

22        Q    Did you have any conversations regarding a

23    raise with anyone else other than those two

24    individuals?

25        A    Not that I recall.
```

```
 1        Q    All right.  Did you share with them that
 2   you felt that you were not paid equally in
 3   comparison to Caucasian employees?
 4        A    Yes.
 5        Q    You told those individuals that?
 6        A    I told John and Bill.  And largely because
 7   Bill added more work to my plate.
 8        Q    Do you know what, if anything, they did
 9   with that information that you shared with them?
10        A    No, I don't.
11        Q    Do you know if they contacted the EEO
12   office?
13        A    No, I don't.
14        Q    Did they ever share with you that they
15   took that information you shared and disseminated it
16   to anyone?
17        A    They said that they would, but I don't
18   know if they did.
19        Q    Did they tell you who they would share
20   that with?
21        A    It would have been John talking to Greg.
22        Q    And I take it you never had a conversation
23   with Greg --
24        A    No.
25        Q    -- regarding raises, pay in comparison to
```

 1   Caucasians, anything along those lines?

 2        A    That's correct.

 3        Q    Correct in there were no conversations?

 4        A    Right.

 5        Q    How long did you work for DRC?

 6        A    I worked for them, it may have been a

 7   little under three years or three years.

 8        Q    Did you receive any promotions at DRC?

 9        A    No promotions.  Job change, but no

10   promotion.

11        Q    What was the change?

12        A    I went in as the labor relations head

13   manager.  I believe that was the title.

14        Q    Labor relations officer?

15        A    Something like that.

16        Q    That's what DRC uses.

17        A    Right.  You know them well.

18        Q    I do.

19        A    They -- our then human resource or

20   personnel -- 'cause the State of Ohio uses old

21   terms -- personnel officer was leaving and retiring,

22   and I asked if I could move over to that position

23   because I wanted to work in more of a generalist

24   capacity.

25        Q    Okay.  That wasn't a promotion?

```
 1      A    No.  It was -- it was the same pay grade.

 2      Q    Sort of a lateral move?

 3      A    Yes, it was a lateral.

 4      Q    And who did you report to at DRC?

 5      A    Warden Khelleh Konteh.

 6      Q    And then --

 7           MR. ABOOD:  I'm sorry.  Could you say

 8           that again?

 9           THE WITNESS:  Khelleh Konteh,

10           K-H-E-L-L-E-H, Konteh, K-O-N-T-E-H.  He

11           was the warden.

12      Q    Where did you work after DRC?

13      A    I went to Lucas County Children's

14  Services.

15      Q    That's approximately 2004?

16      A    Yes.  Yes, that sounds about right.

17  Sorry.

18      Q    How long did you work there?

19      A    11 years.

20      Q    Describe your positions.

21      A    I was only in one position there.  I was

22  hired in as director of human resources.  I had full

23  scope of oversight of the entire HR -- excuse me,

24  human resource function.  I reported directly to the

25  executive director, Dean Sparks.  And the full scope
```

```
 1    included benefits, labor relations, employee

 2    relations, compensation.  And then at that point I

 3    also ran and had oversight over the regional

 4    training center.  And the regional training center

 5    is an entity that -- there are different regions

 6    throughout the state, so Lucas County happened to

 7    be -- hold the region over the training center, and

 8    it was really basically where we trained foster

 9    parents and we also trained employees, mainly case

10    workers.

11        Q    I assume that was considered a supervisory

12    position?

13        A    Yes.

14        Q    Was the positions -- either position you

15    held at DRC, was that considered a supervisory

16    position?

17        A    Yes.

18        Q    Did you supervise individuals?

19        A    Yes, I did.

20        Q    How many subordinates did you have at DRC?

21        A    In the labor capacity, I believe there

22    were two.  And then when I moved over to the

23    personnel side, there was probably three.

24        Q    So I'm clear, was your -- the labor

25    position -- which is the first position you held at
```

1    DRC, right?

2         A    Yes.

3         Q    -- was that the first human

4    resources-related position that you've held in your

5    career that was considered supervisory?

6         A    I believe so.  I believe so.  Because I

7    moved from -- yes.  I'll say yes.

8         Q    Yes.  Okay.  How many employees were in

9    human resources -- in the human resources department

10   when you worked at Lucas County Children's Services?

11        A    Five.

12        Q    Okay.

13        A    I believe there were five.

14        Q    Were all five direct reports?

15        A    Yes.

16        Q    And did those five have responsibilities

17   for certain silos or divisions?

18        A    I'm sorry.  Let me clarify that.  They

19   were not all direct reports.  I had three direct

20   reports.  It would have been a human resource

21   manager, my secretary, and then the payroll manager.

22        Q    And then the other two reported to --

23        A    The other -- so there was probably six, so

24   the HR manager had maybe two or three reporting to

25   her, and then the payroll manager had one.

```
 1        Q    I'm sure it varied over the 11 years, but
 2   approximately how many employees were employed by
 3   Lucas County Children's Services?
 4        A    I will say at that time there were
 5   probably between two and four hundred.
 6        Q    And you left Lucas County Children's
 7   Services, so that brings us to about 2015?
 8        A    Exactly.
 9        Q    All right.  And you came to UT at that
10   point?
11        A    I did.
12        Q    Why did you leave Lucas County Children's
13   Services to come to The University of Toledo in
14   2015?
15        A    I actually had an opportunity for a
16   different role with The University of Toledo.  It
17   was a director of human resources, but it was
18   different in the sense it was academic and it was at
19   a university.  So I, you know, thought that would be
20   a different -- different type job.
21        Q    Did anyone recruit you for that position?
22        A    I remember meeting at an event that I was
23   invited to on campus.  It was a Martin Luther King
24   event, and I recall meeting Jovita Thomas-Williams,
25   who was the VP of HR, newly hired.  And the only
```

 1    thing she said to me was we need to talk when I met

 2    her.  I was introduced by someone who knew us both.

 3         Q    And she was the VP of HR.  Was she the

 4    CHRO?

 5         A    Yes, I believe that was her title.

 6         Q    And what was the position that you were

 7    hired into in 2015 at UT?

 8         A    It's a very long title.  Director of human

 9    resources for academic administration and student

10    services, I believe.

11         Q    Was this a promotion from the position you

12    held at Lucas County?

13         A    In terms of pay, yes, and I would say

14    responsibility, too.

15         Q    How much did you earn when you began

16    working for UT in 2015?

17         A    I believe it was in the 90s, maybe 90 or

18    91,000.

19         Q    The position you just gave to me, was that

20    position advertised?

21         A    I believe it was.

22         Q    Was it posted?

23         A    Yes.

24         Q    Jumping back, you said Jovita

25    Thomas-Williams said you guys should talk?

```
 1        A    Right.

 2        Q    Did you talk?

 3        A    No.

 4        Q    Okay.

 5        A    Yeah.

 6        Q    Do you recall who interviewed you?

 7        A    I believe it was through a search

 8   committee, and as best I can remember, on the search

 9   committee, I believe it was Nate Walker; Terrie

10   Kovacs might have been on that committee; I believe

11   Janelle might have been on that committee if I can

12   remember.  I'm not sure.

13        Q    And who did you report to?

14        A    I reported to Jovita.

15        Q    And did Jovita report directly to the

16   president?

17        A    At that time, she did.

18        Q    Did that change?

19        A    Yes, it did.

20        Q    Describe.

21        A    I don't know the particulars, but she --

22   I believe when she was hired, she reported directly

23   to -- I believe it was internal president, Nagi.  I

24   can't remember his name.  That's what everyone

25   called him, N-A-G-I.  And I believe at that time he
```

 1  was interim president.  She reported directly to

 2  him.  And then I believe, I don't know what year,

 3  the university hired Dr. Sharon Gaber, and I believe

 4  Jovita was still -- if it's okay to refer to her by

 5  her first name.

 6       Q    I think that's fine.

 7       A    Okay.  -- still was reporting to her for,

 8  I don't know, months that I can recall.  And then it

 9  changed.  Her reporting changed to Larry Kelley who

10  was the chief financial officer.

11       Q    Do you know why that switch in reporting

12  was made?

13       A    No.

14       Q    Jovita did not share that with you?

15       A    No.

16       Q    And, I'm sorry, Larry was the CFO?

17       A    Yes, Larry Kelley.

18       Q    What's Jovita's race?

19       A    African American.

20       Q    What's Larry Kelley's race?

21       A    Caucasian.

22       Q    President Nagi?

23       A    Oh, I don't know for certain.  An estimate

24  is Indian.

25       Q    All right.  Gaber?

```
 1        A     Caucasian.

 2        Q     Postel?

 3        A     Caucasian.

 4        Q     Matt Schroeder is Caucasian, right?

 5        A     Yes.

 6              MS. SHARKEY:  I'm sorry.  What was

 7        that?

 8              MR. PIERSALL:  I said Matt Schroeder

 9        is Caucasian, right.  She said yeah.

10              MS. SHARKEY:  Thank you.

11        Q     From 2015 when you were hired until 2020,

12   did Matt Schroeder make any comments to you that you

13   found offensive on the basis of your race?

14        A     No.

15        Q     I strongly assume he did not use any

16   racial slurs in your presence?

17        A     No.

18        Q     Did anyone from -- when you worked at UT

19   from 2015 to 2020, did anyone at the university make

20   any comments that you found offensive on the basis

21   of your race?

22        A     On the basis of my race?

23        Q     Yes.

24        A     Not that I recall.

25        Q     Did anyone use any racial slurs in your
```

 1    presence; again, same time period, from 2015 to
 2    2020?
 3        A    Not that I recall.
 4        Q    Would you memorialize those anywhere?
 5             MS. SHARKEY:  Objection.  She just
 6             said she doesn't recall.
 7        Q    To the extent you -- if anyone makes any
 8    slurs or inappropriate comments, would you have
 9    memorialized those anywhere?
10             MS. SHARKEY:  Objection.
11             Speculation.  Go ahead and answer.
12        A    I likely would have pursued some action.
13        Q    I presume so.
14        A    Yeah.
15        Q    Did you pursue any actions from 2015 to
16    2020 while you worked at UT?
17        A    Yes.
18        Q    What did you pursue?
19        A    I filed an Ohio Civil Rights complaint in
20    September of 2020.
21        Q    And that was in response to receiving your
22    90-day notice?
23        A    Correct.
24        Q    All right.  But from 2015 to 2020 -- let
25    me be clear.  When you were hired in 2015 to

1    September 2020, did you pursue any actions against

2    the university?

3         A    No.

4         Q    Did you file any internal complaints?

5         A    No.

6         Q    You're not a lawyer, correct?

7         A    No.

8         Q    Do you have any legal training?

9         A    What would you characterize as legal

10   training?

11        Q    Yeah.  Did you ever take any courses at

12   the law school, pick up a course or two?

13        A    None at the law school.  I've been -- I've

14   received -- I've been to trainings where lawyers

15   were facilitators.

16        Q    Uh-huh.  I presume you're familiar with

17   the term protected activity?

18        A    Yes.

19        Q    What does that mean?

20        A    It means that activity that someone's

21   conducting in the course of their job that is

22   protected by law.

23        Q    And part of your case that you've brought

24   against the university relates to retaliation,

25   right?

```
 1        A    Yes.

 2        Q    Did Matt Schroeder make any comments to

 3   you that led you to the belief that he was

 4   retaliating against you?

 5        A    Can you repeat the question?

 6               (Whereupon, the court reporter read

 7               back the requested portion of the record.)

 8        A    The comments that I recall were made, they

 9   were not about me.  They were about someone and --

10   they were about someone else.  They were not about

11   me.

12        Q    What did he say?

13        A    In a meeting with him, we were discussing

14   one of my direct reports.  Her name is Carrie Herr.

15   Carrie was the director of continuous improvement --

16   sorry.  I might get the name wrong of the

17   department.  It's long.  And she was responsible for

18   internal and external training.

19               And our discussion was relative -- a

20   common -- the discussion was relative to whether we

21   wanted to continue to have that department reporting

22   up through HR versus the college of business.  And

23   he said to me -- before he said it, he asked Sabrina

24   Taylor, who was his direct report in finance, to

25   look in -- or to access Carrie Herr's records and
```

```
 1   determine how old Carrie was.

 2              And Sabrina came back with a written piece

 3   of paper with Carrie's age on it, and Matt said,

 4   see, Wendy, you don't have to worry about

 5   terminating her; she can retire; she's old enough.

 6        Q    Okay.  What about that comment led you to

 7   believe that Matt was retaliating?

 8        A    Well, in the end, I did not terminate

 9   Carrie, and I was subsequently terminated, so I felt

10   that that was behavior that led to -- partly led to

11   my termination.

12        Q    Did Matt ever make any comments to the

13   effect of or along the lines of I don't like it when

14   people file complaints regarding discrimination?

15        A    No.

16        Q    Did Matt ever indicate to you that he was

17   terminating you because of any complaints or

18   protected activity you may have engaged in?

19        A    Not specifically using those words, no.

20        Q    Generally?  I assume he wouldn't make

21   those types of comments, but I'm just --

22        A    Can you -- can you elaborate on the

23   question or maybe rephrase the question?  I'm not

24   sure I understand what you're asking.

25        Q    Sure.  Did Matt -- well, let's take a step
```

1    back then.

2         A    Okay.

3         Q    What protected activity did you engage in

4    when you worked at the university from 2015 to 2020?

5         A    Well, part of my role as the CHRO in

6    discussing potential terminations or discipline, my

7    role was to highlight reasons -- reasons for or

8    reasons why we would not move forward with any

9    disciplinary action or termination.

10             It wasn't my entire role, but I would

11   often sit in on those conversations.  So I believe

12   that that was part of protected activity and it was

13   really -- I believe it was protected activity.

14        Q    And that's my question.

15        A    Yes.

16        Q    What did you engage in that was protected?

17   Give me specifics.

18        A    Well, you know, I mentioned the one with

19   Carrie Herr.  Carolyn Chapman, there were

20   discussions with Matt about Carolyn, and part of the

21   discussion was, you know, her performance.  And

22   there was basically, you know, no performance issues

23   that -- well, I shouldn't say no.  I mean, when

24   there were, I addressed it with Carolyn, and

25   I believe that Matt wanted me to look at terminating

1   her.  So --

2        Q    Anyone else other than Herr and Chapman?

3        A    Not that I recall.

4        Q    So I want to be clear.  Did Matt tell you

5   that he wanted to discipline or terminate Chapman?

6        A    He referred -- he -- his comments to me

7   were I needed to look at her performance and -- I'm

8   not certain that he actually said terminate her, but

9   he said you need to understand whether she fits into

10  the position or something similar to that.

11       Q    Put me in that conversation.  What did you

12  say back to Matt?

13       A    What -- you know, we talked about what

14  some of the issues were.  So one issue that I can

15  recall was the CEO of the hospital felt that filling

16  vacancies and positions were not as expediently done

17  for them.

18            And what I was explaining to Matt was

19  that, you know, these are union contract positions

20  and often we could not even fill those positions.

21  We could not even post those positions externally

22  before we went through the internal process of

23  filling them.  So it appeared to make those

24  positions seemingly slow to fill.

25       Q    Were any -- let's -- were any of your

 1   discussions related to Chapman, the discussions you

 2   had with Matt, about looking at her performance, as

 3   I believe the words that Matt used to you, correct?

 4       A    Yes.

 5       Q    Were any discussions or the issues you

 6   identified to Matt, did those relate to race?

 7       A    Can you clarify that?  I mean, are you

 8   asking if there was -- what are you asking me?

 9       Q    You had conversations with Matt?

10       A    Yes.

11       Q    Matt came to you and said let's look at

12   Carolyn Chapman's performance, right?

13       A    Yes.

14       Q    Miss Chapman is African American, correct?

15       A    Yes.

16       Q    And you also testified you discussed some

17   issues with Matt related to his instruction to look

18   at her performance, right?

19       A    Yes.

20       Q    My question to you was when you say you

21   discussed some issues related to Carolyn Chapman

22   with Matt Schroeder, were any of those issues

23   related to race?

24       A    No.

25       Q    Were any of those issues related to any

1    protected characteristic?  And I assume you know

2    what those characteristics are.

3         A    No.

4         Q    No, you don't know or --

5         A    No, I know what that -- I know what you're

6    referring to.

7         Q    Yes.

8         A    No, those conversations were not related.

9         Q    Okay.  Carrie Herr.

10        A    Yes.

11        Q    When -- let's be specific.  What did Matt,

12   when he talked about Carrie Herr, did he ask you to

13   terminate her, or was it a similar conversation as

14   Chapman that her performance needs to be looked at?

15        A    No.  He asked me to terminate her.

16        Q    And when you had that discussion with Matt

17   in response to his direction or comment to

18   terminate, did you raise any concerns regarding any

19   protected characteristics regarding her?

20        A    Well, I was taken aback for one, and I

21   said, well, we can't look at that.

22        Q    When you say "look at that," you're

23   referring to?

24        A    I'm referring to his comments related to

25   that she was of the age of retirement and that he

```
 1    was aware of her age because Sabrina Taylor brought

 2    that to him.  And I said, well, we can't look at

 3    that, but that was the only discussion that we

 4    had --

 5         Q    When you --

 6         A    -- at --

 7         Q    -- say "look at that" -- I'm sorry.  I

 8    thought you were done.

 9         A    Okay.  I'm sorry.

10         Q    When you say "look at that," are you

11    referring to Miss Herr's age or Miss Herr's

12    retirement eligibility?

13         A    I was referring to both.

14         Q    When Matt had Sabrina pull Carrie's age,

15    date of birth, did he ask it -- did he -- well, let

16    me back up.

17              Did he make that request of Sabrina in

18    your presence?

19         A    Yes.

20         Q    What did Matt ask her to do?

21         A    He said -- she was in an adjacent office.

22    She was not in the office with us.  So he spoke

23    loudly and said, Sabrina, please access Carrie's

24    records to let me -- and let me know how -- what her

25    age is, something to that effect.
```

1     Q   Did he mention anything that he wanted to

2  check to see if she was retirement eligible?

3     A   No.

4     Q   But when Sabrina handed him the piece of

5  paper with Carrie's age on it, what -- tell me

6  exactly what Matt said.

7     A   He said -- well, first he commented on her

8  age and he showed it to me, and honestly we both

9  were shocked because she doesn't look her age.  And

10  then secondly -- I was shocked that he was showing

11  it to me.  And secondly that he talked about the

12  retirement.  And, again, said she is of retirement

13  age so you shouldn't feel bad about moving forward

14  with termination.

15     Q   And what did you say -- you know, Matt

16  asked you to terminate her employment, correct?

17     A   Well, at that point he did not ask me.  He

18  just said I shouldn't feel bad about terminating

19  her.  And this was all in relationship to discussion

20  of the budget and how to meet my budget target.

21     Q   Just so I'm clear, did Matt ever tell you

22  that you needed to terminate Carrie?

23     A   Yes.

24     Q   Okay.  And what did you -- did you tell

25  him no?

1        A    I -- from what I recall, we talked about

2     me saying I was confused by that because he said my

3     budget -- or my budget -- what do you call it --

4     target was up to me, you know, to decide how I would

5     meet that target.  And I said -- and so we disagreed

6     on terminating Carrie and that program because I had

7     full belief that that program was needed, and I

8     provided an option to keep the program and still

9     meet my target.

10       Q    Did you ever tell Matt -- well, let's back

11    up a second.

12            Were there multiple discussions relating

13    to Carrie's employment or was this all the same

14    discussion?

15       A    Oh, there were multiple.

16       Q    Did you ever express to Matt that you had

17    concerns regarding age discrimination related to

18    potentially letting Carrie go?

19       A    What I said to him was in that -- in the

20    context of that conversation in his office is we

21    can't look at that.

22       Q    When he talked about look at her age --

23    when he looked at her age and said --

24       A    And her retirement eligibility, yes.

25       Q    Okay.

```
 1      A    Can we take a break?

 2      Q    Yes, we can.

 3      A    I just need to go to the restroom.

 4      Q    Yes.

 5           (Whereupon, a recess was taken at

 6           11:28 a.m. and resumed at 11:35 a.m.)

 7  BY MR. PIERSALL:

 8      Q    Did Matt Schroeder ever tell you -- we

 9  just talked about Carrie Herr.  Did Matt tell you to

10  terminate or discipline any employees which you

11  disagreed with, other than it sounds like Herr and

12  Chapman?

13      A    Often it was the other way around.  No.

14      Q    And following up on your comment.

15      A    Of course you would.

16      Q    Of course.  It's my job.  Employees --

17  there were employees that you wanted to

18  discipline --

19      A    Uh-huh.

20      Q    -- or terminate, and you approached Matt

21  regarding that?

22      A    Uh-huh.

23      Q    And he disagreed with that?

24      A    Yes.

25      Q    All right.  Who?
```

1      A     Vicki Riddick.  Vicki reported to me.  She

2  was director -- I believe her title was director of

3  wellness.

4      Q     And did you tell Matt you wanted to

5  discipline Vicki or terminate her?

6      A     Discipline.  It was related to -- well,

7  actually discipline and terminating her.

8      Q     For what?

9      A     We had -- when we were -- Brian Pack and

10  I, when we were doing budget discussions, we

11  discussed how we would meet -- each department

12  discussed how they would meet the budget shortfall

13  and we talked about staff and where we could cut

14  staff as Matt had suggested we do, and we suggested

15  that Vicki Riddick's area did not need a director

16  over the wellness team, and he disagreed with that.

17      Q     Just so I'm clear, did you want to

18  terminate Vicki's employment in response to the

19  budget cuts or was there -- did she engage in

20  behavior that warranted termination?

21      A     It was in relationship to the need, budget

22  cuts related to the position and the number of

23  people that were in the wellness -- on the wellness

24  team.

25      Q     So Vicki didn't do anything that -- did

```
 1   not engage in any inappropriate or improper

 2   behavior?

 3        A    Vicki, likely, yes, but not at that time,

 4   no.

 5        Q    In terms of the reason you approached Matt

 6   for separating her employment?

 7        A    Yes.

 8        Q    Solely budget related?

 9        A    Yes.

10        Q    All right.  Any other individuals that you

11   approached Matt about regarding potential discipline

12   or termination that he disagreed with?

13        A    None that I can think of at this point.

14        Q    And then with respect to Chapman and

15   Carrie Herr -- Herr?  Hare?

16        A    It's Herr, H-E-R-R.

17        Q    With respect to Chapman and Herr, when you

18   raised issues in response to Matt's comments

19   regarding potential separation or looking at their

20   performance, when you raised those concerns, were

21   you doing so as part of your job duties?

22        A    Yes.

23        Q    And I asked you about Matt, did it -- and

24   you answered that question.  Did anyone at the

25   university make any comments to you that you felt
```

1    were retaliatory in nature?

2        A    No.  But it was always inferred.  I mean,

3    there was always underlying, you know, comments --

4    or not comments, but, you know, Matt's a pretty

5    smart guy and is not going to literally implicate

6    himself.  He's not going to come out and use racial

7    slurs.

8        Q    And just to close the loop on that, or

9    make comments that caused you to believe he was

10   retaliating against you?

11       A    Yeah.  He's smart not to do that.

12       Q    When do you believe you first experienced

13   racial discrimination during your stint with the

14   university from 2015 to 2020?

15       A    When I started working and reporting to

16   Matt, so I'm trying to recall the supervisors I had.

17   It was three.  So it was Jovita Thomas-Williams,

18   Larry Kelley, and Matt.  So when I started working

19   for Matt, I would say.

20       Q    And it's my understanding you began

21   reporting to Matt on January 1st, 2019?

22       A    That sounds about right.

23       Q    And I take it you reported to Matt

24   continuously until your separation?

25       A    Yes.

```
 1        Q    How long did you report to Jovita and then

 2   Larry?

 3        A    I reported -- I started in 2015 reporting

 4   to Jovita until she left.  I believe it was in

 5   November of 2016 early.  So from that period of

 6   time, I reported to her.  And then I reported to

 7   Larry Kelley from November '16 until 2019 when Matt

 8   took over the role.

 9        Q    All right.  I may have asked you this,

10   Larry is Caucasian?

11        A    Yes.

12        Q    Do you know where Jovita went?

13        A    Last I heard, she's VP somewhere in the

14   east.

15        Q    Did she tell you why she left?

16        A    No.

17        Q    When you began reporting to Matt in 2019,

18   you reported directly to Mr. Schroeder, correct?

19        A    I'm sorry.  Can you repeat that?

20        Q    Sure.  You were a direct report of Matt?

21        A    Yes.

22        Q    All right.  And then Matt reported

23   directly to the president?

24        A    Correct.

25        Q    And in January of 2019, who was the
```

1    president?

2        A    I believe -- I believe it was Dr. Sharon

3    Gaber.

4        Q    And describe your level of interaction

5    with Gaber.

6        A    Very minimal, as I was not a report -- a

7    direct report of hers.  Anything that needed to be

8    communicated to her about HR was through Matt.

9        Q    Did you find that to be improper,

10   inappropriate?

11       A    Yes.

12       Q    Describe.

13       A    Well, I mean, in the HR industry, we often

14   believe we should be reporting to the heads of

15   organizations because of the work that's being done

16   and the oversight that's needed that it should be a

17   direct reporting to the head of the organization.

18       Q    Did you ever express that to Matt?

19       A    No.

20       Q    And then describe your -- well, first of

21   all, Dr. Postel was initially an interim president?

22       A    Yes.

23       Q    And then became permanent, if you will?

24       A    Yes.

25       Q    Describe your level of interaction with

1   Dr. Postel.

2        A    The only interaction I had with Dr. Postel

3   from his beginning to when I left was I saw him in

4   the hallway, and I said, hi, Dr. Postel, I'm Wendy

5   Davis.  And he goes, oh, I'm trying to get around to

6   meet all the VPs and, you know, hopefully I can get

7   around to meet with you.  That never happened.  And

8   that was my only interaction with him.

9        Q    Ever?

10       A    Ever.

11       Q    Did you ever share any concerns you had

12  regarding discrimination or retaliation with

13  Dr. Postel?

14       A    No.  But I did with Dr. Willie McKether

15  and there was another lady.  I can't think of her

16  name.  And Dr. McKether asked me, he mentioned at

17  some point, you need to give me the permission to

18  talk to Dr. Postel, and I said I give you that

19  permission to talk to Dr. Postel.

20       Q    Do you know if Dr. McKether did so?

21       A    I don't know.

22       Q    He didn't share one way or the other with

23  you?

24       A    No.

25       Q    Other than Dr. McKether -- well, if you

1     don't know -- let's strike that.

2          Do you know if anyone shared any concerns

3     regarding your termination with Dr. Postel?

4     A     Any concerns with it?

5     Q     Sure.

6     A     I -- I don't know for certain, but it was

7     under my impression that Dr. McKether and the other

8     lady would.  Sorry.

9     Q     She was in the pharmacy school?

10    A     Yes.  I'm drawing a blank on her name.

11    Q     Well, we'll take a look.

12    A     Okay.

13    Q     And Dr. McKether's position was what?

14    A     He was, at that time, I believe, the VP

15    for diversity inclusion.  Something -- something

16    similar to that title.

17    Q     Prior to your notification of your

18    separation in September 2020, did you notify

19    Dr. McKether of any concerns you had relating to

20    discrimination or retaliation?

21    A     I don't believe I did officially.  I may

22    have mentioned something.  I'm saying I may have

23    mentioned something, but not in an official

24    capacity.

25    Q     What do you mean by that?

```
1        A    Well, when I say official capacity,

2   actually going and making a complaint with him,

3   on-record complaint.

4        Q    Uh-huh.

5        A    So that's what I mean by official

6   capacity.

7        Q    Do you recall what you shared with

8   Dr. McKether in an unofficial capacity?

9        A    I think I was talking just basically about

10  feeling that I was being treated unfairly, you know,

11  by Matt.

12       Q    Did you put it in terms of race?

13       A    Yes.

14       Q    And were these phone calls, in-person

15  meetings?

16       A    Rarely in person.  It might have been a

17  phone call or two.  Might have been one -- you know,

18  one in-person meeting.  I don't know.  'Cause I

19  would have to meet with him on, you know, certain

20  initiatives so --

21       Q    And how many times did you express to

22  Dr. McKether your concerns with Matt Schroeder?

23       A    My best estimate --

24       Q    Yes, please.

25       A    -- is two to three times.
```

1        Q    When did it first start?  When was the

2   first report, approximately?

3        A    Either latter part of 20 -- 2019, but more

4   in 2020, beginning.

5        Q    Was there -- what specifically did Matt do

6   that caused you to speak to Dr. McKether?

7        A    He was basically -- one thing that always

8   occurred in HR in my role as the CHRO is HR would

9   make a decision about something and we -- we would

10  get pushback by other departments, and it wouldn't

11  often be that that department would call me and talk

12  with me.  They would go to Matt, and they would

13  convince Matt to change his mind, and often he did.

14       Q    Can you give me an example of that?  What

15  department?

16       A    Jason Toth who is the VP of facilities was

17  a repeat offender of this behavior.  He often tried

18  to usurp the collective bargaining agreement.  You

19  know, for instance, he -- he always attempted to get

20  positions out of the union.  They were union

21  positions, and he wanted to make them non-bargaining

22  unit positions.

23            And so we would, you know, have a lot of

24  conversations with him about we're not doing that,

25  we're not -- we're not -- these are union positions;

```
 1    they've been union positions forever.  And if we
 2    often would do something he didn't like, he would go
 3    to Matt.
 4         Q    Would Matt end up agreeing with Jason?
 5         A    Often, yes.  Not always, but often.
 6         Q    And do you believe there was a racial
 7    component to that?
 8         A    Yes.
 9         Q    Based on?
10         A    Based on my race and who I was.
11         Q    Anything other than that?
12         A    No.
13         Q    And you previously testified you first
14    experienced race discrimination when you started
15    reporting to Matt.  What -- do you remember, was
16    there a specific incident or example?
17         A    You know, I often felt that HR was
18    targeted in terms of budget, so Matt was not always
19    my supervisor, but over the last four or five years,
20    my budget was consistently cut.
21              In the last budget for -- I believe it was
22    for 20 -- I'm going to say the discussions were in
23    2020 where we had a budget shortfall of over half a
24    million dollars.
25         Q    And you believe Matt issued that budget
```

1    shortfall over half a million dollars to the HR

2    department on the basis of your race?

3         A    Well, I believe race and unequal

4    treatment.

5         Q    What leads you to believe that race was a

6    component?

7         A    Well, of course he didn't have any other

8    African Americans on his staff, and if you look over

9    the history, my budget was the budget that was

10   probably affected the most.

11        Q    Any other reason you believe it was

12   related to race?

13        A    At this moment, no.

14        Q    Did you ever express that to Matt that you

15   felt his budget cuts specifically to HR were,

16   whatever term, excessive?

17        A    Yes.

18        Q    What would Matt say?

19        A    I did.  As Matt always did, often no

20   response.  There -- in writing, I sent him an e-mail

21   and I said, you know, my budget has been cut over

22   the last four or five years consistently, and I also

23   felt that it was related to who I was in terms of

24   getting resources.

25        Q    Could you be more specific?

1        A     Resources such as equipment to do our job.

2    HR is highly technical.  We needed resources such as

3    applicant tracking systems, systems to -- you know,

4    to -- that housed our data.  There were a lot of

5    issues with those systems.  I repeatedly asked for

6    resources in those areas.

7              For instance, in our Banner system, Banner

8    is a system used by probably half of the

9    universities in the nation, and it's very common,

10   and I requested that those systems be modified or

11   use those modules within those systems to move our

12   HR projects forward.

13             We had over a hundred projects that we

14   were working on in HR, and, you know, they were all

15   seemingly tied together.  So we needed the resources

16   in our Banner system to use those modules to connect

17   with, for instance, our applicant tracking system

18   which I heard this week those systems have been

19   utilized in that manner.

20                  (Whereupon, Defendant's Exhibit A was

21                  marked for identification.)

22        Q     Ms. Davis, you've been handed what's been

23   marked as Defendant's Exhibit A.  And the first

24   question is do you recognize this exhibit?

25        A     Yes.

```
 1        Q      And what is it?

 2        A      This appears to be a job description that

 3   was my job description when I took on the role of

 4   director of human resources at The University of

 5   Toledo in the HR department.

 6        Q      When it says HR academic, was there a

 7   similar person that held this position for the

 8   medical side?

 9        A      Similar, yes.

10        Q      Who was that; do you remember?

11        A      Erin Momenee, M-O-N-I-M-E-E [sic].

12        Q      And if you would take a look at the job

13   duties.  There's percentiles there on the bottom of

14   Page 1 and on to Page 2.  Is that an accurate

15   depiction of your job duties in that position?

16        A      Essentially.

17        Q      And how many -- it says there at the very

18   bottom of the page, employee labor relations.  How

19   many bargaining units were there on the academic

20   side?

21        A      On the academic side, there were -- well,

22   there were five bargaining units that the university

23   interfaced with.

24        Q      And did you -- was there a separate labor

25   department or employee that addressed labor issues?
```

```
 1          A     At that time -- while I was in this role?

 2          Q     Correct.

 3          A     At that time, I don't recall there was a

 4   specific person.  I -- I don't know for sure.  I

 5   can't recall.

 6          Q     Were affirmative action plans under your

 7   duties in this position?

 8          A     No.

 9          Q     Describe your training that you received

10   regarding affirmative action plans.

11          A     Just basically in the role of my former

12   director of HR jobs, by experience and training that

13   I might have received, and I believe that I did

14   receive training through SHRM which is the Society

15   of Human Resources.

16          Q     Uh-huh.  Was there a specific class that

17   you took through SHRM that addressed affirmative

18   action plans?

19          A     No.  As part of their requirements, when

20   you take their rigorous exam, there is a whole piece

21   on EEO and affirmative action that you have to be

22   knowledgeable in because a large percentage of the

23   test is on that material.

24          Q     Did you have any responsibilities or

25   oversight related to affirmative action plans when
```

1    you were at Lucas County Children's Services?

2        A    Not directly.  Lucas County was a county

3    agency, and it was really one of the only county

4    agencies that didn't really have a direct reporting

5    up to the commissioners which is the county

6    commissioners.  So they had their own chief

7    personnel director, but they did the affirmative

8    action for the entire county.  So we would have to

9    provide information.

10       Q    But the compilation of the plan itself was

11   outside of the children's services?

12       A    That's correct.

13       Q    So when you were named CHRO at the

14   university, is that the first time that you had

15   affirmative action plans under your authority?

16       A    Officially.  But I did work with -- in the

17   capacity when I worked for ODOT in the EEO

18   department, they are the ones that actually did the

19   affirmative action plans, so I got really my first

20   experience with it.

21       Q    Were you compiling -- when you were

22   talking about ODOT, were you responsible for

23   compiling information and putting the information

24   together, or actually drafting the plan?

25       A    Compiling information and putting it

```
 1    together and working with the people who are working

 2    on it.  I can't recall their titles.

 3         Q    Is this your signature that appears

 4    halfway down on the last page of Exhibit A?

 5         A    Yes.  That appears to be my signature.

 6         Q    And it looks like you held this position

 7    from February 2015, is that when you were hired by

 8    the university?

 9         A    I -- it seems like it was -- it might have

10    been around that time.  I'm going to say March or

11    February.

12         Q    And you are an unclassified employee.  Do

13    you see that box checked there on the top right-hand

14    corner on Page 1?

15         A    Yes.

16         Q    And I take it you know what that means?

17         A    Yes.

18         Q    That means you're employed at will, right?

19         A    Part of it.

20              MR. ABOOD:  Objection.  Calls for a

21              legal conclusion.

22         Q    What was that?

23         A    Yes, part of it.

24         Q    What's the other part?

25         A    What was your question?  I'm sorry.
```

```
 1         Q    My question was you know what unclassified
 2    status is, right?
 3         A    Yes.
 4         Q    And then I said that means you're employed
 5    at will, right.  And then your attorney objected,
 6    and you said partly.  So I was wondering what the
 7    other part is.
 8         A    Well, there's all sorts of things related
 9    to unclassified individuals.  It depends on what
10    you're speaking of.  Like for disciplinary purposes,
11    for at will.
12         Q    Well, I'll do it -- what does unclassified
13    employment status mean?
14         A    Partly means that you are an employee at
15    will, that you have certain -- UT is a little
16    different.  You have certain oversight -- I don't
17    want to use the word protections, but oversight or
18    different things might refer to you, but I would
19    need to know what specifically you have a question
20    about.
21         Q    I'm just asking --
22         A    Yeah.
23         Q    -- what unclassified status means.
24         A    That's --
25         Q    All right.  Was it your understanding that
```

 1  you could be -- as an unclassified employee, you

 2  could be terminated for any reason or no reason at

 3  all?

 4      A    Yeah, except for reasons that pertain to

 5  discrimination.

 6      Q    Unless contrary to law, correct?

 7      A    Yeah.  That's correct.

 8      Q    All right.  And there is no notice that's

 9  required to be given to an unclassified employee?

10      A    And when you say notice, what are you

11  referring to specifically?  Notice via letter?

12  Notice -- I mean, what are you referring to?

13  Someone can come in my office and that day say

14  goodbye, you're gone?

15      Q    That's what I'm referring to, that second

16  one.

17      A    Not at the University of Toledo.

18      Q    Why is that?

19      A    Because they offer either 90 days' notice

20  or cause.

21      Q    And cause can be immediate, correct?

22      A    It can be, but at times it was not, even

23  for unclassified.

24      Q    But that's pursuant to a University of

25  Toledo policy, correct?

```
 1       A    As far as I know.
 2       Q    Right.  There's a for cause provision and
 3  a without cause provision under UT's policies with
 4  respect to --
 5                 MR. ABOOD:  Objection.  Are you
 6            asking her her understanding, or are you
 7            asking her for legal conclusions?
 8                 MR. PIERSALL:  Well, she was the
 9            CHRO, and she's responsible --
10                 MR. ABOOD:  She's not a lawyer.
11                 MR. PIERSALL:  We've already covered
12            this when you were out of the room.
13                 MR. ABOOD:  I'm asking you --
14                 MR. PIERSALL:  We covered it when you
15            were out the room.  Covered it when you
16            were out of the room.  She said she's not
17            a lawyer.  She's testified to her
18            understanding of the policies.
19                 MR. ABOOD:  That's what you're asking
20            her, her understanding?
21                 MR. PIERSALL:  Sure.  We know she's
22            not a lawyer, so yeah.
23                 MR. ABOOD:  All right.
24       Q    And you're responsible for administering
25  all the human resources policies at the university,
```

1    right?

2         A     Along with others, yes.

3         Q     Okay.  What others?

4         A     Well, the entire leadership team is

5    responsible for administering policies, including HR

6    policies.

7         Q     Okay.  And by -- when you say leadership

8    team, who are you referring to?

9         A     Well, I'm referring to supervisors.  I

10   consider them as leaders.  Employees of the

11   university.  They might not be leaders, but they're

12   responsible for administering policies and

13   leadership team in terms of VPs, supervisor up

14   through the president, including himself.

15        Q     And help me understand.  Where does

16   supervisor --

17        A     Okay.

18        Q     What level at UT, where does supervisors

19   begin?

20        A     What do you mean what level?

21        Q     Well, like in the HR, what's the entry

22   level supervisory position?

23        A     So there's a line staff supervisor.  It's

24   not necessarily related to the HR department, but

25   across the university.

```
 1                    (Whereupon, Defendant's Exhibit B was

 2             marked for identification.)

 3        Q    You've been handed what's been marked as

 4   Defendant's Exhibit B.  Do you recognize this

 5   exhibit?

 6        A    Yes.

 7        Q    And what is it?

 8        A    This appears to be a reaffirming offer,

 9   letter, or a change -- excuse me, change in position

10   to interim associate vice president of human

11   resources and talent development to me from Larry

12   Kelley.

13        Q    And I presume you had a conversation with

14   Larry leading up to this?

15        A    As far as I can recall, yes.

16        Q    And how did it come about -- well, let's

17   take a step back.

18             Describe your conversation with Larry.

19        A    I don't know the particular conversation,

20   but we would have probably talked about me

21   continuing in the role.

22        Q    When did you first begin the role of --

23   this says here effective November 28, 2016, there

24   will be a change of position to interim associate

25   vice president in the human resources and talent
```

```
 1   development department.  Do you see that?

 2        A    Yes.

 3        Q    Did you perform that job function prior to

 4   November 28?

 5        A    No.

 6        Q    Did you replace Jovita?

 7        A    Yes.

 8        Q    And is the salary listed there of

 9   $120,000; is that correct?

10        A    Yes.

11        Q    And it references two $25,000 stipends.

12   Do you see that in the first paragraph there?

13        A    I do.

14        Q    Did you receive both of those stipends?

15        A    I'm going to assume I did.

16        Q    And the letter reaffirms there in the

17   center middle paragraph that you're an unclassified

18   employee, correct?  Paragraph begins by accepting

19   this confirmation?

20        A    Yes.

21        Q    And that's your signature and date on the

22   top of Page 2, correct?

23        A    Yes.

24        Q    Did you have any discussion with Larry

25   Kelley that you were not interested in this
```

1   position?

2      A    I recall a little bit of the discussion

3   relative to not that I wasn't, but felt that it was

4   a challenging position.

5      Q    Why did you feel that it was challenging?

6      A    Because having worked in HR, I knew that

7   there were a lot of things that were going -- needed

8   to be fixed; such as data.  The university at that

9   time did not have a good history on -- on its data

10  analytics, on data in general.  I mean, you know,

11  the systems they were using were a little outdated.

12     Q    Would you agree with me that there were

13  significant problems in the human resources

14  department when you took on the role?

15     A    Yes.

16     Q    Did you talk about those issues with

17  Mr. Kelley?

18     A    I don't recall specifically, but just

19  probably, yes, in general.  I believe I did.

20     Q    Did you develop any goals for yourself in

21  this capacity as interim associate vice president?

22     A    I think at that time the goals were

23  developed by Larry as I was coming in, so he knew --

24  he knew more about what needed to be done, so I

25  believe the goals were developed by him.

```
 1        Q     Did you receive a piece of paper, says
 2   here are your goals?
 3        A     I may have, but I do -- I believe it was
 4   probably a part of my performance evaluation.
 5                    (Whereupon, Defendant's Exhibit C was
 6              marked for identification.)
 7        Q     Ms. Davis, you've been handed what's been
 8   identified as Defendant's Exhibit C.  Do you
 9   recognize Exhibit C, as in cat?
10        A     Yes.  Letter to me from Lawrence Kelley,
11   subject, change of assignment.  Yes, I do recognize
12   it.
13        Q     And correct me if I'm wrong, but this
14   change of assignment removed the interim tag from
15   your title; is that correct?
16        A     That's correct.
17        Q     Were you named CHRO at this time?
18        A     I -- I don't believe -- oh, I was named
19   associate vice president.
20        Q     When did the CHRO title come around?
21        A     Right.  I think that came a little bit
22   later because it was an industry title that most
23   universities were using.
24        Q     Was there a CHRO as of June 22nd, 2017?
25   Had someone been designated with that title by UT?
```

```
 1        A    Yes.  That would have been me.

 2        Q    Oh, I'm just wondering --

 3        A    Okay.  Sorry.

 4        Q    I'm not trying to trick you.

 5        A    Okay.

 6        Q    I just wanted to know when you were named

 7   CHRO.  That's all.

 8        A    Oh, I can't tell you for -- I was named

 9   associate vice president.  Later that CHRO was

10   lobbed onto the title.  Let me say that.  Sorry.

11        Q    Was that later in 2017?

12        A    I don't know when.

13        Q    Okay.

14        A    But I remember discussion.

15        Q    Do you know who the CHRO was at this time

16   in June of 2017 since it wasn't you?

17        A    I mean, I don't -- I'm confused.  I was --

18   again, at this time, I believe in 2017, I was the

19   associate vice president is what the letter says.

20        Q    I understand.

21        A    So I'm sorry.

22        Q    No.  I'm just trying to figure out --

23        A    Okay.

24        Q    -- and, again, I'm not -- I truly don't

25   know.
```

1      A    I'm responding to what's here, and I do

2    remember some discussion later about adding CHRO.

3      Q    Okay.

4      A    Okay.  Does that make sense?

5      Q    How about this:  Do you remember who was

6    CHRO before you?

7      A    Yes.

8      Q    Who?

9      A    Jovita Thomas-Williams.

10     Q    Do you know if anybody served in that

11   capacity in an interim basis after she left?

12     A    No.

13     Q    Do you know who signed off on the

14   separations employment actions after Jovita and

15   before you?

16     A    No, I don't.

17     Q    And your base salary increased to

18   $159,450, correct?

19     A    Correct.

20     Q    And this letter indicates that you are in

21   the unclassified civil service.  Do you see that?

22     A    Yes.

23     Q    Okay.  And that's your signature there on

24   the back of Page 2, and it's dated?

25     A    Yes.

1    Q    When this change of assignment was issued

2    in June of 2017, did you have a conversation with

3    Larry about any goals, or were your goals modified,

4    anything to that effect?

5    A    I don't recall specifically, but likely if

6    it was -- this was in the spring, in June, so we

7    were likely conducting performance evaluations.

8    Q    Uh-huh.

9    A    So those discussions would, you know,

10   happen likely during that time.

11   Q    Let me ask you this:  When you became --

12   well, let's back up even further.

13        What's the levels of vice president?  Is

14   there associate, and then is there a standard vice

15   president, and then executive?

16   A    At The University of Toledo when I was

17   there -- not sure what's occurring now --

18   Q    Understood.

19   A    -- but there is the president, and then

20   there's a vice president with no associate in front

21   of it.  Then there are associate presidents, and

22   there might be one or two assistant associate

23   presidents.

24   Q    Okay.  So above you was vice president?

25   That title was above associate?

```
 1      A    Yes.

 2      Q    Okay.

 3      A    Yes.  Sorry.

 4      Q    And I've seen executive vice president.

 5      A    That -- yeah.  That might be -- that might

 6  be a classification that's there.  I've heard that

 7  before, too.  Sounds familiar.

 8      Q    Yeah.  Do you know if that's above or

 9  below associate VP?

10      A    Above.

11      Q    And your salary at the time of your

12  termination was $178,500, correct?

13      A    Somewhere around in there, yes.

14      Q    All right.  And you're aware that Melissa

15  Hurst was hired in at a salary of $200,000?

16      A    Yes.

17      Q    And you're aware that John Elliott was

18  hired in at a salary of $250,000?

19      A    Yes.

20      Q    Were you aware that Miss Hurst's

21  employment was an interim appointment?

22      A    Can you ask me that question again,

23  please?

24      Q    Sure.  Are you aware that Miss Hurst's

25  appointment, employment by the university as an
```

1    intern, was an interim appointment?

2         A    No, I'm not aware.

3         Q    Same question for Mr. Elliott?

4         A    No, I'm not aware, because interim didn't

5    appear in their titles.

6                        (Whereupon, Defendant's Exhibit D was

7                   marked for identification.)

8         Q    Ms. Davis, you've been handed what's been

9    marked as Defendant's Exhibit D, as in dog.  Do you

10   recognize this?

11        A    Yes.  Somewhat, yes.

12        Q    And what is it?

13        A    It looks like it appears to be an action

14   and -- an action or -- actions are created and done

15   when there is a change, such as a change in title,

16   change in job, change in whatever.  So this was a

17   change, and it was an equity increase.

18                   MR. ABOOD:  I couldn't hear what you

19             said.

20                   THE WITNESS:  It was an equity

21             increase.

22        Q    And it's -- take a look at the bottom

23   right.  It's a little cut off, but looks like

24   January 4th, 2019.  Do you see that?

25        A    Yes.

1      Q      Does that ring a bell?  Did you receive an

2   equity increase at or around that time?

3      A      Likely, yes.

4      Q      Is this a document you would have seen?

5      A      No.  I don't -- I don't recall that I

6   would see these documents.  They would have been

7   created by the HR staff to effect the action, or

8   this would have been the end result coming out of

9   the system.

10     Q      And is this document specific to equity

11  increases?

12     A      Not specific to equity increases.  Any --

13  any type of change or action occurring, one would

14  look like this.

15     Q      Take a look at Page 5 of 8 in the top

16  right-hand corner, please.  And it says pay range

17  there about two thirds of the way down.

18     A      Yes.

19     Q      What does that mean; starting salary range

20  is approximately 76 to $95,000?

21     A      Each position had -- in the compensation

22  for each position had a range, I believe, if I can

23  recall.  So this maybe would have been the range of

24  the position unless it was an error.

25     Q      Of the position you were assigned to?

```
 1        A     It appears to be.

 2        Q     All right.  And right below there, it says

 3    requisition, and then it says request effective date

 4    November 25 of 2018.  Do you see that?

 5        A     I do.

 6        Q     What was that requisition?  Was that the

 7    equity increase?

 8        A     Likely, if it's attached to this.  I'm

 9    assuming it is.

10        Q     And it says natural progression right

11    below that for the reason.  Do you see that?

12        A     Yes.

13        Q     What is -- what's that mean?

14        A     Well, every year the university looks at

15    potential increases that are for the non-bargaining

16    unit staff, and depending often on where you are in

17    the range, whatever we decide that year, what the

18    percentage increase was going to be, and for some

19    reason they call it a natural progression.  So it's

20    based on an increase that most people would get.

21    It's not based on merit or anything like that.  It's

22    based on the university looking at it in a whole --

23    as a whole.

24        Q     How does one go about obtaining an equity

25    increase?
```

1      A     Well, often some people would ask for more

2   money.  So if it was absent that period of time I

3   just described to you, people could talk with their

4   supervisors or VPs or whatever and ask for an equity

5   increase.

6      Q     Did you ask for an equity increase?

7      A     I don't recall.

8      Q     Okay.  And if you take a look at Page 6 of

9   8, it says there per -- management level comments,

10  per discussion with Wendy Davis and Larry Kelley

11  1/3/19.

12     A     Okay.

13     Q     Does that ring a bell or refresh your

14  memory at all?

15     A     No, it doesn't.  But must have been some

16  discussion he and I had.

17     Q     But you don't remember it?

18     A     I don't.

19     Q     Okay.  But your salary, it looks like, was

20  increased to $175,000 effective January 2019; is

21  that correct?

22     A     Yes.

23     Q     Did Matt Schroeder play any role in the

24  approval of this equity increase?

25     A     I don't believe so.  I don't believe Matt

1    was in this role.  I believe I was reporting -- I'm

2    not sure who I was reporting at that time.

3        Q    Well, the reason I ask --

4        A    Okay.

5        Q    -- is if you take a look at Page 7, almost

6    at the very bottom, under the comments, it says,

7    equity increase.  Reports to Matt Schroeder.

8        A    Yeah.  It would have been based on when

9    the exchange took place, 'cause there was a period

10   of time that Larry and Matt worked together.

11       Q    Did they hold different titles?

12       A    I don't -- I don't know, but I know that

13   there was -- and maybe it was just a transition

14   period.

15       Q    Did Matt replace Larry?

16       A    Yes.

17       Q    Okay.

18       A    Yes.

19       Q    Did Larry -- what were the circumstances

20   of his departure?  By that, did he retire?  Resign?

21       A    I don't believe he retired.  I think he

22   resigned.

23       Q    Do you know where he went?

24       A    No.  And I say that because Toni was

25   Larry's secretary, so this is all -- she must have

1    put it through so --

2        Q    I'm sorry.  What are you referring to?

3        A    When I'm looking at this, Toni Blochowski

4    was Larry's secretary.  So I was just confused

5    about, you know, who was my boss at that time.

6    Sorry.

7                    (Whereupon, Defendant's Exhibit E was

8            marked for identification.)

9        Q    Miss Davis, you've been handed what's been

10   marked as Defendant's Exhibit E.  And do you

11   recognize this document?

12       A    I don't know.  It appears to be a legal

13   document through the United States District Court.

14   I don't know that I've seen it.  I probably have

15   but --

16       Q    Okay.

17       A    Sorry.

18       Q    I'll represent to you that this is the

19   lawsuit that was filed --

20       A    Okay.

21       Q    -- on your behalf by your counsel in this

22   case.  If you take a look -- well, first of all,

23   does that refresh your recollection?

24       A    Yes.

25       Q    I assume you reviewed this document before

 1   it was filed?

 2        A    I'm sure I did.

 3        Q    Okay.  It says there at the bottom of the

 4   page, towards the bottom, your start date was

 5   April 13th, 2015; does that sound correct?

 6        A    That sounds correct.

 7        Q    Okay.  And Number -- let's take a look at

 8   the top of Page 2, Number 2.  It states,

 9   Mr. Schroeder instructed you to interfere in the

10   protected activity of another African-American

11   employee through the use of discipline and

12   ultimately termination with no legitimate reason for

13   the proposed discipline; instructions which

14   plaintiff refused to follow.

15             Do you see that?

16        A    Yes.

17        Q    Do you know who that's referencing?

18        A    I'm assuming Carolyn.  I'm assuming

19   Carolyn.

20        Q    Okay.  And we discussed that situation

21   earlier this morning, correct?

22        A    Yes.

23        Q    Was Carolyn Chapman having any performance

24   issues?

25        A    Her area -- she, herself, was not -- was

1   not having -- I mean, there were issues surrounding

2   her area that came into question.

3        Q    Such as?

4        A    Like I described before, timely filling

5   the vacancies.  There were -- there were questions

6   about -- that's what I remember the most were the,

7   you know, timely -- timeliness issues.

8        Q    And it's my understanding Miss Chapman had

9   responsibility for the medical center?

10       A    Yes.

11       Q    So would you agree with me that the

12  leadership, CEO, COO of the medical center expressed

13  frustrations and concerns regarding the filling and

14  timeliness of filling positions?

15       A    Apparently, according to Matt, yes.

16       Q    Well, are you aware of that independent of

17  Matt?

18       A    I remember meeting with Rick Swaine as his

19  concern was, you know, we've got to get, you know,

20  people in; we've got to get them moving.  And at

21  that time, I explained, you know, why there was a

22  hold up and why -- why the process would seem a

23  little slow.

24       Q    And Rick Swaine is?

25       A    He was the CEO of the hospital.

1        Q      CEO?

2        A      Yes, CEO.

3        Q      And during that meeting, did he express

4   concerns to you regarding the timeliness of filling

5   positions?

6        A      Yes.

7        Q      All right.  And you said -- you explained

8   to him the reason for the delays?

9        A      Yes.

10       Q      What were they?

11       A      Well, oftentimes all of the -- a lot of

12  their positions were bargaining unit positions;

13  meaning positions that belonged to a union.  So

14  oftentimes they wanted the positions to be -- when

15  posted, they wanted them posted internally and

16  externally.

17             Well, often, the union contract prohibited

18  us from posting it in that manner, and we had to go

19  through the internal process.  So oftentimes, that

20  was something that seemed to slow the process.  So I

21  explained that to Mr. Swaine.

22       Q      Was he receptive to that?

23       A      He didn't largely understand it.

24       Q      I'm sorry.  I didn't catch that.

25       A      I mean, he didn't largely understand it.

```
 1   But when you say receptive, I -- I mean, he seemed

 2   to hear what I said.

 3        Q    Did his -- under your tenure as CHRO, did

 4   his concerns ever dissipate, go away?

 5        A    There might have been one or two concerns,

 6   but I don't -- I don't recall what the one or two

 7   were.

 8        Q    Okay.  Did he express to you that there

 9   were too many open positions at the medical center?

10        A    That sounds familiar.

11        Q    When you met with Rick, was Schroeder

12   present?

13        A    I met with Mr. Swaine a lot.  I don't -- I

14   don't recall if Matt was in that meeting, in that

15   particular meeting.  I don't recall.

16        Q    Do you know if Swaine wanted Chapman to be

17   disciplined or terminated?

18        A    I believe that -- I believe that --

19   I believe that he did, yes.

20        Q    And what leads you to that belief?

21        A    Well, I mean, you know, there -- there was

22   just discussion about, you know, the performance and

23   what was going on in terms of filling -- filling the

24   vacancies and things of that nature.

25        Q    Did he express concerns to you regarding
```

```
 1    the timeliness of filling non-bargaining unit

 2    positions?

 3         A    Not that I recall.

 4         Q    Did Mr. Swaine express to you that he was

 5    in communication with Mr. Schroeder regarding his

 6    concerns regarding the filling of positions at the

 7    medical center?

 8         A    I don't believe he expressed that to me.

 9    I don't.

10         Q    Did you believe that Miss Chapman had any

11    blame regarding Mr. Swaine's concerns?

12         A    I'm not sure I understand your question.

13         Q    Let's back up a step.  Did you -- do you

14    believe Mr. Swaine's concerns to be legitimate

15    regarding the filling of positions?

16         A    Yes.

17         Q    All right.  Do you believe Miss Chapman

18    bore any responsibility regarding those concerns --

19    Mr. Swaine's concerns regarding the filling of

20    positions?

21         A    That she bore responsibility?

22         Q    Sure.

23         A    Yes.

24         Q    Okay.

25         A    Yes.
```

```
 1        Q    I presume you had conversations with her

 2   about that?

 3        A    Yes.

 4        Q    I presume you told her to improve that

 5   process, the timeliness of filling those positions?

 6        A    Yes.  And I worked with her to improve

 7   that.

 8        Q    Did you tell her that the setup in place

 9   at that time was not sufficient or was not

10   appropriate to address the issue?

11        A    Ask that question again, please.

12        Q    Sure.  Let me just rephrase it and be a

13   little bit more simplistic.

14             Did you tell her to improve the process?

15        A    I said we need to improve the process.

16        Q    Did you place Miss Chapman on a

17   performance improvement plan?

18        A    Not at that time, no.

19        Q    Did you document -- did you document that

20   anywhere that the process needed improvement?

21        A    It may have been in her performance

22   evaluation.  May have been.

23        Q    When you say you did not place

24   Miss Chapman on a PIP at that time, did you ever

25   place her on a PIP?
```

```
 1        A    I don't recall that I did.

 2        Q    Did you ever discipline her?

 3        A    I don't believe so.

 4        Q    Do you believe the concerns expressed by

 5   Mr. Swaine regarding filling positions at the

 6   medical center warranted Miss Chapman's termination?

 7        A    No.

 8        Q    Do you believe it warranted discipline?

 9        A    Not at the time I was talking to her, no,

10   because we talked and we had a plan.

11        Q    Did she have -- was the plan executed?

12        A    Yes, it was.  And then we both were let

13   go.

14        Q    And she was let go after you?

15        A    Yes, I believe so.  Yes.

16        Q    Number 4 there on the second page, it

17   says, at the time you were served with your notice

18   of termination, Mr. Schroeder informed you that the

19   university was going in a different direction with

20   HR.

21             Do you see that?

22        A    I do.

23        Q    Describe the conversation that you had

24   with Mr. Schroeder when he relieved you of your

25   duties on September 18, 2020.
```

```
 1        A    The conversation was very minimal.  I

 2   walked in under the assumption I was going to be

 3   having my one-on-one conversation, which was

 4   typically done every other week on a face-to-face

 5   meeting when I provided weekly reports to him,

 6   thinking we were going to have a conversation.  As I

 7   remember that day, I actually stopped in legal to

 8   talk to Janelle.

 9        Q    Okay.

10        A    And we talked, and then I went to his

11   office because I was a little early getting to my

12   meeting time.  Walked in there, assuming we were

13   going to be talking about the weekly report as we

14   did customarily and what was going on in HR.  And I

15   was -- we were sitting across the table from one

16   another, I believe, in a table similar to what we

17   see here, and he said to me the university's

18   deciding to go in another direction and sort of --

19   and slid the 90-day notice to me.

20        Q    Where did the meeting take place?

21        A    In Mr. Schroeder's office.

22        Q    And how long was it?

23        A    It was very short.  I would say no more

24   than five to ten minutes.

25        Q    What did you say in response to
```

1    Mr. Schroeder?

2         A    I said -- I believe I said I'm shocked; I

3    thought we had a plan.  And I said, well, you'll be

4    hearing from my attorney.

5         Q    Did he say anything in response to when

6    you mentioned that you thought you had a plan?

7         A    Yes.  He said, well, we decided to go in a

8    different direction.  He reiterated that.

9         Q    He what?

10        A    He reiterated that again.

11        Q    Did he explain to you what the different

12   direction was?

13        A    No.

14        Q    And then also in Paragraph 4, it says you

15   were responsible for onboarding your replacement.

16   Do you see that?

17        A    Yes.

18        Q    Who was your replacement?

19        A    At that time, I believed it to be Melissa

20   Hurst.

21        Q    Did your belief change at some point?

22        A    Absolutely.

23        Q    Describe.

24        A    Well, then I heard that John Elliott was

25   hired.  I didn't know anything about John Elliott at

1    the time.

2         Q    Just so I'm clear, at the time you were

3    notified of your separation on September 18th by

4    Mr. Schroeder --

5         A    Yes.

6         Q    -- had you heard the name John Elliott?

7         A    No.

8         Q    No idea?

9         A    No.

10        Q    Okay.  But you had met with Miss Hurst by

11   that point in time?

12        A    I met -- and I met with Miss Hurst, and it

13   was sometime in either early September or latter

14   part of August, and I was under the assumption she

15   was coming in as a consultant, HR consultant.

16        Q    What led -- resulted in that assumption

17   that she was coming in as an HR consultant?

18        A    Because prior to Matt issuing the 90-day

19   notice, the plan I was referring to was he told me,

20   and it was in -- maybe a few weeks before that --

21   well, first he had me to give him information about

22   the consultants that had over the years come into HR

23   to assess HR, to make recommendations about what

24   needed to occur in HR.

25             And over probably, I don't know how long,

1  but there's been four or five consultants in HR come

2  in and assess, and he asked me to get that

3  information for him.  And I asked him why, and he

4  says, we're likely going to go out for RFP to have

5  an HR consultant come in and to work with HR and

6  we're going to get you some help.  That's what he

7  said.

8      Q    And this is --

9      A    So I was shocked to get the 90-day notice.

10     Q    So this was prior to your separation?

11     A    Yes.

12     Q    And you testified you met with Miss Hurst?

13     A    Yes.

14     Q    Where?

15     A    In a conference room in University Hall.

16     Q    Was anyone else present?

17     A    Yes.  Matt Schroeder.

18     Q    Describe the conversation.

19     A    I was introduced to -- well, I knew prior

20  to meeting with her I was going to meet with her.

21  So it wasn't something that was a surprise to me,

22  and was told that, you know, this is someone who's

23  going to be looking at HR.  So because we had the

24  conversation about the consultant, I assumed that's

25  who Miss Hurst was, the HR consultant.

1           And so I was introduced to her, and she --
2     if I can remember correctly, she just basically
3     asked me could I tell her some of the things that
4     were going on in the HR.  And I had my laptop, and I
5     said, well, you know, let me pull up some things on
6     my laptop, and I can share with you some of the, you
7     know, what about HR.
8           And so I just proceeded to tell her, you
9     know, the number of people; these are my direct
10    reports; these are -- this is the work that we do in
11    HR.  We were looking at -- we had over a hundred
12    projects on our project list that we were working
13    through, and I may have named some of those
14    projects.  I can't recall specifically which ones
15    they were.  And then I, you know, just talked about
16    a lot of things in the HR department.
17         Q    Did you have any understanding of what
18    Miss Hurst was going to consult on?  Any specific --
19    and by that, I mean any specific area within HR?
20         A    No.  It was the entire HR department.
21         Q    And during your time as CHRO, had there
22    been any consultants?
23         A    No.  Let me think about that for a minute.
24    You said my time as CHRO?
25         Q    Yes, ma'am.

```
 1        A    As far as I'm aware, there were no

 2   consultants designed or delegated to come in and

 3   review HR.

 4        Q    How about going back to 2015 when you were

 5   initially hired?

 6        A    I don't believe there were.  When I was

 7   coming in, they were in the throws of a large

 8   reengineering.

 9        Q    HR was?

10        A    Yes.  And that was with -- the person

11   facilitating that reengineering was Dave Cutri, the

12   internal auditor.

13        Q    What was being reengineered?  Was there

14   anything specific?

15        A    Yes.  There were payroll processes that

16   was being reengineering.  There was probably about

17   five areas that were being looked at.  It may have

18   been -- I can't recall all of them, but I do know it

19   was payroll because it was titled paying -- paying

20   employees.

21        Q    I'm sorry?

22        A    Paying, P-A-Y-I-N-G.  Sorry.  Paying

23   employees.  So there was just a reengineering

24   surrounding that, and it's really, you know,

25   basically to get solid processes in place.
```

```
1              There was resignation and separation, so I

2    believe at that time what was occurring, there was a

3    process for a resignation and separations, but they

4    were trying to improve the process of how people

5    could submit them electronically.

6              Most of the reengineering was based on

7    automating processes.

8         Q    And Mr. Cutri was leading that effort?

9         A    Yes.

10        Q    To your knowledge, did it work?  Did the

11   reengineering work?

12        A    I think some of it did, but that was a

13   part of why I did not want to take HR, because

14   Jovita left very abruptly and how I perceived it is

15   she came in and she blew up all the processes but

16   didn't have time to put them back together.  So I

17   knew that part of my role was going to be to do

18   that, so I had hesitation.

19        Q    And I may have asked you this.  I really

20   don't remember.  Did you express that to anyone,

21   that hesitation?

22        A    I believe I talked with Larry about that,

23   but I -- I wanted to take the position because I was

24   part of the regime with Miss Thomas-Williams, and I

25   wanted -- I really wanted things to be fixed in HR
```

 1   and I really feel sorry for the people there.

 2        Q    When you were named CHRO, would you agree

 3   with me that there were -- that those significant

 4   issues in HR remained?

 5        A    Yes.

 6        Q    When you were terminated, would you agree

 7   with me that there were still significant issues in

 8   HR?

 9        A    There were a lot of improvements done.

10   There were some -- there was, without a doubt, some

11   issues still remaining.

12        Q    What were the major issues that remained?

13        A    Well, again, we had over a hundred

14   projects on our project list, and I don't have

15   access to my project list so I can't go through each

16   one of those to tell you what they are.  I'd like to

17   get that, by the way.

18        Q    We'll work with your counsel on that.

19        A    Please.

20        Q    No, I'm just wondering as you sit here

21   today --

22        A    Yeah.

23        Q    -- what are the major issues that you

24   wanted to improve but you didn't.  That's all.

25        A    A lot of -- a lot of the -- we had

1    automated a lot of things in HR.  Again, when Jovita

2    Williams came in, she, through her reengineering,

3    had done some work and there were some improvements.

4         There still needed to be -- you know, data

5    was a big one.  The data, we had a legacy system,

6    which I can't recall the name of the legacy system.

7    We had the Banner system.

8         So often when we were extrapolating data

9    out of the systems, we had to go to two data systems

10   to do it.  So that was a problem.

11        There were some processes that were,

12   again, still not automated, a lot of manual

13   processes.  One of our big projects was related to

14   personnel files.  So, believe it, in this day and

15   age, personnel files were still paper, and so we

16   were trying to automate that process, and actually

17   we had a big scanning project that David Gaus worked

18   with me on and the entire staff to get all of those

19   personnel files scanned, but it cost money to do

20   that because we needed certain systems to do it, and

21   I believe that system was the extender system.  And

22   our budget was getting cut, so we were not afforded

23   a lot of money to do those changes.

24        There was -- oh, gosh, there was so much.

25   There was -- our FMLA process was sort of a manual

1    process.  So we worked with Dave Cutri who did an

2    assessment of our FMLA and made some recommendations

3    about what we needed to do to improve that.  And

4    then we -- at that time, we did not have access to

5    an outside party to do it.  We did not -- we did not

6    outsource it at that time.  We did not have approval

7    to outsource it.

8            There was a recommendation and discussion

9    on the table, but it was not outsourced at that

10   time.  So we were still doing it.

11           We actually had a person who was -- Martin

12   May, I believe was his name, who was doing all the

13   FMLAs for both campuses, and then he left.

14        Q    Were you supportive of outsourcing FMLA?

15        A    Yes.  I think -- I think, what I believe,

16   in discussing this with Matt was that -- yes, but

17   I -- what I said, it still had to be a component

18   that was done in-house.

19        Q    What do you mean by that?

20        A    Because the systems, so you had to -- you

21   know, data goes into a system.  I think the part

22   that I was discussing with him that needed to stay

23   in-house was maybe some data entry in that you had

24   to have -- you still had to have a key person or a

25   top -- not a top person, but at least a liaison to

```
 1    the consultant outsourcing it versus the -- you

 2    know, and working for the university, if that makes

 3    sense.  I can explain that better.

 4         Q    All right.  I think I got it.

 5         A    Okay.

 6         Q    Did you onboard your replacement?

 7         A    No.

 8         Q    Okay.

 9         A    No.

10         Q    Did you continue to work after

11    September 18th, 2020?

12         A    Initially, I believe that I did -- what do

13    you call it?  I was actually called for a hearing, I

14    remember.  I can't remember what it was about, but I

15    expressed some concerns to legal, to Janelle,

16    that --

17         Q    Don't need -- don't tell me what those

18    are.

19         A    Okay.

20         Q    I don't want to hear it.

21         A    Okay.

22         Q    Because it's privileged.

23         A    Oh, is it?  I don't work for the

24    university any more.

25         Q    Well, it's not worth getting into.
```

```
 1        A    Okay.

 2        Q    But my question is did you do any work for

 3   the university after --

 4        A    I did.

 5        Q    Okay.

 6        A    Yes.

 7        Q    And I take it you were paid through

 8   December 17th, 2020?

 9        A    Correct.

10             (Whereupon, Defendant's Exhibit F was

11             marked for identification.)

12        Q    Ms. Davis, I take it you recognize

13   Exhibit F?

14        A    Yes.

15        Q    And this is the separation letter that

16   Mr. Schroeder provided to you on September 8th,

17   2020, correct?

18        A    Yes.  September -- you said September 8th?

19        Q    Did I?

20        A    It's September 18th.

21        Q    That's what I meant.

22        A    Okay.

23        Q    I take it you did not find employment

24   during this 90-day period?

25        A    No.
```

1       Q     Since your separation from the university,

2  have you been offered any jobs that you've turned

3  down?

4       A     No.

5       Q     When did you first hear the name John

6  Elliott?  I'll ask you this way --

7       A     Okay.

8       Q     -- was it before or after that

9  December 17th date, the expiration of your 90-day

10  period?

11      A     It might have been after, sometime after,

12  but I can't tell you specifically when.

13      Q     Did Mr. Schroeder ever inform you who was

14  going to replace you as CHRO?

15      A     He did not specifically inform me.  I

16  recall, interestingly, I asked him to address my

17  staff.  I knew that I was going to be transitioning

18  my office out and that they would notice it.  And I

19  asked him if he would address my staff and let them

20  know that -- his plans for the department.  You

21  know, because I said you owe them that; don't leave

22  them in the dark.

23            And we had a Zoom meeting with everybody

24  on the staff, myself, and Matt addressed the staff

25  and said at that point -- and I think that's the

 1   first time I heard.  There was no name mentioned who

 2   was coming in, but I remember him saying we're

 3   getting a real CEO in here -- or excuse me, a CHRO,

 4   and I remember thinking I can't believe you just

 5   said that.

 6        Q    Do you recall when that meeting with your

 7   staff was?

 8        A    It had to be before -- it had to be after

 9   the September 18th that I received the notice.  I'm

10   thinking shortly, but if I had my calendar I could

11   tell you.

12        Q    Is there a recording of that meeting?

13        A    It was on Zoom.  I didn't record it.

14        Q    Okay.  Did anyone else record it to your

15   knowledge?

16        A    I don't know.

17        Q    When you were CHRO, how many direct

18   reports did you have?

19        A    I had an administrative assistant.  I had

20   a director -- let me ask you.  Are you -- as a CHRO

21   in general?  I had a director of employee labor

22   relations; I had a director of affirmative action; I

23   had a director of benefits; I had a director of

24   compensation and HRIS; and then I had two employment

25   directors, one for main campus and one for the

1    clinical enterprise.  Might have been somebody else,

2    but I can't recall.

3         Q    Who was your -- is it director?  Who was

4    your director of employee labor relations?

5         A    Before they left, it was Bethany Ziviski.

6         Q    Was she employed when you were separated?

7         A    Oh, so I had two.  So it was initially

8    Bethany Ziviski.  Dre Wynn replaced Bethany Ziviski.

9         Q    All right.  Affirmative action?

10        A    That would have been Tiffany Murray.

11        Q    Was she still employed by the university

12   when you were separated?

13        A    No.

14        Q    She left?

15        A    Yes.

16        Q    Why?

17        A    Tiffany owned a home -- when I hired her,

18   I hired her from Kent.  She was working at Kent

19   State.  She owned a home there, and she always

20   wanted to go back, from my understanding, because

21   her family's there.  She owned a home there.  And

22   she left to take another job at Kent State.

23        Q    Did you have any performance issues with

24   Tiffany Murray?

25        A    I mean, nothing -- nothing blaring.  It

1    was basically, you know, Tiffany -- Tiffany was very

2    high strung.  She was a go-getter.  And she would

3    often work on things that were not as priority as we

4    needed to be, and so I would just have to redirect

5    her efforts.

6         Q    Was she the individual in human resources

7    responsible for compiling the human -- I'm sorry,

8    the affirmative action plans?

9         A    Yes.

10        Q    All right.  Were there concerns or issues

11   with the affirmative action plans?

12        A    So she did not compile the affirmative

13   action plans.  What our role was, to extrapolate and

14   have the data sent to -- the university at that

15   time, I don't know if they still do, had two

16   consultants working on our plan.  And one was DCI.

17   I don't know the entire title or what those acronyms

18   mean, but they are the ones that review the data and

19   did whatever they needed to do under the law with

20   the data and send it to Attorneys Vorys was the name

21   in Cleveland, I believe.

22        Q    Was there -- were there any issues with

23   the timely submission of affirmative action plans

24   during your stint as CHRO?

25        A    Yes.

```
 1        Q     Whose responsibility was that?

 2        A     Tiffany.

 3        Q     What was she not doing --

 4        A     Well --

 5        Q     -- that resulted in the timeliness issues?

 6        A     Okay.  It wasn't what she wasn't doing.

 7   It was her difficulty of extrapolating the crazy

 8   data that was in our systems.  So if I could give

 9   you an example.

10        Q     Sure.

11        A     So one of the things we were working on

12   was -- it's all how data is put in.  So a lot of

13   times it was put in incorrectly, for instance, and

14   that wasn't just from HR.  There was surrounding

15   people who entered data into our Banner system.

16             So this is just a really simple example.

17   Someone would -- you would put it in as PROF, and

18   then someone would enter it in as professor spelled

19   out, so when you extrapolated the data, you didn't

20   get -- sometimes you didn't get, you know, what

21   you -- the true compilation of the data because --

22   and that was something that -- that was one of the

23   biggest projects we were working on is inserting SAP

24   codes that -- the university never had any SAP

25   codes.  I mean, nightmare.
```

```
 1        Q    And I guess my question is was this a
 2   Tiffany issue or --
 3        A    No, it wasn't.
 4        Q    -- was it just the system?
 5        A    It was mainly -- it was mainly a system
 6   issue of just getting the right data because -- it
 7   wasn't only Tiffany.  She had to work with our HRIS
 8   system.  She had to work with our benefits systems
 9   because they had to be related to compensation.  I
10   mean, I don't -- I wouldn't say it was related to
11   Tiffany.  It was her difficulty --
12        Q    It was --
13        A    It was her difficulty trying to get the
14   data out of the system.
15        Q    Did Tiffany ever express to you
16   frustration or concern with your involvement or lack
17   of involvement in the affirmative action plans?
18        A    No.
19        Q    Are you aware if Tiffany ever expressed
20   that to Willie McKether?
21        A    I heard that since all of this.
22        Q    Okay.
23        A    I read it somewhere.  I don't know where,
24   but --
25        Q    Did you ever talk to Dr. McKether about
```

```
 1   that issue, about Tiffany coming to him --
 2        A    No.
 3        Q    -- with concerns regarding --
 4        A    No.
 5        Q    Dr. McKether never raised that to you?
 6        A    No.
 7        Q    Did you ever talk to Tiffany about that?
 8        A    No.  I didn't know she --
 9        Q    You didn't know that until the litigation
10   process?
11        A    That's correct.
12        Q    Did Tiffany express to you in any way that
13   you were not supportive of her or providing her the
14   necessary tools to get her job done?
15        A    Well, I think she probably had a problem
16   with me redirecting her efforts when we talked about
17   what needed to be done.  You know, she -- she wanted
18   to work on assembling a committee, and I'm like, no,
19   we got to get this plan done and out.  You know,
20   that's the priority.
21             So, no, she never really, per se, said
22   anything to me, but what I can say -- I'm just
23   ascertaining what she might be thinking.
24        Q    All right.  Benefits?
25        A    Yes.
```

```
1        Q    Who was in that spot?

2        A    Oh, initially it was Nate Walker.  Nate

3   resigned and left, and then I hired Brian Pack --

4   Pack, P-A-C-K.

5        Q    Let's go back real quick.  Ziviski is

6   Caucasian, right?

7        A    Yes.

8        Q    Wynn is African American?

9        A    Yes.

10        Q    Murray is African American?

11        A    Yes.

12        Q    And Walker and Brian Pack are Caucasian?

13        A    No.  Nate Walker is African American.

14        Q    Oh, I'm sorry.

15        A    He was hired by Jovita.

16        Q    Okay.  And Brian is Caucasian?

17        A    Yes.

18        Q    All right.  And then you said comp and

19   HRIS, was that one department or is that two?

20        A    Well, at the time it was -- it was a

21   combined department.  Nate had responsibility of

22   compensation, and HRIS might have been another area,

23   but I can't recall.

24        Q    Okay.

25        A    So when I took it on, it got separated.
```

```
 1        Q    And then who led comp and who led HRIS?

 2        A    So Dave Gaus led compensation and HRIS,

 3   and then Brian Pack had employee benefits or

 4   benefits, which included insurance, student

 5   insurance.

 6        Q    I'm sorry.  I thought you testified comp

 7   and HRIS were split?

 8        A    Well, let me go back to clarify it.  When

 9   I took it, it was together and ran by Nate Walker.

10   When Nate left, we decided to -- oh, I'm sorry.

11   This is my confusion.  Nate had benefits, HRIS, and

12   compensation.

13        Q    Okay.

14        A    Okay.  So when I took on the role, I split

15   out benefits and student insurance over to Brian

16   Pack, and David Gaus had compensation and HRIS.

17        Q    Okay.

18        A    Sorry.

19        Q    Gaus is Caucasian?

20        A    Yes.

21        Q    And then you said you had two employment

22   directors; one over campus and one over clinical?

23        A    Yes.

24        Q    Who were those folks?

25        A    Terrie Kovacs was over main campus,
```

1    Caucasian.  Carolyn Chapman.

2         Q    Was over clinical?

3         A    Yes, over clinical.  Well, before Carolyn,

4    it was Erin Momenee who was Caucasian.

5         Q    And Miss Chapman is African American?

6         A    Yes.

7         Q    Did you ever discipline any of those --

8    any of your supervisors?  And I can list them all

9    again.  I don't really want to, but do you recall

10   ever disciplining any of those individuals?

11        A    I don't recall.  I don't recall.

12        Q    Do you recall issuing any of those

13   individuals, your supervisors, performance

14   improvement plans?

15        A    I don't recall.

16        Q    Do you recall issuing any performance

17   evaluations to any of those supervisors you just

18   identified?  Do you recall ever giving anyone an

19   overall score of 2 or 1?

20        A    I don't believe a 1.  I -- I don't recall.

21        Q    How many employees -- when you started as

22   CHRO, how many -- we talked about your direct

23   reports, but how many employees were there in HR?

24        A    Oh, there was -- I don't know the specific

25   numbers, but I would say between -- between 40 and

1  50.

2      Q    And how many open positions were there

3  when you took over as CHRO?

4      A    I don't -- I don't know.

5      Q    Was there any direction or thought to fill

6  open positions when you became CHRO?

7      A    I don't know for sure, but likely I would

8  have been looking at that.

9      Q    I'll rephrase it.  Did anyone express to

10  you that there were concerns regarding the sheer

11  number of open positions and the urgency to fill

12  those positions?

13      A    Not at that time when I took it on, no.

14      Q    Was that expressed to you at any point in

15  time during your tenure as CHRO?

16      A    No.  I always requested to fill positions

17  and that had to go through Matt through the

18  president because of budget concerns.

19      Q    Were you involved in budget forecasting?

20  And by that, I mean, would Matt give you a number,

21  say, hey, this is your budget cut for this year, or

22  were you actively involved in discussions with Matt

23  regarding budget shortfalls and projection for HR?

24      A    No.  I was not involved in creating what

25  the amount was.  I was just given the amount and,

1   you know, instructed to meet that target.

2        Q    Were all departments issued budget cuts

3   during your tenure as CHRO?

4        A    Not all departments, but likely all of --

5   likely a lot of them, so I can't say for certain all

6   of them.

7        Q    Was the university suffering from

8   decreased enrollment?

9        A    As far as I know, some, yes.

10       Q    And as far as you know, was the university

11  facing budget issues?

12       A    Right now?

13       Q    No.  During your tenure as CHRO.

14       A    Yes.

15       Q    Did the number of employees -- I know you

16  said when you became CHRO you estimated it as 40 to

17  50; did that number change during your tenure as

18  CHRO?

19       A    Yes.

20       Q    Up or down?

21       A    Down.

22       Q    When you left, how many employees were

23  there in HR?

24       A    I don't have a number.

25       Q    I mean, was it a substantial decrease in

1   the number of employees?

2        A    What do you mean by substantial?

3        Q    Enough to impact operations.

4        A    No, because we kept our operations going.

5        Q    Well, I understand.  How about were there

6   enough employees that left that it caused you

7   concern?

8        A    Yes.

9        Q    Would you conduct exit interviews with

10  employees who left?

11       A    I didn't, but my staff did.

12       Q    All right.  Was there one person or was

13  there multiple people that did that?

14       A    There might have been multiple people who

15  did that.  It would have been employment staff,

16  meaning those that fell under Terrie Kovacs or

17  Carolyn.

18       Q    They would typically conduct the exit

19  interviews?

20       A    Yes.

21       Q    All right.  Did Terrie or Carolyn, or

22  suppose anyone else, express any concerns with the

23  working environment that they received from those

24  departing?

25       A    No.

1      Q    Did any departing employees tell you

2   directly, not through an exit interview, but tell

3   you directly that they had concerns with the working

4   environment in HR and that resulted in their

5   departure?

6      A    Yes.

7      Q    Who told you that?

8      A    Dan Powell.

9      Q    What did Powell tell you?

10     A    He told me that HR will never have the

11  respect it deserves and is likely why the

12  environment was the way it was.

13     Q    I'm sorry.  It doesn't have the respect

14  from who?

15     A    Well, I don't know.  You'd have to ask

16  him.

17     Q    I mean, did he express --

18     A    No, he didn't.  He didn't say.  He said HR

19  will not have the respect it deserves.

20     Q    Okay.  Let me step back.  Did Dan Powell

21  express concerns to you with the working environment

22  you created as the leader of HR?

23     A    No.  If he did, he didn't say it to my

24  face.

25     Q    Okay.  Were you made aware that one of

```
 1   Dr. Postel's goals as president was to modernize HR?

 2        A    No.

 3        Q    That was never communicated to you?

 4        A    No.  Not until I heard those words

 5   after -- after I heard we were going in a different

 6   direction.

 7        Q    I'm sorry.  I don't follow.

 8        A    Excuse me.  When I met with Matt Schroeder

 9   and he gave me my 90 days and he said it was going

10   in a different direction, at that time he did not

11   disclose that.  I did not hear the word

12   modernization.  I later heard it after I was gone,

13   and I don't know how I heard it.  I can't -- if it

14   was in the newspaper or what.

15        Q    Well, during your -- I guess from the day

16   Dr. Postel started until your separation notice from

17   Matt in September of 2020, was it ever communicated

18   to you by anyone that modernization of HR was one of

19   the goals of Dr. Postel?

20        A    I don't recall.  But I believe that's what

21   I was trying to do while I was there.

22        Q    That's a different question.

23        A    So, yeah, okay.

24        Q    I'm just wondering if that was ever --

25        A    Okay.
```

```
 1        Q    -- if you were ever told that or that was

 2   your understanding?

 3        A    I -- I don't recall.

 4             MR. PIERSALL:  Why don't we take a

 5             quick break?

 6             THE WITNESS:  Okay.

 7             (Whereupon, a recess was taken at

 8             1:17 p.m. and resumed at 1:28 p.m.)

 9   BY MR. PIERSALL:

10        Q    All right.  If you would flip back to your

11   complaint, the lawsuit, which was E.  We're on

12   Number 5.  We were talking about the splitting of

13   your duties to two Caucasian employees, and I think

14   you mentioned something to the effect of that was

15   your understanding at the time.  Has your

16   understanding regarding who --

17        A    Was there a specific place you wanted me

18   to be at?

19        Q    Yeah.  Number 5 on Page 2.

20        A    Okay.

21        Q    And my question is simple:  Did your

22   understanding of who replaced you change?

23        A    I'm not sure what -- can you --

24        Q    Sure.  Correct me if I'm wrong.  You

25   testified -- when I showed this to you before, you
```

```
 1    indicated that that was your understanding at the

 2    time as to what was going to happen with your job

 3    duties or words to that effect, and I'm just

 4    wondering if your understanding of who replaced you

 5    changed?

 6         A    Well, I didn't -- I'm not --

 7                   MR. ABOOD:  Objection.

 8         A    Yeah, I'm not --

 9                   MR. ABOOD:  That mischaracterizes

10         what she said.

11         Q    Who replaced you?  What's your

12    understanding of who replaced you?

13         A    Melissa Hurst and John Elliott.

14         Q    Okay.  What duties did Melissa Hurst take

15    on that you previously performed?

16         A    All training and development, and at times

17    the filling of executive positions.

18         Q    When you were CHRO, did UT conduct any

19    executive searches?

20         A    Yes.  But I can't recall what they were.

21    They absolutely did.

22         Q    Were some of them outsourced?

23         A    Yes.

24         Q    Okay.

25         A    Yeah.
```

```
 1        Q    Can you give me a sense of how many were

 2   in-house versus outsourced?

 3        A    You said a sense of the number?

 4        Q    Yeah.  I mean, were a lot more outsourced

 5   than kept in-house or vice versa?  I don't know.

 6        A    I -- I don't know a number.  I mean, maybe

 7   four or five that were in-house.

 8        Q    Versus more that were outsourced?

 9        A    No.

10        Q    Okay.

11        A    I mean, they -- while I was there, I don't

12   recall filling a whole lot of positions in executive

13   arenas.

14        Q    If you would, take a look at Paragraph 25.

15   It's on Page 6.

16        A    Can I -- can I go back and stay on Page 2

17   for a minute?

18        Q    Sure.  Why not.

19        A    Why not.  Appreciate it.  I was just

20   thinking about this.  You asked me about the

21   African-American employee, and I talked about

22   Carolyn.

23        Q    Uh-huh.

24        A    There were more than one African-American

25   employees for Number 2 --
```

1      Q     Okay.

2      A     -- on Page 2.

3      Q     Let's talk about it then.  Who else are we

4   talking about?

5      A     Dre Wynn.  Dreyon Wynn, D-R-E-Y-O-N.

6      Q     So describe the circumstances surrounding

7   Dreyon that you're referencing in Paragraph 2?

8      A     Well, Mr. Wynn was at -- when I was

9   leaving, was my director of labor employee

10  relations, and we worked with various departments

11  around the university on their labor relations

12  issues.  And we were involved in an issue that came

13  up, a potential ULP that was going to be filed at

14  the university -- on the university because our

15  chief of police, Jeff Newton, was involved in

16  violating the contract and so there were tempers

17  surrounding this time and --

18     Q     I'm sorry.  Did you say tempers?

19     A     Tempers, T-E-M-P-E-R-S.  Tempers, you

20  know, heated conversations about what needed to

21  happen.  And I literally had to go to Matt to say

22  because, of course, Jeff would not listen to me,

23  Jeff Newton, and I said you need to settle this.  We

24  need to settle this.  We got our third-party legal

25  counsel that we use for labor relations involved.

1        Q     Just be cautious about any communications.

2        A     Okay.  Okay.  I got it.

3        Q     There may be attorney-client privilege.

4        A     Okay.  Well, I wasn't going to say what

5   they said, but I was just saying --

6        Q     I'm just -- as soon as you say that, you

7   know I'm going to jump in there and say just watch

8   it.

9        A     Okay.

10       Q     That's all.  You're fine.

11       A     And that, you know, Mr. Newton would not

12  settle this agreement.  And, you know, Mr. Wynn told

13  Mr. -- you know, Mr. -- Jeff -- I'm going to use

14  Jeff, I'm sorry, Jeff, that he needed to settle.

15  And they sort of got into a -- not heated exchange

16  but it was a -- both raised their voices.  Let me

17  say that.

18            And Jeff called me and said, you know,

19  this is -- this is crazy; Dre is not for the

20  university; he's telling me that I need to settle

21  this.  And I said, you do need to settle this.  And

22  he said, well, I'm sick of him and that mother

23  fucker needs to be fired.

24       Q     Okay.

25       A     And that's weird to say because I don't

1    use that word.

2         Q    Okay.  So going back to Number 2, how did

3    Mr. Schroeder -- and I appreciate what you just told

4    me, but how did Schroeder instruct you to interfere

5    in the protected activity of Dre?

6         A    Because Dre was in -- he was -- you know,

7    he was trying to protect the university and

8    asserting his right to let, you know, Mr. Newton

9    know, you know, that this was going to be a ULP

10   against the university.  While he was protecting the

11   university, he was also ensuring that the

12   collective -- excuse me, collective bargaining

13   agreement was not going to be violated.  So, to me,

14   that's the protected activity.

15        Q    Okay.  And my question is how did

16   Schroeder interfere in that?  You said Schroeder

17   instructed you to interfere.

18        A    So he got involved -- he got involved with

19   it because I had to go to him to ask -- ask him to

20   talk to Jeff.

21        Q    Okay.

22        A    So that's -- that's all I want to say

23   about that.

24        Q    No.  My question to you is Matt calling

25   Jeff?  Is that -- what is the interference that

```
 1    Mr. Schroeder engaged in?

 2         A    Well, ultimately Mr. -- ultimately Dre was

 3    fired from the university.

 4         Q    I know -- yes.

 5         A    Yes.

 6         Q    Okay.

 7         A    That's all.  I mean --

 8         Q    I'm going to ask one more time.

 9         A    Yeah.

10         Q    How did Mr. Schroeder instruct you to

11    interfere in the protected activity of Dre Wynn

12    through the use of discipline and ultimately

13    termination?

14         A    Can you ask me that question again?

15         Q    Sure.  How did Mr. Schroeder instruct you

16    to interfere in the protected activity of Dre Wynn

17    through the use of discipline and ultimately

18    termination?

19         A    Well, from my knowledge, he -- I don't

20    believe that he instructed Mr. Newton to change his

21    mind about it.

22         Q    I'm just reading the words on the paper.

23    You put Wynn in Number 2.

24         A    Yeah.

25         Q    Did he -- did Schroeder instruct you to
```

```
 1    interfere -- let's take a step back even further.

 2              Did Schroeder ever instruct you to

 3    discipline Dre Wynn?

 4        A    I don't -- I don't recall specific

 5    instructions.

 6        Q    Did Matt Schroeder instruct you to

 7    terminate Dre Wynn?

 8        A    No.

 9        Q    All right.  I'll give it one more shot.

10        A    Yeah.

11        Q    I'm going back to my original question.

12        A    Right.

13        Q    In what manner, how did Schroeder instruct

14    you to interfere in the protected activity of Dre

15    Wynn through the use of discipline and ultimately

16    termination?

17        A    I don't have an answer.

18        Q    Okay.  Did Mr. Schroeder issue you any

19    instructions regarding Dre Wynn which you refused to

20    follow?

21        A    I can't recall specifically.

22        Q    All right.  Did you file a charge with

23    OFCCP, the Office of Federal Contracting?

24        A    I believe I did, but I can't recall -- I

25    can't recall.  I know -- I can't recall if I did or
```

1    not.

2         Q    Okay.  Do you recall receiving any

3    correspondence from OFCCP?

4         A    Likely, yes.  I just can't recall sitting

5    here.

6         Q    All right.  Do you have any recollection

7    of whether that charge is still pending or it's been

8    closed?

9         A    I don't even know if I filed it.

10        Q    Fair enough.  And I'm going to show you

11   what we marked as Exhibit 18 with Matt, and just

12   take a look at it.

13        A    Okay.

14        Q    It's my understanding that's the one and

15   only performance evaluation that Mr. Schroeder

16   issued to you; is that correct?

17        A    Yes.

18        Q    Was there a plan to have a performance

19   review in 2020?

20        A    I don't know that there was a plan, but

21   the university requires them to be done during a

22   certain period of time.

23        Q    Okay.  Do you know what that time period

24   is?

25        A    It's around -- I believe in spring.  I

```
1    don't know the specific dates, but there's a policy.

2         Q    In your tenure at CHRO, did you comply

3    with that directive; i.e., issue performance

4    evaluations to all of your subordinates in a timely

5    fashion?

6         A    I attempted to.

7         Q    Not my question.  Did you do so?

8         A    As far as I know, yes.

9         Q    What do you mean you attempted to do so?

10        A    Well, I mean, you know, things probably

11   got -- you know, for anybody, you know, you get --

12   you're working on other things and you don't get

13   them done by the date.  But most of mine, I believe

14   that I got them done within a -- within the required

15   time or shortly thereafter.

16        Q    Do you recall ever not issuing a direct

17   report a performance evaluation for any particular

18   year?

19        A    Not that I recall.

20        Q    Can I have that back?

21        A    Yes, you can.

22        Q    Thank you.  And you see the final rating

23   there?  I'm on the right-hand --

24        A    Yes.

25        Q    -- portion of it.
```

1      A    Yes.

2      Q    And your final rating was a 3.  Do you see

3  that?

4      A    Yes, I do.

5      Q    Did you file any response or written

6  response to this evaluation?

7      A    I thought it was on here.  Employee

8  comments.

9      Q    I understand that.

10      A    Is that --

11      Q    Well, I'm wondering if you submitted a

12  separate sheet or a memo or anything in response to

13  the evaluation that you received from

14  Mr. Schroeder --

15      A    To --

16      Q    -- above and beyond the comments?

17      A    To whom?

18      Q    To Matt or anyone else, I suppose.

19      A    I don't recall whether I did or not.

20      Q    Okay.  I'm reading from the manager --

21  here, I think I've got it.  I'm reading from the top

22  there under manager comments, and it says, given --

23  under the second paragraph, given HR's footprint,

24  expectations are high regarding process and system

25  improvements to enhance efficiencies and to minimize

```
 1   workflow disruptions.  Do you see that?
 2        A    Yes.
 3        Q    Did Mr. Schroeder share that with you when
 4   he met with you to issue the performance evaluation?
 5        A    It was on the manager's comments,
 6   I believe.
 7        Q    I understand that.  I'm just wondering if
 8   he reviewed that verbally with you?
 9        A    Not that I recall.  Don't recall.
10        Q    And then he says, in fiscal year '20, I
11   encouraged her and the team to continue to elevate
12   their sense of urgency regarding project delivery.
13   Do you see that?
14        A    Yes.
15        Q    Did Mr. Schroeder verbally tell you that
16   there was a sense of urgency related to project
17   delivery, to use different items such as personnel
18   action reports, I-9s, retirement plans, affirmative
19   action, et cetera?
20        A    I don't recall.
21        Q    Did Mr. Schroeder ever share with you that
22   the pace at which things were being implemented was
23   too slow or not meeting expectations?
24        A    We talked about that.
25        Q    What did Mr. Schroeder say?
```

1      A    I don't recall what he said, but I

2  remember having a conversation about, you know, some

3  of the processes, and like I discussed with Carolyn,

4  that, you know, some of the filling of the vacancies

5  and, you know -- you know, some of those things were

6  slow and he knew the reason why, too.

7      Q    Well, let me -- do you recall any specific

8  processes that were not being implemented quickly

9  enough?

10     A    That he was -- that he was saying to me?

11     Q    Yeah.  Yes.

12     A    I already described one, filling the

13  vacancies.

14     Q    Yes.  I'm referring, though, specifically

15  to those processes that he described in that top

16  paragraph.

17     A    Yeah.  I'm not even sure what -- the

18  personnel action report is the report that went to

19  Dr. Postel, and that was always -- we had deadlines

20  on that, so we got that out and to -- and I believe

21  that went to Matt for review before it went to the

22  president.

23          I'm not sure what the retirement plans

24  were, because we don't develop retirement plans.  So

25  I'm not sure what that is referring to.

 1          Affirmative action, he would have been

 2    discussing the information to -- I'm assuming to --

 3    that we provided to DCI and then to the external

 4    consultant.

 5          And then I don't know what -- the metrics,

 6    we developed the metric system through Power/BI for

 7    the hospital which had never been done before and

 8    that was being done on a regular basis.

 9      Q    Have you ever had a conversation with John

10    Elliott?

11      A    No.

12      Q    Other than the one time Melissa Hurst

13    visited campus, have you ever talked to her?

14      A    No.

15      Q    And if you would flip back to the

16    complaint which is E, and I'm on Number 34, which is

17    Page 7.  And under 34, there's some Roman

18    Numerals -- Roman Numeral I, I should say.  Your

19    recommendations for department restructuring were

20    being constantly rejected based upon Schroeder's

21    changing directives to you or his denying he gave

22    the directives altogether, but then implementing her

23    suggested changes shortly after her termination.  Do

24    you see that?

25      A    Yes.

1      Q    All right.  What recommendations that you

2  gave to Matt were rejected?

3      A    We recommend that, as I talked about

4  before, the Banner system to utilize modules that

5  were already available.  That was denied to use.  We

6  asked for I-9s.  We were already using IntelliCorp,

7  which is a vendor, to do background checks.  We

8  asked that that be expanded to include I-9

9  processing and review.  That was denied.

10          I, as a part of budget -- when Tiffany

11  left the organization, her position became available

12  and we were in the discussion of budgets and how to

13  reduce budgets.  And I requested that her job and

14  the labor relations director's job be combined

15  temporarily until we had received more dollars in

16  the budget to do something different.  That was

17  denied.

18          His basic reasoning was that's clunky and

19  it doesn't make sense, and from my understanding,

20  that's exactly how it is now.  It's a combined area.

21      Q    You're talking about Murray's job and

22  labor relations?

23      A    I'm sorry?

24      Q    When you say it's your understanding

25  that's now the way it is, you're talking about the

1   combination of Murray's job and labor relations?

2        A    Yes.  It's been done by Stacy Latta, and

3   the area is combined if that makes sense.

4        Q    What was Matt's reasoning to reject your

5   recommendation to utilize modules in the Banner

6   system?

7        A    He said it cost too much.

8        Q    Has that since been implemented to your

9   knowledge?

10       A    Yes.

11       Q    How do you know that?

12       A    Well, Melissa said it yesterday.

13       Q    Oh, above and beyond that?

14       A    That's how I know.

15       Q    And what was Matt's response when you

16   asked that IntelliCorp increase their function as

17   opposed to collect the I-9s?

18       A    Well, that period of time, you know, as

19   Matt did regularly, he dragged his feet on a lot of

20   things.  We -- HR was not the only people who did --

21   at least with me he dragged his feet.  He -- HR was

22   not the only entity that processed I-9s.  There were

23   five other entities in the university, but the

24   responsibility really was going to end up lying on

25   HR's plate.

```
 1            So I looked into a program that would

 2   be -- would consistently review and process I-9s

 3   under -- in accordance with the requirements of the

 4   law.

 5       Q    Okay.

 6       A    And there were meetings about it.  You

 7   know, I consistently asked him to, you know, have

 8   these departments to work with us.  I mean, there

 9   was a big project surrounding this, and he basically

10   said it costs too much to do.  And I'm told they

11   have it now.

12       Q    So same as the Banner system, costs too

13   much?

14       A    Yeah.

15       Q    When you say he changed directives to you

16   or denied he gave them altogether, what do you mean

17   by that?

18       A    Well, I mean, you know, we were working on

19   layoffs around COVID, and I recall a time where he

20   gave me one directive to move forward with layoffs

21   of a certain group of people.  We worked tirelessly,

22   my staff and I, to get the layoff letters in

23   accordance with the contract.  We met with the union

24   officials about it.  I mean, we did everything we

25   were supposed to do under the contract to get this
```

 1   ball rolling.

 2          Then he came back and he changed it.  So

 3   we had to change letters.  We had to remeet with the

 4   union.  And then I remember that night we walked out

 5   of HR at 12:00 at night.

 6      Q    Was the understanding that Mr. Schroeder

 7   was trying to avoid laying people off?

 8      A    No.

 9      Q    No?

10      A    Because they were hired back very shortly.

11      Q    I'm sorry, what group is this?

12      A    I believe it was probably CWA more so.  It

13   might have been other groups, too, but I remember

14   the CWA group, which is Communication Workers of

15   America.  It's one of the unions.

16      Q    What directives -- that's the one he

17   changed, right?

18      A    Yes.

19      Q    Can you give me an example or give me all

20   examples of the directives he denied giving

21   altogether?

22      A    That he denied giving?

23      Q    Uh-huh.

24      A    You said directives or resources?  I don't

25   understand the question.

1        Q    Mr. Schroeder changed directives to

2   Miss Davis or he denied he gave the directives

3   altogether.  That's what I'm looking at.

4        A    Okay.

5        Q    Paragraph 34, Roman Numeral I.  And you

6   just discussed the changing directives.

7        A    Uh-huh.

8        Q    Are there any other directives that you

9   can recall Mr. Schroeder changing?

10       A    There were -- there were lots surrounding

11  the benefits area.  We were doing a lot of work

12  with -- there was a requirement that came down

13  relative to retirement programs.  We had to identify

14  fiduciary for our plans, so we had to get -- we had

15  to get -- excuse me.  We had to get a committee

16  together, which he was a part of.  And there was a

17  lot of confusion around that committee, and there

18  was a lot of -- and it was all new to us, including

19  him.  But there was a lot of confusion about how we

20  needed to proceed with this.

21       Q    I understand there may have been

22  confusion --

23       A    So -- right.

24       Q    -- but did he issue any change in

25  directives with respect to the benefits area?

1      A      Yeah.  There was -- there was change in

2  directives with who -- what plan we were going to go

3  with, what vendors we were going to go with, and I

4  can't articulate the specific vendors that we had at

5  that time.  Would have been Paramount was one of

6  them.

7      Q      They were -- UT was changing their

8  benefits provider?

9      A      Yes.

10     Q      Providers?

11     A      Yes.

12     Q      And Matt made up his mind -- I just want

13  to be clear.  Matt made up his mind on one

14  particular vendor, and then would change it?

15     A      Yes.  And so we had to do a lot more work

16  on that, and it just prolonged things.

17     Q      All right.

18     A      And another area was the wellness team.

19  We had to jump through a lot of hoops to verify

20  their existence, and we worked with another area

21  which was on the academic side who had wellness as

22  well, and we all made an actual recommendation to

23  make some changes in the wellness area and he

24  initially accepted them, then he changed his mind,

25  and we ended up keeping wellness.

```
 1        Q    Okay.  What directives did he deny giving
 2   altogether?
 3        A    I'm sorry.  I'm having a little trouble
 4   understanding the difference between a directive and
 5   a resource.  I'm sorry.  That was --
 6        Q    The words on the paper say directives --
 7        A    Right.
 8        Q    -- so that's what I'm going with.  Can you
 9   recall any?
10        A    Other than ones that I talked -- I talked
11   about was just the -- you know, the resources and,
12   you know, my team and I actually went to a meeting
13   with him to talk about -- and we were told we want
14   the restructure of the HR reorganization, and it
15   was -- when I say my team, it was my -- me and
16   probably four of my directors.  The only one I don't
17   recall being there -- he might have been -- Brian
18   Pack was not there, and we -- he initially okayed
19   the restructure of the organization, and then when
20   we went to have our final meeting with him, he said,
21   oh, no, no, no, it's too top heavy.
22             And, you know, what's interesting is the
23   way it's structured right now is what I proposed to
24   Matt.
25        Q    My question, though, was did he deny
```

 1  giving that directive?

 2       A    Did he deny giving the directive?  I'm not

 3  understanding.  I'm not understanding what you're

 4  asking me, but --

 5       Q    I'll try to rephrase it.

 6       A    Okay.

 7       Q    One of your allegations is that Matt

 8  Schroeder -- I'll just read it.

 9            Her, that's you, Wendy Davis's

10  recommendations for department restructuring being

11  constantly rejected based upon Mr. Schroeder's

12  changing directives to Miss Davis.

13       A    Uh-huh.

14       Q    Let's hard stop right there.

15       A    Yeah.

16       Q    I think we talked about the changing

17  directives.  You've given me examples.

18       A    Uh-huh.

19       Q    New clause in the sentence.

20       A    Okay.

21       Q    Or his denying he gave the directives

22  altogether.

23            So my question to you is what directives,

24  it sounds like related to restructuring, did Matt

25  deny giving altogether?

```
 1        A    Well, it was related to the restructure of

 2   the organization.  When I went back to talk to him

 3   about that -- well, he sent us back away to redo it,

 4   and he came back again, and, you know, I basically

 5   said -- I just didn't understand why he was denying

 6   it, and now what I have recommended is the same

 7   thing.  I mean, that's all I can say about it.

 8        Q    Okay.  Let me try to ask it this way:  Did

 9   Matt ever instruct you to do something, issue a

10   directive, and then you went back to him at some

11   point in the future, maybe a day, maybe a week,

12   maybe several months later, and Matt said, I never

13   told you to do that or I never gave you that

14   directive or words to that effect?

15        A    Other than what I told you, it escapes me

16   at this moment.

17        Q    Okay.  While you were CHRO, were any human

18   resources employees, to your knowledge, placed on a

19   PIP?

20        A    Not that I recall but that's not unusual.

21   I wouldn't necessarily know about my direct reports.

22        Q    What do you mean?

23        A    I mean, I wouldn't -- I wouldn't always

24   know if they've had discipline, because you said

25   abroad HR, correct?
```

```
 1        Q    I did.  Sure.
 2        A    Yeah.  Are you talking about termination
 3   or discipline?
 4        Q    I'm just talking about a PIP.
 5        A    A PIP?  Yes.  I'm -- I might be aware of a
 6   PIP.
 7        Q    All right.  During your tenure as CHRO?
 8        A    Oh, yes, I was.  I'm sorry.
 9        Q    What HR employees received a PIP?
10        A    Lisa Simpson received a PIP.  I'm sorry.
11   I just misunderstood your question.
12        Q    Yeah.
13        A    Lisa Simpson, I believe, received a PIP.
14   Lisa was the labor relations person, and she left
15   and she -- she's come back, so she's a -- she
16   received a PIP and it was on untimely -- untimely
17   work, submitting untimely work and working with her
18   customers which would have been all the unions.
19        Q    Did she report to Dre?
20        A    No.  She initially reported to -- she
21   reported to Erin, and then she reported to Beth, and
22   Beth is the one that gave her the PIP.
23        Q    Beth Ziviski?
24        A    Beth Ziviski.
25        Q    Did you assist Beth in drafting and
```

 1   preparing the PIP?

 2        A    I don't recall I did.  Yeah.  And

 3   I believe another person that received a PIP was

 4   Bonnie Harrell.  She was working in the HRIS.

 5   And --

 6        Q    Bonnie Harrell?

 7        A    Yeah.  I think it's H-A-R-R-E-L-S.

 8        Q    Harrell, E-L-L, I think.

 9        A    Yeah.  And I believe also -- who received

10   a PIP?  Kelley Guldenpfennig.  I can't say her -- we

11   used to call her Kelley G.  And then there was

12   another employee.  Oh, gosh, she was oddly a union

13   employee, CWA employee, and I'm escaping her name.

14        Q    But she was an HR employee?

15        A    Yes.

16        Q    What area was she in?

17        A    I think she worked in -- I think she

18   worked in HRIS.

19        Q    All right.  Bonnie Harrell, who issued the

20   PIP to her?

21        A    I believe it was David Gaus, or it's --

22   I'm sorry, it was either Nate Walker or David Gaus.

23        Q    Why?

24        A    I believe it was -- I just remember the

25   PIP.  I don't remember the particulars of it.

1      Q    Do you know if Bonnie successfully

2  completed the PIP?

3      A    Oh, I assume she did.  She left the

4  organization.

5      Q    Did Lisa Simpson successfully complete her

6  PIP?

7      A    I -- I don't know.  I guess she did.  I

8  assume she did.

9      Q    All right.  Kelley Guldenpfennig, Kelley

10  G.?

11      A    Uh-huh.

12      Q    Who issued that PIP?

13      A    I believe that was Nate Walker.

14      Q    Why?

15      A    Kelley -- Kelley was our HRIS person and

16  who knew a lot about that system and the information

17  that was in it, but she was seemingly unwilling

18  to -- unwilling to work with people in the HR to get

19  the information.  There was some complaints about

20  her performance.

21      Q    What was the result of her PIP?  Did she

22  complete it?

23      A    As far as I know.

24      Q    Who issued the PIP to the CWA employee?

25      A    That might have been David Gaus, because

 1   I believe David was her supervisor.

 2        Q    Do you know if she successfully completed

 3   that?

 4        A    As far as I know.  Don't know -- no.

 5   Well, I don't know.  She was let go --

 6        Q    Okay.

 7        A    -- for cause.

 8        Q    Do you remember her race?

 9        A    Caucasian.

10        Q    Did other areas of the university come to

11   HR?  I assume they had performance management

12   questions regarding employees?

13        A    Yes.

14        Q    Did you help other areas of the university

15   craft PIPs?

16        A    No.  That was not regularly something I

17   did unless it was a VP, you know, would call me, but

18   probably supervisors and line supervisors would go

19   to Terrie Kovacs and Carolyn.

20        Q    Okay.  So that would be their point of

21   contact for crafting a PIP?

22        A    Yeah.  I mean, it wasn't a hard, you know,

23   etched in stone that that would happen, but usually

24   that's how it happened.

25        Q    Did you ever help draft PIPs?

1      A      Probably.  Yeah, can't recall.

2      Q      Do you remember any specific ones?

3      A      Not that's ringing a bell at this point.

4      Q      Roman Numeral III, back on the complaint,

5  says you were discharged without being offered any

6  opportunity to transfer to a different position

7  within the university.

8      A      Uh-huh.

9      Q      Are you aware of any individuals who were

10  offered the opportunity to transfer to a different

11  position?

12     A      Yes.

13     Q      Who?

14     A      Terrie Kovacs.

15     Q      What position?

16     A      She was demoted back to an HR consultant.

17     Q      Anyone else other than Kovacs?

18     A      There was a lady who worked in Dr. Gaber's

19  office, but I cannot recall her name.  There were

20  multiple complaints about her, her behavior, and she

21  was allowed to move to another position.

22     Q      Was this while you were CHRO?

23     A      Yes.

24     Q      Was she demoted?

25     A      No.

```
 1        Q     This was just a lateral transfer?

 2        A     Yes.

 3        Q     What was her race?

 4        A     Caucasian.

 5        Q     Was that Joan Stasa.

 6        A     Stasa, yes.  Yes.  Thank you.

 7        Q     Were you involved in assisting the

 8   president's office with that lateral transfer?

 9        A     No.  No.

10        Q     Do you know, did they contact anyone

11   within HR regarding that?

12        A     I don't know, but I was not.

13        Q     Number IV there, Roman Numeral IV, you

14   were excluded from meetings held with other

15   department heads wherein Schroeder would, without

16   your knowledge or consent, purport to speak on your

17   behalf?

18        A     Yes.

19        Q     What meetings were you excluded from?

20        A     Often, especially around the COVID time,

21   we were asked to discuss issues surrounding COVID

22   and what needed to occur with the VPs and the

23   requirements and where we were going with it.

24              I was not allowed to or permitted to

25   discuss these at the VP meetings.  Matt did it.
```

```
 1        Q    My question, though, was what meetings

 2   were you excluded from?

 3        A    So meetings I was excluded from, when we

 4   were talking about HR and the systems with Bill

 5   McCreary who was the CI -- CIO?  I think it's CIO,

 6   chief information officer.  There were a lot of

 7   discussions surrounding, you know, what systems we

 8   would be using in terms of the applicant --

 9   applicant -- what do they call that?  The applicant

10   system.

11        Q    Job applicants?

12        A    Yeah.  It was the applicant tracking

13   system.

14        Q    All right.

15        A    So I was excluded from some of those

16   meetings.

17        Q    Do you know who was in those meetings?

18        A    Yes.  Matt, Bill McCreary, and David,

19   David Gaus who reported to me.  Often -- often

20   people like David Gaus or Brian Pack would be

21   invited to meetings and I was not.  Often Matt would

22   call those individuals.  They reported to me, and

23   they would discuss things that I should have been

24   aware of.

25        Q    How did you find out that these meetings
```

1   had taken place?

2        A    Later, after the fact, you know, they

3   would mention it to me, and I would be like, well,

4   why wasn't I at that meeting.

5        Q    And what do you mean by Schroeder would

6   purport to speak on your behalf?

7        A    Well, at those meetings.  So, for

8   instance, at the meeting where, as a CHRO, I should

9   have been invited to, the meetings to talk to the

10  VPs about what was going on with COVID, for

11  instance, he did those meetings instead of inviting

12  me.

13        People on his other staff, Jason Toth,

14  Jeff Newton were invited to those meetings

15  occasionally and asked to speak, so he spoke on my

16  behalf.

17        Q    And how did you find out what was shared

18  at that meeting by Schroeder?

19        A    Probably from Matt.  I mean, just say, you

20  know, this is what was discussed.  I mean, he

21  followed up.

22        Q    I mean, was he trying to hide the meetings

23  from you?

24        A    He didn't tell me about them.  I don't

25  know if he was trying to hide them.  He didn't tell

 1   me about them.

 2        Q     When you say these meetings with vice

 3   presidents, was this a senior staff meeting?  Is

 4   that what you're referring to?

 5        A     Yes.

 6        Q     Were you on the senior staff?

 7        A     No.

 8        Q     Okay.  But there were people that were

 9   vice president level or above?

10        A     Or associate vice president at my level

11   that -- who were invited to those meetings --

12        Q     Who?

13        A     -- to speak at those meetings.

14        Q     Who?

15        A     Jason Toth and Jeff Newton.

16        Q     They're both AVPs?

17        A     Yes.

18        Q     Associate vice presidents?

19        A     Jeff Newton was not then.  He has sense

20   become AVP.  He was chief of police.

21        Q     Do you know if those two individuals

22   regularly attended the VP meetings?

23        A     Not regularly, I don't believe.

24        Q     Did you ever attend a senior staff

25   meeting?

1        A       When Larry Kelley was my boss, I did.

2        Q       Next Roman Numeral, manipulated Davis's

3   performance to make her appear incompetent through

4   the use of budget cuts and restructuring changes.

5   Explain --

6        A       Which one?

7        Q       Yeah.  The very bottom of the page.  Page

8   7, Exhibit E, Roman Numeral V.

9        A       Well, this is related, you know, to budget

10  cuts and restructuring.  I mean, I discussed how my

11  budget was consistently cut leaving me no ability to

12  restructure, to provide new services, to provide new

13  systems, to not approve my restructures, to not

14  approve things I was requesting, to fix the things

15  in HR, particularly, you know, some of the open

16  positions that were there.  I requested that, you

17  know, a few positions be combined.  I was denied

18  that.

19       Q       And you made proposals -- excuse me.  You

20  made proposals regarding restructuring changes,

21  correct?

22       A       Yes.

23       Q       What were the restructuring changes that

24  you proposed that were ultimately implemented?

25       A       For me?

 1      Q     Yeah.

 2      A     There were a few positions that -- for

 3  instance, I believe when Dan -- for instance, Dan

 4  Powell left.  I was afforded permission to fill his

 5  position.  I think it was Dan's.  It might have been

 6  Lisa's position, because they held the same

 7  position.  So I was afforded to fill that position.

 8  Might have been Lisa.

 9      Q     I'm sorry.  That was -- what was that

10  restructuring change?  Was that a restructuring

11  change you recommended?

12      A     Yes.

13      Q     Okay.  Any other restructuring changes

14  that you recommended that were adopted?

15      A     No, not that I can remember.

16      Q     All right.  Go to the top of the next

17  page, please.  Roman Numeral VI.  Retaliating

18  against you for your refusal to discipline and

19  terminate an African-American male administrator

20  without justification who was actively engaged in

21  activities protected under the law.

22            Do you see that?

23      A     Uh-huh.

24      Q     Are you referring to Dre Wynn?

25      A     Yes.

 1     Q    Okay.  And we've already talked about

 2  that, right?

 3     A    Yes.  That's what we were referring to.

 4     Q    Look at 36.  Elliott and Hurst were both

 5  initially hired by the university as consultants.

 6  Do you see that?

 7     A    Yes.

 8     Q    That's not accurate, is it?

 9     A    No.  They ultimately were not hired as

10  consultants.  But they -- their presence was -- was

11  insinuated that they were coming in as consultants

12  by Matt Schroeder to me.

13     Q    Understand.

14     A    Okay.

15     Q    They weren't hired as consultants, were

16  they?

17     A    No.

18     Q    You agree with that, correct?

19     A    No.

20     Q    No, you --

21     A    Well, what's interesting about their hire

22  is, I mean, what they were hired to do is come in

23  and allegedly fix HR for a set amount of time.  So

24  call it consult -- permanent individuals don't have

25  an end date usually, usually, on their -- you know,

1    on their new hire paperwork, and they had an end

2    date.

3         Q    Let me try this again.

4         A    Okay.

5         Q    Were Elliott and Hurst hired by the

6    university as consultants?

7         A    From my knowledge, no.

8         Q    It says there, on 37 I'm looking at, were

9    hired without their new job positions having job

10   descriptions, approved in accord with Ohio State law

11   and regulations.

12             Do you see that?

13        A    Uh-huh.  Yes.

14        Q    What are you basing that on that they did

15   not have job descriptions?

16        A    So their job descriptions, I believe

17   Melissa's was a new position to the university and

18   should have been approved or gone through the

19   channels of adding it to the classification plan.  I

20   don't know and don't believe that that occurred.

21        Q    I'm just -- my question is solely focused

22   on job descriptions.

23        A    Yeah.  That's what I'm talking about.  I'm

24   not sure --

25        Q    Well, let me ask you:  Do you know if

1   Miss Hurst's position she was hired into has a job

2   description?

3       A    Yes.  Yes.  As far as I know, yes.  You

4   asked me if it -- go ahead and ask me the question

5   again.

6       Q    Does Mr. Elliott's position have a job

7   description to your knowledge?

8       A    I don't know.  I assumed.

9       Q    39 says, upon information and belief, both

10  Elliott and Hurst were friends of University

11  President Postel, a Caucasian male who had

12  previously worked with him.

13           Where did you learn that?  Where did you

14  hear that?

15      A    Oh, I'm not sure where I heard it.  I'm

16  not sure where I heard it, but I heard it yesterday

17  from -- that they worked together.

18      Q    Right.  And I'm just wondering where you

19  heard that they were friends.  That's all I'm

20  wondering.

21      A    Yeah.  I don't -- I can't recall.

22      Q    42 --

23      A    And it might have been through Willie

24  McKether.

25      Q    42 on Page 9 there.  You say, the reasons

1    asserted by the university for terminating you, and

2    you go on to list some specific reasons.

3            Where did those specific reasons come

4    from?  And by that, I'm referring to she was fired

5    for budgetary reasons.  She was terminated for

6    failure to implement adequate cuts to the

7    university's HR department.  Do you see those there?

8        A    Yes.

9        Q    Where did you get those?

10       A    Well, that was my indication and my belief

11   of why I was terminated from the University of

12   Toledo.

13       Q    Right.  And I'm just wondering where you

14   got those from.

15       A    Yeah.  Well, because of my interaction

16   with Matt.  He consistently pressed me to terminate

17   Carrie Herr, which we talked about before, and I did

18   not do that.  I was told by Jeff Newton that I

19   needed to terminate, in so many terms, Dre Wynn, and

20   I didn't do that.  So it's my belief in how I

21   believe I was treated.

22       Q    Do you know if Newton ever told Schroeder

23   that he wanted Dre fired?

24       A    I don't know.

25       Q    Did Schroeder ever express that to you?

```
 1        A    No.

 2        Q    And at the very end there, after 42, it

 3   says, the claim of budgetary constraints was

 4   patently false?

 5        A    Where is that?

 6        Q    The very last sentence that appears right

 7   above the footnote.  Paragraph 42.

 8        A    Uh-huh.  Yes.

 9        Q    What claim of budgetary constraints was

10   patently false?

11        A    Is it in the footnote or above it?  I'm

12   sorry.

13        Q    Yes.

14             MR. ABOOD:  Are you in Exhibit 2?

15        A    Okay.

16        Q    Exhibit E, Paragraph 42, Page 9.

17             MR. ABOOD:  Do you have Exhibit 2?

18             There's a reference that refers to --

19             MR. PIERSALL:  Oh, no, I don't.

20        Q    Do you know what that's referring to?

21        A    No, I don't.

22        Q    Okay.

23        A    I'm sorry.

24        Q    43.  If you would take a look at 43 on the

25   top of Page 10.  Are we talking about Dre again?
```

```
 1        A    Yes.

 2        Q    Okay.  46, if you would, it says, it was

 3   at this point -- feel free to read 44 and 45.  It

 4   was at this point that the university's chief

 5   negotiator, an African-American male -- are you

 6   referring to Dre?

 7        A    Yes.

 8        Q    -- follow the -- the police chief follow

 9   the advice of the university's outside counsel.  You

10   said that Dre recommended that Newton follow the

11   advice of outside counsel?

12        A    Yeah.

13        Q    Is that the names?

14        A    Yes.

15        Q    48, plaintiff refused to discipline or

16   terminate Dre based on the lack of merit for the

17   recommended termination and the liability to which

18   such action would expose the university,

19   particularly because of the university -- of Dre's

20   active involvement in other protected activities,

21   all of which were well known to the university.

22             So did you tell Newton, when he said fire

23   this mother fucker, did you tell him, I'm not going

24   to do that or words to that effect?

25        A    Yes, I did.
```

 1        Q    Do you remember what you said exactly?

 2        A    And I said, and we need to -- let's just

 3    all talk about this, because, you know, they were

 4    both heated.

 5        Q    Do you think Newton was being serious

 6    about firing him, or do you think he was just

 7    frustrated?

 8        A    I think he was both.

 9        Q    When you say Dre's active involvement in

10    other protected activities which were well known to

11    UT, what did you mean by that?

12        A    It was basically his activity of --

13    especially relative to terminations and discipline

14    and, you know, Dre's the type of person that he

15    doesn't mince his words.  I mean, he -- if he felt

16    that university management was wrong, he would tell

17    them.  They didn't like that a lot of times.  And I

18    don't know if I answered your question, but that's

19    what I'm referring to.

20        Q    Can you give me an example of a discipline

21    that he opposed?

22        A    Yes.  One that I can think of off the top

23    of my head was with an employee that worked at the

24    hospital.  They did not -- they wanted her

25    terminated and he -- he refused to agree with the

```
1    recommendation for termination based on the
2    background, based on, you know, the investigation.
3              She was -- I don't know if this played a
4    part, but she happened to be African American, and
5    it was based on the background -- I mean, the
6    supervisor and her handling of the situation.
7         Q    Was she a bargaining unit employee?
8         A    The employee?
9         Q    Yeah.
10        A    That's a good question.  I'm not sure.
11   Yes, I believe she was.
12        Q    Okay.
13        A    So Dre's job was not only to make
14   recommendations on bargaining unit but also
15   non-bargaining as he was in employee relations, too.
16        Q    Okay.  Correct me if I'm wrong --
17        A    Okay.
18        Q    Well, no, correct me if I'm wrong, but you
19   have the ultimate authority, though, correct, to
20   make that termination decision?
21        A    Well, most of my -- when I signed off on
22   terminations, they were recommendations from the
23   directors.  Yes.
24        Q    I understand that.
25        A    Okay.
```

```
 1        Q     But you possessed the ultimate authority,
 2   though, correct?
 3        A     As a signer or the appointing authority,
 4   yeah.  Matt's an appointing authority.
 5        Q     I wasn't asking about Matt, though.
 6        A     He terminated -- well, you asked me a
 7   question so --
 8        Q     Well, I asked if you possessed the
 9   authority --
10        A     Uh-huh.
11        Q     -- to disregard a recommendation and
12   effectuate a removal?
13        A     Yes.
14        Q     Do you recall any recommendations that you
15   went against as it pertained to employee discipline
16   or termination?
17        A     It's been three years since I've been
18   there.
19        Q     That's an "I don't remember"?
20        A     Yeah.  I don't remember.
21        Q     Look at 49 on the top of the next page,
22   please.  You say, as a result of plaintiff's refusal
23   to wrongfully discipline or terminate Dre, the
24   university's police chief, Newton, went to Schroeder
25   and engaged his assistance in an attempt to force
```

```
 1   Wendy Davis into the unwarranted discipline of Dre.

 2   Right?

 3        A    Yes.

 4        Q    Did that happen?

 5        A    It's -- I was under the impression it

 6   happened.

 7        Q    I'll rephrase.

 8        A    I don't know.

 9        Q    Okay.  What led you to that belief?

10        A    Because Dre was ultimately terminated.

11        Q    To your knowledge, did Matt Schroeder ever

12   attempt to terminate Dre while you were employed by

13   the university?

14        A    I don't know when Dre was terminated, but

15   while I was there, which was a short period of time,

16   no.

17        Q    On Number 50 there, it says, shortly after

18   refusing to abide the university's attempts through

19   Schroeder and others to have plaintiff wrongfully

20   interfere with African-American employee's protected

21   activities, plaintiff was terminated by defendant.

22   Do you see that?

23        A    Yes.

24        Q    When you say Mr. Schroeder and others, who

25   are the others?
```

1        A    I'm not sure who the others are.

2        Q    Okay.  And it says to have plaintiff

3   wrongfully interfere with another African-American

4   employee's protected activities, who are you

5   referring to?  What African-American employee?

6        A    I -- the only two people I'm aware of

7   is -- or excuse me, is Dre Wynn and Carolyn.

8        Q    Right.  And we've established that

9   Mr. Schroeder did not try to interfere with Dre

10  Wynn's protected activities during your employment,

11  correct?

12       A    As far as I know.

13       Q    All right.  Who do you believe at the

14  university engaged in race discrimination against

15  you?

16       A    Matt Schroeder.

17       Q    Anyone else?

18       A    No.

19       Q    Who do you believe at the university

20  engaged in retaliation against you?

21       A    Matt Schroeder.

22       Q    Anyone else?

23       A    No.

24       Q    54 says, as detailed above, defendant

25  targeted plaintiff with racial bias.  Do you see

```
 1   that?  It's toward the bottom of Page 11.

 2        A    Yes.

 3        Q    Are there any other examples, above and

 4   beyond what we've already discussed, that you

 5   believe the university engaged in racial bias

 6   directed towards you?

 7        A    It was what I talked about earlier,

 8   withholding resources, and you're asking about --

 9   and it was Matt Schroeder --

10        Q    Okay.

11        A    -- implementing things that I suggested

12   after the fact.

13        Q    But -- and my question to you is there

14   anything else?

15        A    No.

16        Q    Is there anything that you're referring

17   to?  We talked about actions that were implemented

18   after the fact.  My question to you is are there any

19   other examples or incidents of alleged racial bias

20   that you're referencing that we haven't already

21   discussed?

22        A    No.

23        Q    Okay.  Do you know of any unclassified

24   employees who were afforded a hearing prior to their

25   termination?
```

```
 1       A    Yes.  Oh, my gosh, but I'm drawing a blank

 2   on their names.

 3       Q    Uh-huh.

 4       A    I recall this being discussed.  My first

 5   discussions on it was in -- when I first came to the

 6   university, and with Jovita, who was very specific

 7   about non-bargaining unit employees having hearings,

 8   because we did those for bargaining unit and

 9   classified employees, and she believed that they

10   were not afforded hearings.

11       Q    I'm sorry.  Who?  When you say they --

12       A    Jovita Thomas-Williams.

13       Q    I understand.  When you say they were not

14   afforded a hearing.

15       A    Well, that -- not -- unclassified were not

16   of -- I'm telling you about a discussion I had with

17   her.

18       Q    Okay.

19       A    Right.

20       Q    I understand.

21       A    Okay.  Sorry.

22       Q    I'll try to simplify it.  Are you aware of

23   any unclassified employees who received a hearing

24   prior to their separation?

25       A    Yes.  But I am drawing a blank on the
```

 1  name.

 2       Q     Let me try to narrow it.

 3       A     Yes.

 4       Q     During your tenure as CHRO, were any

 5  unclassified employees offered a hearing?

 6       A     Yes.

 7       Q     Prior to their termination?

 8       A     I believe so, yes.

 9       Q     Can you think of any names?

10       A     I'm drawing a blank on names, but I can

11  get back to you on that.

12       Q     Would you -- I'm not asking you in a legal

13  capacity, but based on your familiarity with the

14  university's policies, is it your understanding that

15  university employees who are unclassified are not

16  entitled to a hearing?

17       A     They're -- under the law, they're not

18  entitled to a hearing, but UT is a little different.

19       Q     In what sense?

20       A     They have, in the past, allowed

21  non-bargaining unit employees to have hearings.  And

22  there was a discussion, and you can -- you said that

23  I can't reference legal because of privilege, but we

24  talked with legal about this.

25       Q     Okay.

```
 1        A    And we had varying opinions I'll say.

 2        Q    Let me ask you the converse.  Are you

 3   aware of university employees who are unclassified

 4   who were separated without a hearing?

 5        A    Yes.

 6        Q    Take a look at 71 which is at the very

 7   bottom of Page 13.  It says, plaintiff, Miss Davis,

 8   was instructed by UT to wrongfully discipline

 9   another African-American employee based solely on

10   personal vendettas and racial discrimination during

11   the time in which that African-American employee was

12   engaged in protected activity.

13             Do you see that?

14        A    Yes.

15        Q    Who's the African-American employee?

16        A    That would be Dre Wynn.

17        Q    And who possessed the personal vendetta

18   against Dre?

19        A    Jeff Newton.

20        Q    Did Jeff Newton have the authority or

21   ability to fire Dre Wynn?

22                  MR. ABOOD:  Objection.  Form.

23        A    Oh.

24        Q    Do you understand my question?

25        A    I do understand your question.
```

```
 1        Q    I thought I asked it fairly well.

 2              MR. ABOOD:  It's a very vague

 3         question.  That's a very vague question.

 4              MR. PIERSALL:  She understands it so

 5         she can answer it.

 6        A    Would you repeat it?

 7        Q    Sure.  Did Jeff Newton have the authority

 8   to fire Dre Wynn?

 9              MR. ABOOD:  That's a different

10         question.

11              MR. PIERSALL:  I tried to -- geez.

12              MR. ABOOD:  I'm not -- I'm just

13         saying.

14              MR. PIERSALL:  It is a different

15         question because I'm trying to streamline

16         things, but I can go back to the original

17         one.

18        Q    But could Jeff Newton fire Dre Wynn?

19        A    He's not an appointing authority.

20        Q    So that's a --

21        A    No.  He sure could add to it.

22        Q    I'm sorry?

23        A    I said he sure could add information to

24   it.

25        Q    To what?
```

```
 1        A    To his firing.

 2        Q    Jeff Newton could add what information?

 3   To Dre's firing?

 4        A    Yeah.

 5        Q    What are you referencing?

 6        A    I'm referencing the fact that he could

 7   make a complaint regarding Dre's behavior, and he

 8   had issue with Dre and his work that he can make a

 9   complaint to Matt.  That's all I'm saying.

10        Q    And you have no information that would

11   lead you to the belief --

12        A    I don't, but --

13        Q    Let me finish my question.

14        A    Okay.

15        Q    And you have absolutely no information

16   that Newton made a complaint to Matt Schroeder or to

17   anyone else regarding Dre Wynn?

18        A    I don't.  But I do not have any

19   information that he didn't either.  So I answered

20   the question.

21        Q    Did Newton express concerns to you about

22   the performance of any other employee?

23        A    Yes.

24        Q    Who?

25        A    Lisa Simpson.
```

```
 1         Q    Did he ask that you fire her?

 2         A    No.

 3         Q    Did he make a complaint to Matt, to your

 4    knowledge, about Lisa?

 5         A    Not that I'm aware of.  I don't -- not

 6    that I'm aware.

 7         Q    But he could have?

 8         A    He could have.

 9         Q    When you say Newton had a personal

10    vendetta against Dre, what was the personal nature

11    of it?

12         A    It was, I believe, the heated exchange

13    they had relative to the contract violation and that

14    Dre pushed him into the decision to acquiesce.

15         Q    Okay.  But this --

16         A    Does that make sense?

17         Q    Yeah.

18         A    I'm sorry.

19         Q    When I hear personal, it wasn't like they

20    got into a fight at a bar?

21         A    Oh, no.

22         Q    I mean, this was a professional dispute?

23         A    Yes.

24         Q    Okay.

25         A    Yes.
```

```
 1        Q    Over a collective bargaining agreement,
 2   correct?
 3        A    I'm not aware of them getting into a fight
 4   personally.
 5        Q    Right.
 6        A    But --
 7        Q    No.  When you said personal, I wondered if
 8   there was any personal animosity.  This was a
 9   dispute over whether or not a bargaining agreement
10   should be entered into?
11        A    Well, he personally didn't like him.
12   That's for sure.
13        Q    Well, I understand that.
14        A    So --
15        Q    Let me ask you this:  Outside of this
16   issue surrounding the collective bargaining
17   agreement -- and this was an FOP contract, right?
18        A    No.  UTPPA.
19        Q    I'm sorry.  UTPPA.
20        A    Uh-huh.
21        Q    Outside of that contract, are you aware of
22   any concerns Newton had with Dre?
23        A    I mean, just -- just his style in general.
24   You know, and it was -- it was related to -- it was
25   always related to UTPPA really, and this grievance
```

```
 1   handling, I mean, there were a number of incidents

 2   that occurred --

 3       Q    I'm para --

 4       A    -- besides this one.

 5       Q    I'm paraphrasing, but, in general, was it

 6   Chief Newton's position that Dre was too nice to the

 7   unions?

 8       A    I don't know what his position was, but as

 9   I remember the issues, it was the police

10   unfortunately who was violating the contract.

11       Q    Okay.  Did Chief Newton end up

12   acquiescing?

13       A    As far as I know, I believe it was -- it

14   was -- this, I believe, was around the time I was

15   leaving, I think, or a little bit before.

16       Q    Did he or do you know?

17       A    I believe he did.

18                  (Whereupon, Defendant's Exhibit G was

19            marked for identification.)

20       Q    Ms. Davis, do you recognize what's been

21   marked as Defendant's Exhibit G?

22       A    No.

23       Q    Do you have any idea who prepared this

24   document?

25       A    I'm sorry?
```

1      Q    Do you know who prepared this document?

2      A    No.  I don't recall it, no.

3      Q    Do you recall having a meeting on or about

4  July 14th, 2020, with Carolyn Chapman and Rick

5  Swaine?

6      A    Vaguely.  And I believe either Mo Smith

7  was there and maybe Chris Stesney.  I don't recall

8  this document --

9      Q    I'm not --

10     A    -- but I recall a meeting.

11     Q    Right.  And that's what I'm focusing on.

12     A    But I don't know if that meeting was with

13  Carolyn or -- I don't know.  I don't recall.

14     Q    And let me -- I understand you haven't

15  seen this document before, but let me just ask you

16  this:  Did Rick Swaine or anyone at the medical

17  center express critical issues to you, including

18  overall decrease in applicants has been significant?

19  And I'm referring to the first bullet point.  Did

20  Rick Swaine or anyone in UT leadership express that

21  to you?

22              MR. ABOOD:  Are you talking about the

23         issues that are listed as critical issues?

24              MR. PIERSALL:  Yeah.

25     A    Yes.  And we -- we got together with them,

```
 1   with them, meaning the CEO and the hospital, and we

 2   developed a bonus program to sort of resolve a

 3   decrease in applicants.

 4        Q    Did it work?

 5        A    I don't know.

 6        Q    You didn't --

 7        A    They implemented it in the timing I was

 8   exiting.

 9        Q    And looking at that second unfilled

10   circle, it says, the medical center has reached a

11   critical situation with approximately 260 open,

12   posted, positions or over 10 percent of the

13   workforce.

14        A    Yeah.

15        Q    Did Rick Swaine or anyone in UT Medical

16   Center management express that to you?

17        A    I knew because I looked at the -- I looked

18   at our openings, and I don't know if they

19   specifically, but I was aware of it.  It was -- it

20   was still a COVID situation and a lot of people were

21   experiencing vacancies.

22        Q    My question was did Rick or anyone in

23   medical center management specifically address the

24   critical situation that over 10 percent of the

25   workforce positions were open?
```

```
 1        A    He might have.  I don't recall
 2   specifically.
 3        Q    Did he -- did you talk frequently with
 4   Rick?
 5        A    Not frequently, no.
 6        Q    Okay.  The second filled-in circle there,
 7   it says leaders indicate the current hiring process
 8   is complicated with too many steps.
 9        A    Yes.
10        Q    Did Rick express that to you?
11        A    Yes.  And that was what I referred to as
12   the union contracts that prevailed.
13        Q    Were there any steps that you took to try
14   to address that, or was that the contract says what
15   the contract says?
16        A    Well, no.  I didn't say that -- I mean,
17   that was part of -- you know, we know the contract
18   is what it is, but we did work on trying to -- you
19   know, to -- especially for the non-bargaining unit
20   positions, to decrease the steps in hiring, and
21   that's when we implemented also the bonus program.
22        Q    What was that bonus program called?
23        A    It was in -- the gist of it was if I was
24   an employee and I was recommending particularly
25   nurses for hires, and they came on, they would --
```

1    the employee recommending would receive a bonus.

2    But that was another issue.  Because when we first

3    developed the program, there were some -- not

4    problems, but there were some restrictions because

5    UT was a public employee, and under law there were

6    certain bonus programs that you couldn't, you know,

7    give to staff who were public employees, and so it

8    took a minute to get to the point of the program.

9    You had to find a way to do it.

10         Q    Did you agree with Rick, his assessment

11   that there were multiple critical issues within the

12   medical center?

13         A    I agree that there were some issues, yes.

14         Q    Were they critical in nature?

15         A    Some of them, yes.

16         Q    Those opportunities, short term, there,

17   there's five bullet points at the bottom of the

18   first page, were any of those short-term

19   opportunities implemented by human resources?

20         A    The first one, that was a discussion that

21   we had and I talked about before that the bargaining

22   unit positions, some of the union contracts would

23   not allow us to post simultaneously, but some of the

24   positions we could.  So, yes, we did implement that

25   for some of the positions.

         1           And at the same time -- yes, we did, if I

         2    recall, did work with a staffing company to get

         3    temporary staffing in.  I don't remember the

         4    particulars of it.

         5           I talked about the retention bonuses for

         6    nurses and other key positions.  I recall vaguely

         7    the on-the-spot interviews.  And I remember the

         8    discussion on the total benefits package.

         9       Q    Was anything implemented on that total

        10    benefits package?

        11       A    I don't recall if it was or not.

        12              (Whereupon, Defendant's Exhibit H was

        13              marked for identification.)

        14       Q    Ms. Davis, do you recognize Exhibit H?

        15       A    I recognize that it's an e-mail from Matt

        16    Schroeder to me.

        17       Q    All right.  And this contract, the subject

        18    line is FOP, correct?

        19       A    Yes.

        20       Q    And that's a reference to the Fraternal

        21    Order of Police?

        22       A    Correct.

        23       Q    And what was your understanding of the

        24    issues that Matt had and why he would not present

        25    that agreement to the board of trustees?

1          A     We were in the throws of negotiation.

2     Beth Ziviski had left.  She recommended, with

3     approval from Matt, that Lisa Simpson continue on

4     with the negotiation process with this group, and

5     Lisa worked with this group and negotiating the

6     contract and developed a tentative agreement related

7     to language on the wage scale and what wages would

8     occur over the three-year period and life of the

9     agreement.

10          When I got the TA that was signed by

11    Lisa --

12          Q     That's tentative agreement?

13          A     Yes, I'm sorry.

14          Q     That's fine.

15          A     The tentative agreement that was signed by

16    Lisa, I went looking at it, because I had instructed

17    her to go to David Gaus, have it costed out and all

18    of that, which she told me she did.  Since found out

19    that she didn't.  It was -- these steps resulted --

20    that she had signed off on with the union had

21    resulted in, I would say, more than what the

22    university wanted to pay.

23          So there was an issue which she had agreed

24    to, and so Dre was just coming in working in the

25    institution, and I believe after he and I reviewed

1    it, we discovered the discrepancy that Lisa had

2    agreed to.

3          So we called Matt.  We had a one-on-one

4    conversation -- well, it was via phone, and we told

5    him what happened; that this was signed and that if

6    we go back to the table, then it would be likely we

7    would be engaging in regressive bargaining and that

8    we needed to -- one option would be to discuss a way

9    or opportunity to fix this.

10         So fixing it was, you know, here's the

11   steps, here's what she did, here's a way to fix it,

12   and if we go back to the table and ask them to, you

13   know, say we -- we -- it was incorrect that it would

14   like -- we would likely get a ULP.

15   Q    That's an unfair labor practice?

16   A    Yes.  I'm sorry.

17   Q    That's okay.  I use a lot of acronyms,

18   too.

19   A    Unfair labor practice.  And that -- you

20   know, so Matt told us to talk to our outside counsel

21   and get some information from them as to how we

22   should proceed.

23         So I don't know how all it came about, but

24   decision basically was made to go back to the table

25   and ask the union to renegotiate this.

```
 1        Q    Did they agree to do that?

 2        A    They did.  And interestingly, it was the

 3   work of Dre who convinced them to do it.

 4        Q    Did you discipline Lisa?

 5        A    I don't believe I did.

 6        Q    And I didn't catch what you said earlier.

 7   You said Lisa had said she did something, but she

 8   actually had not done that?

 9        A    She was asked to -- she was -- as a part

10   of -- which would have been customary as a part

11   of -- before signing off on the TA, the tentative

12   agreement, we just cost it out.  And that just

13   means, you know, somebody sits there and does the

14   figures on it.

15        Q    And I'm sorry, Lisa said she had done that

16   but she --

17        A    Yeah, she said she did that.

18        Q    But?

19        A    But she had not.

20        Q    How did you discover that?

21        A    Dre and I, after looking at it, discovered

22   it, and then I asked David to go back and cost it

23   out.

24        Q    David?

25        A    David Gaus.  Excuse me.  He was our
```

 1    compensation manager.

 2         Q    When this was presented to Schroeder --

 3         A    Yes.

 4         Q    -- and by "this," I mean, this is the

 5    tentative agreement, right?

 6         A    Yes.

 7         Q    Did you know there were issues with the

 8    tentative agreement when the tentative agreement was

 9    presented to Matt?

10         A    Well, I believe that Matt knew about it

11    and he asked us for a breakdown of this.  So, yeah,

12    I believe I knew about the discrepancy and so did

13    he, if I remember correctly.  And this is his

14    response saying, well, okay, I have some questions.

15    And I said, well, you asked me to present the TA.

16    It wasn't even -- it wasn't for the board.  It was

17    to him.  It was getting close to the board -- the

18    board meeting.  Excuse me.

19         Q    Well, the attachments there, the first

20    one's entitled BOT routing slip, right?

21         A    Yes.

22         Q    And that references board of trustees,

23    right?

24         A    Yeah.

25         Q    All right.  So you knew this was going to

 1  be presented to the board fairly soon?

 2      A    Well, it was around the time, but it was

 3  not going to be -- I mean, it was around the time of

 4  the board meeting.  I'll say that.

 5      Q    All right.  Let me ask you this:  Did you

 6  know there were issues with the tentative agreement

 7  when the tentative agreement was shared with Matt?

 8      A    Yes.  And so did he.

 9      Q    Okay.  Did you attempt to correct those

10  issues before you presented it to Matt?

11      A    Yes.

12      Q    By costing it out?

13      A    Costing it out, and he asked us to come up

14  with a plan as to -- you know, 'cause I said, well,

15  there's a way that we can work this out in terms of

16  moving forward with the tentative agreement as is

17  signed.  So Dre and I worked on a plan and submitted

18  it -- and we submitted it to Matt.

19      Q    Do you know his answer to that final

20  question there?  It says, curious, who from UTMC

21  and/or UTPD reviewed and approved the proposed

22  economics?

23      A    Which bullet point was that?

24      Q    It's just right here.  Just the final line

25  of the e-mail.  It's not a bullet point.

 1      A    So I believe -- when was this?  I --

 2  I believe Dan Barbee was still there.  He was the

 3  former CEO of the hospital.  And Lisa reviewed it

 4  with Dan Barbee who approved it.

 5      Q    And, I'm sorry, Dan Barbee's position was

 6  what?

 7      A    He was the CFO before Rick Swaine.

 8      Q    So it's your belief that Rick Barbee had

 9  reviewed this?

10      A    Dan Barbee.

11      Q    I'm sorry.  Dan had reviewed it?

12      A    Yes.

13               (Whereupon, Defendant's Exhibit I was

14          marked for identification.)

15      Q    Ms. Davis, do you recognize what's been

16  identified as Defendant's Exhibit I?

17      A    Yes.

18      Q    And what is it?

19      A    It's an e-mail from Matt Schroeder to

20  myself dated April 1st, 2020.

21      Q    Did Matt and you ever have a conversation

22  regarding why he could not take the tentative

23  agreement to the board?

24      A    Yes.

25      Q    Okay.  Describe that for me.

```
1       A    It was -- he conveyed that, you know,

2  based on the health and -- the physical health of

3  the university that the proposed agreement resulted

4  in the amounts over that -- the amounts over which

5  were approved.

6       Q    The tentative -- let me -- let's break

7  that down.  The tentative agreement contained

8  amounts that exceeded --

9       A    The parameters that we were given.

10      Q    And who gives those parameters?

11      A    That comes from Matt.

12      Q    Do you remember what the parameters were?

13      A    No, I don't.

14      Q    Was it referring to like percentage --

15      A    Yes.

16      Q    -- of wage increases?

17      A    Yes.  Over the life of the contract, yes.

18      Q    Two, two, twos, or something like that?

19      A    Yes.

20      Q    Okay.

21      A    And, honestly, if I remember, it appeared

22  that it didn't meet in the first two years, but

23  altogether, it evened out, I believe.  I don't know

24  the particulars.  I would have to look at

25  everything.
```

1      Q     Just so I'm clear, do you agree that the

2  tentative agreement contained certain economics that

3  exceeded the parameters that had been given to you

4  by Matt Schroeder?

5      A     The first two years, yes.

6      Q     So why did you present it to Matt?

7      A     Because Matt asked me to present to him an

8  alternative to what was -- Matt was fully aware of

9  what was agreed to.  The tentative agreement that

10 Lisa had signed with she and the union, he was aware

11 of it.  He asked me and Dre to give him an option,

12 and I believe this is what we did in explaining it.

13 We were attempting to explain it.  This is a way

14 that we can still move forward without going back to

15 the union.

16          And he said ultimately no, which was fine,

17 and instructed us to go back to the union and get --

18 and get those -- excuse me, and attempt to try to

19 get the unions to come back to the table.

20     Q     Before you presented your proposals to

21 Matt --

22     A     Uh-huh.

23     Q     -- did you contact the union?

24     A     I did not.

25     Q     Did Dre?

 1      A    No.  I don't know.  I don't know.  I did

 2 not and neither did he.  We did not do anything

 3 until we were instructed by Matt what would be the

 4 next step.

 5      Q    Do you know the answer to that question

 6 that Matt posed at the last sentence of his e-mail?

 7 I'm looking -- I think you're on H.

 8      A    Yes.

 9      Q    I'm looking at I.

10      A    Oh, sorry.  Which one?

11      Q    He says, I'd like to understand why the

12 negotiation summary and resolution did not

13 accurately reflect the true economics.

14      A    I'm not sure why he's asking this

15 question, because what we -- what he asked us to do

16 was go back and submit the option and that's what

17 I believe we were submitting to him, so I'm confused

18 by that.

19      Q    When you say -- I guess I'm confused, too.

20 What option were you submitting to Matt?

21      A    When we let Matt know that there was a

22 discrepancy in the proposal, he said, okay, this is

23 what we need to do then:  Go back, relook at it,

24 relook at what was submitted and provide an option.

25 And the option was to -- because we were -- Dre and

```
 1   I were saying, well, Matt, this could work, and he
 2   says, okay, well, show me.  And so I believe this is
 3   what we were presenting to him.
 4              Does that make sense?
 5        Q    Not really.  That's all right.  I
 6   appreciate the attempt.
 7        A    Okay.  Yeah.
 8        Q    I'm trying to follow.
 9        A    That's what I got.
10        Q    I get it.
11        A    So --
12        Q    So what was the ultimate outcome of this
13   whole issue?
14        A    The ultimate outcome is Matt instructed us
15   to go back to the union, and Dre was able to get the
16   unions to -- the union, excuse me, to go back to the
17   table, because they understood, you know, that the
18   university did have some budgetary issues and so I
19   don't know how he convinced them, but he got them to
20   go back to the table.
21        Q    And did Dre bear any responsibility for
22   the error that was in the original -- error or
23   errors that was in the original tentative agreement?
24        A    No.  He was just coming in to -- actually,
25   he was just -- I think he was just starting with us.
```

```
 1        Q    Did anyone, other than Lisa Simpson, bear

 2   any responsibility for the issues in the tentative

 3   agreement?

 4        A    No.  Probably myself, you know.

 5        Q    Well, what responsibility did you bear?

 6        A    I mean, we just -- well, I caught the

 7   error before it went to Matt and told Matt before,

 8   so I was not at the table and she was.  But I wasn't

 9   supposed to be at the table, so that was her

10   responsibility.

11        Q    No.  I just --

12        A    That's all.

13        Q    I'm just wondering what your --

14        A    I don't know.

15        Q    Let me just ask it.  What responsibility

16   do you bear for this issue?  You said because you

17   caught the error.  That sounds like a positive.

18        A    Well, she was a part of HR, and I'm over

19   HR.

20                  MR. PIERSALL:  Okay.  Why don't we

21             take a quick break.  Okay?

22                  (Whereupon, a recess was taken at

23             3:12 p.m. and resumed at 3:24 p.m.)

24                  (Whereupon, Defendant's Exhibit J was

25             marked for identification.)
```

```
 1   BY MR. PIERSALL:

 2        Q    Do you recognize Exhibit J, Miss Davis?

 3        A    Yes.

 4        Q    And this is an affidavit that you

 5   executed; is that correct?  I'm looking at the top

 6   of the second page.

 7        A    Yes.

 8        Q    And did Dre Wynn draft this for you to

 9   execute?

10        A    I don't believe so.

11        Q    Who drafted this?

12        A    I believe I did.

13        Q    All right.  And it says there -- I'm

14   looking specifically at Paragraph 3, it says in the

15   affidavit that you were responsible for reviewing,

16   updating, and/or maintaining UT policies, and that

17   would include the outside employment policy, and it

18   has the policy number there.

19             Do you see that?

20        A    Yes.

21        Q    And it says, an employee may not undertake

22   any other type of employment unless authorized by

23   the appropriate vice president.

24             Do you see that?

25        A    Yes.
```

1      Q     All right.  Are you at the vice president

2  level that's -- so that you could permit outside

3  employment?

4      A     That's not solely related to the

5  appropriate -- I don't know if it says vice

6  president.  I'd have to look at the policy, but it

7  pertains to your supervisor authority, because

8  that's the means that it goes through.  So if an

9  employee has outside employment, they're going to

10  their -- I believe to their supervisor and then it

11  goes up the chain of command.

12                    (Whereupon, Defendant's Exhibit K was

13            marked for identification.)

14      Q     And is Exhibit K the outside employment

15  policy that's referenced there in Paragraph 3 of

16  your affidavit?

17      A     It appears to be.

18      Q     Do you see policy statement there,

19  Paragraph A, on the first page of Exhibit K?  Begins

20  staff employees who hold.

21      A     Yes.

22      Q     I'm not going to read the whole thing.

23  It's too long.

24      A     Yes.

25      Q     But it says at the end, an employee may

```
 1   not undertake any other type of employment which

 2   clearly impinges upon or detracts from his/her

 3   availability and ability to perform requirements of

 4   the university position unless authorized by the

 5   appropriate vice president.

 6            Do you see that?

 7       A    Yes, I do.

 8       Q    Were you of a sufficient vice president

 9   level to authorize outside employment under this

10   policy?

11       A    My title was not vice president.

12       Q    Right.

13       A    Associate vice president.

14       Q    I understand.  Did you authorize any other

15   outside employment for any other employee other than

16   apparently Dre Wynn?

17       A    Yes.

18       Q    Who?

19       A    Terrie Kovacs.

20       Q    Describe.

21       A    Terrie worked in the HR organization

22   and -- well, I don't even -- I'm not sure if you

23   could construe this as outside employment.  She was

24   a professor in -- excuse me, an adjunct professor in

25   UT, so she had an outside -- maybe it wasn't
```

1    outside.  Sorry.  Scrap that.

2        Q    All right.  Let's try it again.

3        A    Yes.

4        Q    Other than Dre, did you authorize outside

5    employment for any other UT employee?

6        A    Not that I'm aware of.

7        Q    All right.  Did any other employees ask

8    you for outside employment opportunities under this

9    policy?

10        A    I can't recall if they did or not.

11        Q    Are you --

12        A    When you say any other employee, other

13    than Mr. Wynn?

14        Q    Yes.  Yes.

15        A    Yes.  I'm not aware that I was asked.

16        Q    Were any other employees -- well, strike

17    that.

18            Are you aware of any employees other than

19    Mr. Wynn who asked to work outside the university

20    under that policy?

21        A    Not particularly.  But I know that it's

22    very common for faculty to do it, but I can't

23    specifically give you a name.

24        Q    Are you aware of any other HR employees

25    that had outside employment under this policy?

```
 1        A    Not that I can think of.

 2        Q    It says here, as associate vice president

 3   and CHRO, I was aware that Dreyon Wynn had outside

 4   employment and provided verbal authorization.

 5   Paragraph Number 4 says that on Exhibit J, correct?

 6        A    Yes.

 7        Q    All right.  What employment did Dre share

 8   with you?

 9        A    I was aware that he was an adjunct

10   faculty.  It was either at Cleveland State or --

11        Q    Tri C?

12        A    -- Cuyahoga -- some -- one of those

13   universities in Cleveland.  He was adjunct faculty

14   or he taught a class.

15        Q    Well, let's be clear.  Was he teaching one

16   class or was he actually serving in a more full-time

17   capacity?

18        A    I don't -- I don't recall.

19        Q    Do you recall --

20        A    I would need --

21        Q    Do you recall whether or not he shared

22   those details with you at the time he requested the

23   outside employment?

24        A    I don't recall that he did.

25        Q    Did he seek permission to work for the
```

1   City of Cleveland at the same time he was working

2   for The University of Toledo?

3        A    I don't recall that.

4        Q    Are you aware since that time that he

5   worked at the City of Cleveland while he worked for

6   UT?

7        A    I just became aware yesterday.

8        Q    Okay.  How did you become aware?

9        A    From my attorney.

10       Q    All right.  And obviously I don't want to

11  go there, but up until yesterday, you did not

12  approve -- let me strike that.  It's getting -- I

13  need to refocus here.

14            The only authority for outside employment

15  that you provided for Dre Wynn was his work as an

16  adjunct faculty member at some college or university

17  in Cleveland, correct?

18       A    That's the employment I was aware of.

19       Q    All right.  And you had never heard of

20  Mr. Wynn working for the City of Cleveland until

21  yesterday?

22       A    I knew he was -- when we hired him, I knew

23  he was coming from somewhere, from another job,

24  and --

25       Q    Yes, I'm sure he was.

1       A      Right.  But -- so I was assuming -- I

2  probably assumed that it was that entity that you --

3  the City -- I don't know because I don't have his

4  resume in front of me, but at some point I did know

5  he worked there.

6       Q      I'm being specific.

7       A      Yes.  Okay.

8       Q      He worked at the City -- at some point in

9  time, you knew that Dre worked for the City of

10 Cleveland?

11      A      Yes.

12      Q      But you did not know that he worked for

13 the City of Cleveland at the same time he worked for

14 UT until yesterday?

15      A      That's correct.

16      Q      Okay.  Did your authorization of him

17 working as a professor, as an adjunct professor, was

18 that memorialized anywhere?

19      A      Not that I recall.  I don't recall if it

20 was.

21      Q      Do you recall sending an e-mail to that

22 effect?

23      A      No.

24      Q      Did you tell Matt Schroeder that you had

25 provided approval for Dre to teach as an adjunct

1    faculty member?

2         A    I don't recall.

3         Q    Did you tell anybody?

4         A    He might have, Dre, but I don't recall

5    like just discussing this with anybody.  I just

6    remember talking to him about it and him telling me

7    he was teaching -- teaching classes.

8         Q    Are there any -- is there a form or a

9    document at UT that requests outside employment?

10        A    I'm not aware of a form.

11        Q    Have you ever talked to Dre about working

12   at the City of Cleveland at the same time he was

13   working at UT?

14        A    No.

15        Q    Where was this submitted?  Who was this

16   submitted to?  And by "this," I'm referring to

17   Exhibit J.

18        A    I don't even know.  So many papers.  I

19   don't know where this was submitted.  I don't know

20   where this was submitted, if it was submitted as a

21   part of my case or -- I'm not sure.

22        Q    Do you recall Dre asking you to submit an

23   affidavit on his behalf as part of his charge of

24   discrimination with the civil rights commission?

25        A    And it might have been -- it might have

1   been them asking me for this, the civil rights

2   commission asking me for this when they talked to me

3   about his case.

4        Q    But my question was a little more

5   specific.  Do you recall Dre asking you to prepare

6   an affidavit?

7        A    No, I don't.  I think -- I believe it was

8   the civil rights commission.

9        Q    Did Matt Schroeder ask if you or inform

10  you that he was going to talk to some of your

11  subordinates who had left?

12       A    Yes.

13       Q    All right.

14       A    On two occasions.

15       Q    Who were those individuals?

16       A    Well, the first time when we were

17  experiencing some attrition, and he was asking me

18  what was the attrition about, and I said, well,

19  various reasons.  You know, people are leaving for

20  more money, jobs, some relocations.  And he said,

21  well, you know, is that a -- do you see that as a

22  problem.  And I said, well, any attrition you want

23  to look at.

24            So I said, well, why don't you talk to

25  my -- to my direct reports to see if you can -- you

1    know, if you get a picture of what I'm telling you.

2    Every time we meet, I'm telling you what I'm

3    observing, but maybe talk to them.

4          So he said you would want me to talk to

5    them.  I said, absolutely, I have nothing to hide.

6    So he talked to each one of them, and I believe it

7    was David Gaus, Brian Pack, Terrie Kovacs, Carolyn.

8    I believe Beth was there at the time.

9          Q    Ziviski?

10         A    Yes.  And I believe Tiffany Murray.  And I

11   said, you know, to him, as long as you follow up

12   with me, you know, let me know what they said.  So

13   he did, and he said that let me tell you, they

14   really like working for you, they respect you, and

15   they understand what you're doing.  I said, oh,

16   thank you.

17         So the second time, as these -- as some of

18   the individuals that were reporting to me were

19   leaving, he asked if he could speak with them, and I

20   said, sure, okay, just as long as you follow up with

21   me.

22         Q    Were there specific individuals that he

23   wanted -- he shared with you he was going to talk to

24   as they were leaving?

25         A    Yes.  I think Brian -- let me see who left

1    first.  Beth left first, I believe.  And so he

2    talked with her.  And what I remember is that he

3    said she was very -- she didn't give a lot of

4    details about why she was leaving except that it's

5    an organization -- she was going to an organization

6    that was near her house and she was going to be

7    close to her home.

8            And then I don't know who left after that,

9    if it was David Gaus.  So he talked to David Gaus.

10   I don't know if he was the next one, but let's just

11   talk about him for a minute.  He left, and he talked

12   to David, and he did not disclose to me what David

13   said.  And I said, well, Matt, I don't think that's

14   fair that my direct reports can go talk to you and

15   you don't even share with me what they said.

16           And to this day, he's not shared with me

17   what they -- what David said, nor Brian, and he did

18   not talk to Tiffany ever.

19      Q    So he -- just so I'm clear, he talked to

20   David, but he didn't tell you what David shared with

21   him?

22      A    Well, what he said, he says, well, you

23   guys used to be really close.  And I said, well, you

24   know, what does that mean.  So obviously he had some

25   problems with me, but Matt shared no details

```
 1   about -- to me what specific problems David had and

 2   why he was leaving.  But David told me he was

 3   leaving because he wanted to go work, which made no

 4   sense, to an SEC school and he needed more money.

 5        Q    Okay.  Why didn't that make sense?

 6        A    Well, I mean, who -- who sets out to go

 7   work for an SEC school?  It made no sense to me.

 8   Might make sense to you, but doesn't to me.

 9        Q    Where did he go?

10        A    Missouri somewhere.

11        Q    Did you ask Matt to tell you what David

12   shared with him?

13        A    I did.

14        Q    Same question for Brian Pack.

15        A    Yes.

16        Q    What did Matt tell you about Brian Pack,

17   the conversation with Brian?

18        A    Nothing.

19        Q    I mean --

20        A    He gave me no details about either one of

21   them as to why they were leaving.

22        Q    Did you have a poor working relationship

23   with David or Brian?

24        A    I'm sorry?

25        Q    Did you have a poor working relationship
```

```
 1   with either one?
 2        A    Not until -- I did not, not until -- no, I
 3   didn't.  I didn't.  I didn't have a poor
 4   relationship with either one of them.
 5        Q    Okay.  Did you have concerns with Bethany
 6   Ziviski's performance?
 7        A    No.
 8        Q    Did you have concerns with David's
 9   performance?
10        A    No.
11        Q    Brian Pack?
12        A    No.  They -- they had pretty good
13   performance.
14        Q    Did you have training in EEO?
15        A    Did I have it?
16        Q    Uh-huh.
17        A    Did I -- you mean did I take training to
18   EEO?
19        Q    Yeah.
20        A    I'm sorry, I just need to understand your
21   question.
22        Q    Sure.  No.
23        A    I didn't know if you were asking about
24   supervised training in the EEO.
25        Q    No.  Have you ever received EEO training?
```

1      A      Yes, I have.

2      Q      Describe.

3      A      Well, the university, number one, has a

4   policy, I don't know, 335 something that requires

5   mandatory training, and part of -- part of that

6   requires, I believe, sexual harassment training,

7   nondiscrimination, and EEO.  And there is another

8   one.  I'm sorry.  I'm drawing a blank on it.

9      Q      Was this --

10     A      So that was not the only -- I mean, I've

11  had trainings before.  You know, I worked in the EEO

12  department, and I'm sure there were trainings that I

13  had there when I worked at ODOT.

14     Q      Did you have biweekly meetings with Matt?

15     A      As much as we could, yes.

16     Q      I mean, did you have a standing meeting

17  with him though?

18     A      Yes.

19     Q      And it was every two weeks?

20     A      It was every two weeks, and then I

21  provided a weekly report.

22     Q      Describe the report for me.

23     A      The report was really basically related to

24  every area in my department and what we were doing.

25  It was to keep him up to date on -- so he knew some

```
 1    of the things we were trying to accomplish in doing.

 2    And to my understanding, I was the only AVP that had

 3    to do one.

 4         Q    How did you discover that?

 5         A    I -- I mean, just talking to people, other

 6    AVPs.

 7              It's cold in here.

 8         Q    Have you ever calculated or tried to

 9    figure out how many employees left human resources

10    under the supervision of John Elliott?

11         A    Yes.

12         Q    How did you do that?

13         A    Well, some I know in talking with other

14    people and, you know, basically saying, hey, did you

15    know this person left or just as a casual, you know

16    FYI.  And one day I was actually looking on the

17    website because I was trying to update my resume on

18    some of the areas and, you know, that HR was under

19    me, so I was looking on the resume to get

20    information -- excuse me, resume -- looking on the

21    website to get information, and, I mean, I basically

22    saw who was left in the organization.

23         Q    Do you know how many employees left HR

24    under Elliott's tenure as CHRO?

25         A    Yeah.  Maybe around 19, 20, something like
```

1    that.

2         Q    Were you aware that Elliott and Hurst were

3    hired with one-time money?

4         A    Whatever that means.

5         Q    Do you know what that means?

6         A    No.

7                   (Whereupon, Defendant's Exhibit L was

8                   marked for identification.)

9         Q    Do you recognize Exhibit L?

10        A    No.

11        Q    You've never seen this before?

12        A    I could have, but I don't recognize it.

13        Q    Did you have any conversations with Matt

14   Schroeder, I guess, or Karen Bjorkman in or around

15   May of 2020 regarding financial cuts that were the

16   result of COVID?

17        A    I don't believe I had any conversation

18   about -- with Dr. Bjorkman, no.

19        Q    Okay.

20        A    Huh-uh.

21        Q    I assume you had conversations with Matt

22   about budget cuts?

23        A    Sure.

24        Q    And these were more extreme budget cuts

25   than the past two fiscal years, correct?

```
1        A    Yes.  Because of COVID.

2        Q    Were you aware of the amount of the budget

3   cuts in other departments?

4        A    Some, but not all of them.  Just, you

5   know, I don't know, basically word of mouth.

6        Q    Yeah.  Did Matt express to you that the

7   budget situation for the emergency was dire?

8        A    I don't believe he used those words, but I

9   know it was serious.

10       Q    Okay.  Did any employees lose their job as

11  a result of the budget cuts in HR related to COVID?

12       A    There were recommendations placed in the

13  budget for me of a couple job cuts, but in the end,

14  no one lost their job due to that.

15                 (Whereupon, Defendant's Exhibit M was

16                 marked for identification.)

17       Q    Have you seen a chart that appears here on

18  the bottom half of the page of Exhibit M, have you

19  seen that chart before?  Not necessarily in this

20  e-mail, but in some other place.

21       A    I don't recall this, no.

22       Q    Were you -- see the target percentages

23  there that are in the middle column?

24                 MR. ABOOD:  I have to raise a

25                 concern.
```

```
 1                    MR. PIERSALL:  Okay.

 2                    MR. ABOOD:  You're using a document

 3             that's clearly from your legal department.

 4             I want to make sure that's not a mistake.

 5                    MR. PIERSALL:  No.  This was

 6             submitted to the civil rights commission.

 7                    MR. ABOOD:  Okay.

 8                    MR. PIERSALL:  It was received from

 9             the civil rights commission.

10       Q     You see the target percentages that you --

11       A     Yes.

12       Q     -- that appear there?

13             Was it ever made known to you that your --

14   first of all, you were made aware that there was an

15   18 percent target within HR, correct?

16       A     Yes, I heard that the other day.

17       Q     Well, prior to --

18       A     Right.

19       Q     Did you know the percentage cut that you

20   were supposed to make?

21       A     I didn't know the percentage.  I was

22   focused on the dollar amount.

23       Q     Okay.

24       A     I didn't know what percentage that was

25   honestly.
```

```
 1        Q    So just so I'm clear, which dollar amount
 2   were you focused on here when you look at HR?  I see
 3   a target number of 971,986.
 4        A    Yes.
 5        Q    Was that the target, or was it some
 6   different number?
 7        A    I -- my understanding, the target was the
 8   578.
 9        Q    Okay.  Do you know what after pull back
10   means?
11        A    No.
12        Q    Okay.  At the time that you served as
13   CHRO, was it made -- was it made known to you that
14   that 18 percent target for HR was the same as
15   internal auditing?
16        A    No, I was not aware of that.
17        Q    Is it your understanding that you had the
18   highest percentage of all the budget cuts?
19        A    Yes.
20        Q    What did you base that on?
21        A    We had a budget and a list.  Patty -- oh,
22   Lord.  I can't think of her name. -- who worked with
23   me on --
24        Q    Peterson?
25        A    No.  Hell no.  Sorry.
```

1      Q    It's okay.

2      A    That bitch.

3      Q    Ooh.  Pertz?

4      A    Yes.  Thank you.  There's a P in there.

5  Forgive me.

6           Patty Pertz worked with me on a lot of the

7  budget stuff.  She was our analyst, so she was

8  assigned to HR.  And just casually mentioning, you

9  know, because I was complaining about, wow, this is

10  big, I'm not going to be able to do anything.  And,

11  you know, probably, you know, I think she basically

12  said, you know, everybody across the university has

13  cuts and, you know, some are higher.

14      Q    But did you feel you were unfairly

15  targeted by Matt with your budget reduction?

16      A    I felt that it was -- it was a pretty high

17  percentage, yes, given our situation.

18      Q    What do you mean by that, by your

19  situation?

20      A    We were down staff that I was requesting

21  to fill, and I couldn't fill them based on these

22  budget cuts.

23      Q    In your capacity as CHRO, would you be

24  aware of other departments and their staffing needs?

25  And by that, I mean, open positions, need to hire,

1   things like that?

2       A    Sometimes, yes.

3       Q    You brought it up, so I'll ask:  Why is

4   Patty Peterson a bitch?

5       A    Well, I mean, I basically heard Matt say

6   that she didn't get along with HR which was not

7   true.  I mean, Patty Peterson did not get along with

8   anybody in the university.

9       Q    Who is that?  Who is she?

10      A    She was the controller, and Matt alluded

11  to her, and she was over payroll, as well.  So he

12  alluded to issues with HR and payroll.  There were

13  issues.  I mean, you know, we would give them data,

14  and there might be some data they didn't need or,

15  you know, they would push back on us and vice versa.

16  It worked both ways.

17      Q    Did you not have a good working

18  relationship?

19      A    I thought I did.

20      Q    Well, why --

21      A    I don't know.

22      Q    What are you basing that comment on?

23      A    What comment?

24      Q    Calling her a bitch.

25      A    Well, I apologize for that.  That's so

```
 1   unnecessary.  Because, you know, Matt's comment that
 2   trying -- excuse me -- to portray this woman as
 3   someone who was just this wonderful person that
 4   takes it upon herself to do -- you know, to work
 5   with everybody was not true.  And, you know, that --
 6   that upset me, because that is -- you know, but
 7   that's Matt, portraying Patty Peterson for who she
 8   was not.  So that's why I'm angry.  And trying to
 9   indicate that HR didn't get along with people and
10   that we consistently provided erroneous information.
11   That is not true.
12                   MR. PIERSALL:  N.
13                   (Whereupon, Defendant's Exhibit N was
14            marked for identification.)
15        A    Bad copy.
16        Q    That's the way I get them.  Have you seen
17   Exhibit N before?
18        A    Yes.
19        Q    And this is an internal audit and
20   compliance department memorandum that was provided
21   to you on or about August 30, 2019, regarding
22   employment eligibility verification collection and
23   retention procedures; is that correct?
24        A    Yes.
25        Q    Did you know this audit was ongoing?
```

1      A    This audit, which I'm sure Matt would

2   never tell you, was prompted by me.

3      Q    Okay.

4      A    The audit, I -- we were receiving -- I

5   belong to Society of Human Resources, so

6   periodically they provide information on law changes

7   or, you know, enforcement.  So I was aware that DOL

8   was going to be ramping up enforcement on I-9s, so

9   that concerned me because -- and so I wanted to make

10  sure, you know, that our I-9s were up to speed.

11          So initially my staff and I took a look at

12  them, and we did some test cases and we found some

13  discrepancies.  So I went to Dave Cutri and I said,

14  hey, I think we got some problems with our I-9, and

15  I specifically needed -- there was a reason why I

16  went to him publicly -- or excuse me, went to him so

17  he could launch the investigation on the I-9s,

18  because I knew the severity of it and I knew that we

19  needed resources to do it.

20          And so if it was public and out there and

21  issued by somebody else, Matt would take notice of

22  it.

23      Q    How long did this audit take,

24  approximately?

25      A    I don't know.  There was -- Dave's audit,

```
 1   you mean, or --

 2        Q    This audit.

 3        A    -- just in general?

 4        Q    Yeah, I'm just trying to gather when you

 5   first spoke to Dave and how long it took.

 6        A    I spoke to Dave -- I spoke to Dave

 7   probably even before -- early, before this date, but

 8   I can't tell you if it was 2019 or may even have

 9   been -- this -- the I-9 issue started in '17 before

10   I -- no.  Was it '17 or '16?  Not the audit.  But

11   issues surrounding I-9s.  Okay?

12        Q    Okay.

13        A    So it was on Kelley's radar.  It was on

14   Jovita's radar.  It was on whoever's radar.  And

15   then the ball got dropped somewhere between Jovita

16   been there, leaving, Dave not following up,

17   whatever.  So there wasn't a whole lot done.  And

18   then I got that notice saying there was going to be

19   a ramp up, and I said, Dave, we really need to --

20   you need to get this audit back going.

21             Does that make sense?  I might have used

22   the wrong terms.

23        Q    So do you know how long it took for --

24        A    No, I don't.  I don't.

25        Q    Okay.  And you see the summary of tests
```

1    performed which is at the top of the second page

2    here?  Let's back up.  I presume you reviewed this

3    document when you received it?

4         A    Oh, probably, yes.  Okay.

5         Q    It says, with the missing percentage --

6    I'm looking at the second paragraph under that

7    heading.  With the missing percentage of Form I-9s

8    ranging between 20 and 32 percent.  Do you see that

9    there?

10        A    Yes.

11        Q    All right.  Did you have any reason to

12   dispute Cutri's analyses?

13        A    I -- I don't know if it was another area,

14   but I remember we had some conversation amongst the

15   HR staff that seemed a little high, but, okay, he's

16   doing the test.

17        Q    Well, did you come up with a percentage

18   when you said you did like a -- sort of a --

19        A    No, at that time we did not.

20        Q    Okay.  And I assume you're aware that

21   there were fines associated with missing I-9 forms?

22        A    Sure.

23        Q    All right.

24        A    Uh-huh.

25        Q    All right.  Did you have a reason to

1    question the financial -- the potential financial

2    penalties that Cutri came up with here?

3        A    I have -- I don't know how the fines are

4    calculated, but I know they can be significant, so I

5    don't dispute what he's saying here.

6        Q    All right.  Were there discussions about

7    outsourcing the I-9 collection at this time,

8    August 30th of 2019?

9        A    I don't recall discussions of outsourcing.

10   It could have been.  It could have been in other

11   documents, 'cause there are far more documents than

12   this.  So --

13       Q    When was the I-9 collection process

14   outsourced?

15       A    I don't know that it is.

16       Q    All right.  That didn't happen under your

17   watch?

18       A    No.  No.  I was not afforded the money

19   to -- I talked about this on the record before.  It

20   was related to IntelliCorp.  We were using them.  I

21   requested to use IntelliCorp for I-9 processing, and

22   I was told no.

23       Q    When was that request made?

24       A    It was probably --

25       Q    Before or after this?

```
 1        A    Oh, it was after that.

 2        Q    Okay.

 3        A    Once the final report -- what you don't

 4   have here is the final report that Dave put out.

 5   There's a final report where HR goes through and we

 6   provide management response to how we fix it.

 7        Q    Who in the human resources department at

 8   this time was responsible for the collection of I-9s

 9   and the maintenance of I-9s?

10        A    It would have been the employment

11   directors along with their staff.

12        Q    Who?  Was that Kovacs and --

13        A    Yeah, it would be have been Terrie Kovacs

14   for main campus, and Carolyn for clinical.

15        Q    Was there anyone under those two

16   individuals that had that specific responsibility?

17        A    I believe they all did, because at the

18   time we had generalists who did the same thing, so

19   they would do some of the onboarding.

20        Q    I'm listening.

21        A    And which would include all of the

22   paperwork and filling out the I-9s.

23        Q    Okay.

24                  (Whereupon, Defendant's Exhibit O was

25             marked for identification.)
```

1      Q     Do you recognize Exhibit O, Miss Davis?

2      A     Yes, vaguely.

3      Q     And this is an internal audit report

4  regarding FMLA conducted by internal audit and

5  compliance, and it appears the report is dated

6  July 6th, 2020, correct?

7      A     Yes.

8      Q     I assume you received this report?

9      A     I assume I did.

10      Q     What prompted this audit?

11      A     What I believe prompted the audit was we

12  had one person doing -- one person for the entire

13  university doing -- was our FMLA leave

14  administrator.

15      Q     Who was it?

16      A     Martin May.  And, you know, there were

17  across the university several people out on FMLA.

18  And so, of course, that was a concern because they

19  weren't there to do the job.  So it was prompted by

20  looking at, you know, how to improve the process,

21  and, you know, moving these people and getting them

22  back to work if we could.

23      Q     What prompted this audit?

24      A     I don't recall what prompted it.  One

25  part -- let's see.  I don't know if Martin left.  It

```
 1   might have been because of the concern.

 2        Q    Did you request this audit?

 3        A    I don't know if I requested this one.  I

 4   know I did the I-9.

 5        Q    Right.  Did you know that Cutri and his

 6   internal audit group was conducting this audit?

 7        A    Yes.

 8        Q    Okay.  You said Martin was -- Martin May

 9   was the FMLA --

10        A    I believe so, yeah.

11        Q    -- person?

12        A    Yes.

13        Q    Who did he report to?

14        A    Terrie Kovacs.

15        Q    If you would, take a look at -- it's, I

16   think, the next-to-last page.  It says -- Number 8

17   there, it says, include FMLA in the HR department

18   strategic planning process.  Do you see that?

19        A    Yes.

20        Q    It says, in February of 2020, the director

21   of compensation and HRIS and project management

22   indicated that implementing the FMLA module in

23   Banner was on the project plan, but due to HRIS

24   resources, efforts were being focused on a Banner

25   revitalization, plus improvements to the current
```

```
 1  employment processes.

 2          Do you see that?

 3      A   Yes.

 4      Q   Who was that at that time?

 5      A   I believe that was David Gaus was the

 6  director.

 7      Q   Okay.  And so help me understand.  In the

 8  Banner system, there is an FMLA module?

 9      A   I believe so.  There's several modules.

10  And what we were recommending in terms of those

11  modules is that so they could talk to or interface

12  with our applicant tracking process and leave

13  administration.

14      Q   Was there a leave administrator?

15      A   Yeah.  That was Martin May.

16      Q   That was Martin.  Okay.  Did you -- take a

17  look at this.  It says management's response there

18  on the final page.  Is that something you drafted or

19  somebody on your team drafted?

20      A   It would have been somebody on my team.

21  Either Terrie Kovacs, the lead administrator, if he

22  was still there, and then we had a whole team of

23  people working on this.

24      Q   And that was my next question.  What steps

25  were taken to address the deficiencies identified in
```

1   this internal audit report?

2       A    We had a whole team, and when I say a

3   whole team, so it was members of Terrie's team,

4   would have been some of the generalists or the

5   consultants working on it, and then some people

6   aside from Carolyn's team to work on the

7   recommendations and, you know, putting those

8   recommendations forward and then writing the

9   management response.

10      Q    All right.  And you were separated two

11  months later, so I assume -- my question is what was

12  the status of the steps taken to address this FMLA

13  process as of the time of your separation?

14      A    It was all based on what's found in the

15  management response.

16      Q    I understand.

17      A    That understand --

18      Q    I mean, had significant progress been

19  undertaken in that two-month time period?

20      A    Yes, from my perspective.

21      Q    Okay.  At some point in here, it's just,

22  you know, the management's response, would you agree

23  with me that FMLA applications were rubber stamped

24  up until the issuance of this audit?

25      A    No, I would disagree with you.

1       Q     Who made that determination?

2       A     Martin.

3       Q     Martin?

4       A     Yes.

5       Q     Okay.  What was Martin's race?

6       A     Caucasian.

7                     (Whereupon, Defendant's Exhibit P was

8             marked for identification.)

9       Q     Ms. Davis, do you recognize Exhibit P, as

10  in Peter?

11      A     No.

12      Q     All right.  Have you ever seen this

13  before?

14      A     Nope.

15      Q     All right.  Were you aware that David Gaus

16  described his relationship with you as tense?

17      A     I'm shocked at that.

18      Q     Why is that?

19      A     Because we worked well together and he was

20  my project manager, my compensation, the HRIS, and

21  we did a lot of work together and effected a lot of

22  change together.

23      Q     I presume Matt did not share with you that

24  he received this e-mail from David?

25      A     No, he didn't.

1      Q    And does this ring a bell at all that

2  David was rejecting meeting requests that you sent

3  to him?

4      A    No, it doesn't.  But I'm not surprised.

5  Matt allowed people to come and talk to him and

6  never talked to me about it.  I'm not surprised.

7      Q    Who are others that were allowed to do so?

8      A    Brian, as far as I know.  The two white

9  males in the department.

10     Q    Brian and David?

11     A    Yes.

12              (Whereupon, Defendant's Exhibit Q was

13              marked for identification.)

14     Q    Do you recognize Exhibit Q?

15     A    It's an e-mail from Rick -- Rick -- excuse

16  me, Rick Swaine, CEO of the hospital to myself, cc'd

17  Chris Stesney-Ridenour.

18     Q    Remind me again, who's Stesney?

19     A    I believe she was the COO of the hospital.

20     Q    Do you know what they're referring to, or

21  I should say what Stesney is referring to in the

22  bottom e-mail:  Here is what I have so far, see

23  attached spreadsheet, from Jessica Shank and a

24  second e-mail from Ken Vellequette?

25     A    No.  I don't know.  It appears -- I don't

1    know what they're referring to.  It appears the

2    subject line says delays in job postings.

3         Q    Do you know who Jessica Shank is?

4         A    No.  I don't recognize that name.

5         Q    Ken?

6         A    Ken Vellequette, that sounds familiar.

7    Like he may have been a supervisor at the hospital

8    or something.

9         Q    Is this --

10        A    The hiring manager.

11        Q    Would Rick send you e-mails such as this?

12   Was this unusual?

13        A    No.  If I asked him to, you know, or if he

14   just decided, you know, to send me something.  No,

15   it's not unusual for him to send it.

16        Q    Do you know specifically what

17   issues/frustrations he's referring to?

18        A    No.  I'm assuming because the subject,

19   delays in job postings, which we talked about.

20                  (Whereupon, Defendant's Exhibit R was

21             marked for identification.)

22        Q    Do you recognize Exhibit R?

23        A    Yeah, e-mail from Rick to me.

24        Q    All right.  And if you take a look about

25   halfway down, it's an e-mail from Amy Rettig to

```
 1  Stesney.  Do you see that?

 2       A    Yes.

 3       Q    Who's Rettig?

 4       A    I don't know who that is.

 5       Q    Okay.  Did you look into this per Rick's

 6  request?  Do you recall doing so?

 7       A    I would assume that I did with Carolyn,

 8  but I can't recall the particulars of it.

 9       Q    All right.  What was Carolyn's

10  explanation?  It seems that we've seen some

11  documents today that there were delays in getting

12  positions posted.  What was Carolyn's rationale for

13  that?

14       A    Well, they were down positions also.  I

15  don't know what her particular -- I don't recall her

16  particular rationale for it at this point -- at this

17  time, but I know that they were down a few

18  positions.  They had a few vacancies there, so they

19  were all doing a lot more than usual.

20       Q    You mean referencing Chapman's team?

21       A    Yes.

22       Q    Yeah.

23            (Whereupon, Defendant's Exhibit S was

24            marked for identification.)

25       Q    Have you seen this before, Exhibit S?
```

```
 1        A     Give me a moment.

 2        Q     Sure.

 3        A     No.  As usual, it wasn't shared with me by

 4   Matt.

 5        Q     Was Brian -- did Brian depart, leave the

 6   university right before your separation?

 7        A     Brian left, I think, in early September or

 8   August.

 9        Q     Yeah.

10        A     Somewhere around in there.

11        Q     Take a look at about halfway down.  It

12   says one area where Wendy and I did not agree was in

13   expanding Happy Fox.

14        A     Oh, yeah.

15        Q     What's that?

16        A     Oh, hard to remember.  It is the software.

17   Oh, gosh.  Happy Fox was brought to us and brought

18   to our attention by David Gaus, and we were going to

19   use that as part of the restructure in developing a

20   service center concept, where all the functional and

21   all the trans-- track -- excuse me, transactional

22   things done at HR was going to be solely isolated in

23   one place, separating out the strategic from the

24   functional and transactional.  And Happy Fox was a

25   service center software that would track the calls
```

1    and the response time so we could improve.  So it

2    was -- it will give us data to help us improve.

3        Q    And where did you -- well, first of all,

4    do you remember disagreeing with Brian Pack

5    regarding Happy Fox?

6        A    Well, I'm not sure why Brian's talking

7    about Happy Fox.  Well, okay.  I know why.  Sorry.

8    Just one moment.

9        Q    Sure.

10       A    Can you take me back specifically to the

11   area?

12       Q    It was right here.  One area where Wendy

13   and I -- about halfway down.

14       A    Okay.  Thank you.

15       Q    Yeah.

16       A    So Happy Fox, we did get approval to use

17   Happy Fox, so there was a cost associated to it, and

18   he wanted -- I think he wanted specific --

19   specific -- or he wanted all his staff to have it.

20       Q    Uh-huh.

21       A    And I said, no, we can't afford all the

22   licenses for everybody to have it.  So I believe

23   that's what that conversation was about, if I

24   remember.

25       Q    Okay.  And if you want to take a look at a

```
 1    little further up in that paragraph.  It says also

 2    attached about a third of the way down.  The

 3    comment, the don't make this a regular practice

 4    comment not only was disrespectful but more

 5    importantly wasn't focused on how to best get the

 6    job done.  This is an example of lack or flexibility

 7    and respect that started me thinking as to whether

 8    the UToledo HR division was a good fit for me.

 9            I presume Brian never shared that with

10    you?

11        A    No.  And neither did Matt --

12        Q    All right.

13        A    -- who got this.  This is the regular

14    behavior I had to deal with.

15        Q    Do you believe Matt should have shared

16    your subordinate's concerns that they apparently

17    went around you and went to him?

18        A    Absolutely.

19        Q    Do you think he should have shared those

20    with you?

21        A    Absolutely should have.

22        Q    Had that ever happened with you?  Had any

23    subordinates of any of your directors kind of gone

24    up the chain of command and went straight to you and

25    had expressed concerns with the directors?
```

```
 1        A    Not that I -- not that I'm aware of.

 2        Q    Is this a surprise?

 3        A    The people -- no, it's not a surprise.  I

 4   knew this was happening.  This is a part of the

 5   reason why I -- I was let go.  I was not spoken to

 6   about these issues, particularly when someone like

 7   my direct reports goes to my boss.  Customarily

 8   wouldn't you talk to the person?  So I can't even

 9   defend myself here.  This is Matt Schroeder all day

10   long.

11        Q    What is it about Matt?

12        A    Going behind my back.  That's what he did

13   all the time.  And talk to my subordinate employees

14   about things that were going on in my area that he,

15   himself, did not talk to me about.

16        Q    Well, he didn't send this e-mail, right?

17   Brian sent it?

18        A    Well, Matt received it.  That's okay that

19   Brian sent it, but Brian would only send things that

20   Matt would allow him to do.  I mean, if you allow

21   this behavior, it keeps happening.  Right?

22        Q    Are you aware of any prior e-mails that

23   Brian had sent to Matt?

24        A    I'm sure there are some.

25        Q    Are you aware?
```

```
 1        A    Let's do a public records request.

 2             THE WITNESS:  Norman, please, do one.

 3        Q    Let's get back to the question.  Are you

 4   aware of any e-mails that Brian sent prior to this

 5   one to Matt Schroeder addressing his relationship

 6   with you?

 7        A    I'm not aware of any one particular, but I

 8   can guarantee you there are some.

 9        Q    Okay.  Was it unreasonable for Matt to

10   rely on these types of communications?

11        A    Yes.

12        Q    Why?

13        A    Solely.  Because this is one-sided.

14        Q    Did Brian ever tell you about his

15   observation that you were not very strong in budget

16   administration and you have a lack of Excel skills?

17        A    No.  But I don't -- I can tell you I'm not

18   versed in Excel.  I'll agree to that.

19        Q    Are you well versed in budget

20   administration?

21        A    I know budget administration.  And all the

22   jobs I've had, I've had to administer a budget.

23        Q    Have you talked to Brian since he left the

24   university?

25        A    No.
```

```
 1                   (Whereupon, Defendant's Exhibit T was

 2              marked for identification.)

 3      Q     Do you recognize Exhibit T?

 4      A     This appears to be related to the job

 5  description or specification that Matt sent to me

 6  regarding Melissa Hurst.

 7      Q     And then Matt had you review, I guess, the

 8  attachments, entitled the attachments contained

 9  therein, right?

10      A     Yeah.  They're not attached, by the way,

11  so I can't tell you if it was the exact one.

12      Q     It says there, the very first sentence --

13  I should say second, I have to say, I'm a bit

14  confused by the job description and functions as you

15  indicated that Dr. Hurst's role was going to work

16  executive recruitment.  The description is a much

17  more in-depth HR role.

18              When did Matt share that with you about

19  Melissa's role with respect to executive

20  recruitment?

21      A     After he told me that HR consultants were

22  coming in.  And then she comes in, to my surprise,

23  and then he sends me this job description.

24              I'm sorry.  Did I answer your question?

25  I'm sorry.
```

```
 1        Q    What -- when there was executive

 2   recruitment, you testified earlier that that was

 3   done when you were CHRO in-house, some of it?

 4        A    Yes.

 5        Q    Who would conduct it?

 6        A    It would be a myriad of people.  It could

 7   be me or me working on it with the employment

 8   directors.  It's not like it happened or occurred

 9   frequently.

10             MR. ABOOD:  Are you getting close to

11             the end?  Because we've been going since

12             10:00 without a lunch break or anything

13             like that.  And I can tell my client is

14             extremely tired.

15                  So if you got a lot to do, maybe we

16             should break and reconvene at another

17             time.  But if you're close to being done,

18             let's finish it up.

19        Q    Well, let's address the point that Norm

20   just raised.  Are you tired?

21        A    I am.

22        Q    Are you tired to the extent that it's

23   impacting your ability to testify?

24        A    No.  I just need a break or something.

25             MR. PIERSALL:  Okay.  Let's take a
```

```
1          break.  Let me talk to Janelle, and then
2          I'll answer your question.
3               (Whereupon, a recess was taken at
4          4:26 p.m. and resumed at 4:39 p.m.)
5               MR. PIERSALL:  So I spoke with Norm
6          and Susan, and the plan is I estimate we
7          have about 90 more minutes to go-ish, and
8          we'll pick back up on March 2nd.
9               THE WITNESS:  Okay.
10              MR. PIERSALL:  Either before or after
11         Willie.  We'll figure out the logistics.
12         But I did tell Norman and Susan that I jut
13         want to get through a couple more
14         exhibits, and then we'll wrap up today
15         because you're getting tired and we've all
16         been here a long time today.
17              THE WITNESS:  Okay.
18              MR. PIERSALL:  So that's sort of the
19         general plan that we've all agreed to.
20              THE WITNESS:  Okay.  Thank you.  I
21         appreciate it.
22              MR. PIERSALL:  Sure.  We want our
23         witness to be fresh and prepared.
24              We can go off the record.
25              (Whereupon, a discussion was held off
```

```
 1              the record.)

 2                   MR. PIERSALL:  All right.  So let's

 3              go through a couple exhibits and then

 4              we'll call it a day, and I appreciate

 5              everyone's flexibility.

 6                   (Whereupon, Defendant's Exhibit U was

 7              marked for identification.)

 8    BY MR. PIERSALL:

 9         Q    Miss Davis, you've been handed what's been

10    marked as Defendant's Exhibit U, and first of all,

11    do you recognize this document?

12         A    Yes, I do.

13         Q    And this is -- I should say the second

14    page is a complete -- the complete version of the

15    e-mail that you sent to Willie McKether and Monica

16    Holiday-Goodman on September 21st, 2020, correct?

17         A    Yes.  And that was the name I was --

18         Q    Right.

19         A    -- trying to remember.

20         Q    She's the pharmacy person that you

21    mentioned earlier --

22         A    Uh-huh.

23         Q    -- in your deposition, correct?

24         A    Yes.

25         Q    And had you -- prior to -- let me strike
```

1    that.

2          Why did you send this e-mail to Willie

3    McKether and Monica Holiday-Goodman?

4       A    I sent this -- excuse me.  I sent this

5    e-mail because I had mentioned to you that I had

6    spoken to Dr. McKether for sure before about how I

7    was feeling I was being treated by Matt.  I don't

8    know if I had spoke to Dr. Holiday-Goodman before,

9    but they were responsible -- they were leading at

10   this time an initiative related to diversity and

11   inclusion, and specifically what I was told by them,

12   the president was concerned about minorities leaving

13   the organization.

14      Q    If you take a look at the second page,

15   about a third of the way down, it says, I want to

16   bring the following issues to your attention as I'm

17   aware of the work you both are doing regarding the

18   max exodus of African-American women at UT.

19          Do you see that?

20      A    No.  I'm sorry.  Can you direct me?

21      Q    It's about halfway through.  There you go.

22   To date.

23      A    Okay.

24      Q    No, I'm sorry.  Next sentence after that.

25   Right there.

 1      A    Yes.

 2      Q    Okay.  Was there any formal or -- yeah,

 3  let's stick with that.  Was there a formal committee

 4  or group formed to analyze that issue?

 5      A    I'm going to say I believe it was at that

 6  time, but I cannot verify whether that's accurate.

 7      Q    All right.  And I may have asked you this.

 8  I'm sorry.  Did you ever speak to Monica

 9  Holiday-Goodman prior to sending this e-mail?

10      A    I don't recall if I actually spoke to her.

11      Q    What was the relationship between HR and

12  Dr. McKether's diversity office?  I'm sure that's

13  not the formal title, but essentially what it was,

14  right?

15      A    Yes.  Our role, we worked with him on

16  diversity initiatives.  A few of my staff probably

17  were on -- if there was a committee -- I think there

18  was now that I'm thinking about it.  They might have

19  participate -- excuse me -- participated on the

20  committee, and there was a lot of work with Tiffany

21  Murray with Dr. McKether.

22      Q    All right.  Did Dr. McKether have any

23  authority or responsibility to accept complaints

24  regarding discrimination?

25      A    I don't know if he had the authority, but

1    he certainly took complaints.  And if he was not the

2    person to resolve those complaints or move them

3    forward, he would get them to the right person.  But

4    he often did take complaints.

5         Q    All right.  Did -- according to your

6    understanding of UT's policies, did Willie have any

7    authority to investigate complaints that he

8    received?

9         A    Well, anybody, if they were assigned to do

10   an investigation, they could.  We typically didn't

11   do that.

12        Q    Right.

13        A    But he certainly could have.

14        Q    Meaning -- and to the extent he was

15   identified as an investigator?

16        A    Well, his job was to look at issues of

17   diversity, and so that would maybe often or

18   sometimes include looking into a matter.  I won't

19   use the formal word investigation, but looking into

20   a matter, because he's called -- he called me a

21   couple times on other issues.

22        Q    If someone filed an internal complaint at

23   UT regarding discrimination --

24        A    Right.

25        Q    -- who would that -- let me rephrase it.

```
 1   Who was that supposed to go to according to the
 2   policy?
 3        A    Tiffany Murray.
 4        Q    Okay.
 5        A    Yes.  And sometimes they worked together
 6   on --
 7        Q    And then Tiffany Murray or whoever held
 8   her position was to conduct the investigation, or
 9   was that ever delegated to someone else?
10        A    It could have been delegated to -- if
11   Tiffany was out, say, on vacation, it could have
12   been delegated.  Because Tiffany had one direct
13   report, and then some of the -- sometimes some of
14   the consultants, we really have some outstanding
15   people that worked in the area that did those
16   before, did investigations, such as Melissa Studor
17   and some of our labor team would help out with those
18   investigations.
19        Q    To your knowledge, was Dr. McKether ever
20   assigned to conduct an investigation?
21        A    I don't know.
22        Q    First page, from Monica Holiday-Goodman
23   e-mail to you, right in the middle of the page, it
24   says, please let me know how you feel -- it says
25   ABFS can support you during this difficult time.
```

```
1          A    Yes, I see that.

2          Q    Yeah.  My question is do you know what

3     that stands for?

4          A    No.

5          Q    Okay.  After you sent this e-mail,

6     obviously you had an exchange with Monica, did you

7     ever talk to her?

8          A    I don't believe I did.

9          Q    Did you have any further e-mail exchange

10    with Monica or Willie?

11         A    Let's see.  This was on the 21st.

12    I believe -- I believe this was the only e-mail

13    exchange -- e-mail exchange I had.

14         Q    All right.

15              (Whereupon, Defendant's Exhibit V was

16              marked for identification.)

17         Q    You've been handed what's been marked as

18    Defendant's Exhibit V, as in Victor.  And first of

19    all, do you recognize this exhibit?

20         A    It appears to be text messages.

21         Q    It's my understanding these are text

22    messages between yourself and Willie McKether?

23         A    That's correct.

24         Q    All right.  And then I assume you're on

25    the right-hand side, because it says, Willie, can
```

1  you talk for a sec.

2      A    Yes.  I would assume that's me.

3      Q    All right.  And it says there -- I'm

4  looking at the top right hand of the first page -- I

5  sent you and Monica an e-mail with details.

6          I presume that's the e-mail we just looked

7  at, correct?

8      A    Yes.

9      Q    If you wish, you can use this to open the

10  door with the president.  I'm sending the president

11  a very short meeting.

12          Do you know what you meant by that?

13      A    No, I don't.

14      Q    Okay.  Would that mean meeting invite or

15  do you have any recollection of that?

16      A    No, I don't.  I'm sorry.

17      Q    All right.  And I think I asked you this

18  before, but do you know if Willie contacted the

19  president as a result of this text message exchange?

20      A    I don't know.

21      Q    Did you have a conversation with Willie?

22  We know the e-mail was sent to Willie on the 21st of

23  September.

24      A    Yes.

25      Q    Do you recall having a phone call with him

1    at or around that time?

2        A    I don't recall.  I might have, but I don't

3    specifically recall the conversation or if I did.

4        Q    Understood.  How about an in-person

5    meeting?

6        A    No.

7        Q    Okay.  And then you have an exchange with

8    him on the day of your separation in the middle of

9    the page going down to the bottom.

10       A    Yes.

11       Q    Go to Page 2.  What did you mean -- I'm

12   looking right there towards the top, your first text

13   on the right towards the top, this will not go

14   unnoticed.

15       A    I was referring to I knew I was going to

16   file a civil rights complaint.

17       Q    Okay.  My point exactly, that's how

18   ignorant Matt is.  What was your reference there?

19   What did you mean by that?

20       A    His -- his actions related to how I was

21   treated by him.  That's what I was referring to.

22       Q    And I can't make out the dates, but I

23   assume these are going in reverse chronological

24   order?

25       A    Yeah.  I think they go up from the bottom,

1   because these are starting -- oh, no, they don't.

2        Q    No, they kind of bounce around.

3        A    Yeah.

4        Q    All right.

5        A    I don't know.

6        Q    How about can you talk, please call me

7   ASAP.  These are texts from Willie.

8             Do you have any recollection what that

9   pertained to?

10       A    It sounds like we must have talked, but it

11  would have been about this, all of this probably.

12       Q    And it says there on the right, Shanda was

13  just on TV at Women's Summit.  Who's Shanda?

14       A    She used to -- Dr. Shanda Gore who used to

15  report to Dr. McKether, and she was let go.

16       Q    And what was her title?

17       A    Oh, I don't know her title.  But she did a

18  lot of diversity work.  She used to be over

19  diversity, and then Dr. McKether came in.  I

20  don't -- when she was leaving, I don't know what her

21  title was.

22       Q    Okay.  Did she report to Willie at the

23  time of her separation?

24       A    Yes.

25       Q    Was she terminated?

```
 1       A    I think -- I believe she received a 90-day

 2   notice, yes.

 3       Q    Why?

 4       A    Oh, I don't -- I don't recall.  I don't

 5   recall that.

 6       Q    Do you know what that means, what that's

 7   referencing, what time is Gore's e-mail cut off?

 8       A    Oh, so these -- these e-mails are not

 9   related.  It looks like they were done at certain

10   times, so it was a conversation about Gore because

11   that's back in July.

12       Q    Yeah.  Looks like -- right.

13       A    I'm just trying to understand it.  And

14   then there was a conversation way back in September.

15   So I just wanted to say that.  So this is when she

16   was going to be let go.  I think he was asking me

17   some preliminary questions.

18       Q    About shutting off her e-mail and things

19   like that?

20       A    Yes.  Yes.

21       Q    All right.  If you take a look at the very

22   last page in the top left-hand corner.  Hey, Wendy,

23   long time no talk.  No surprise to you, but for very

24   different and perhaps legitimate reasons, the

25   university has lost several African-American female
```

1    staff members over the years.  Can we have a

2    conversation about what we can do to retain our

3    women of color at the university.  I know that's a

4    big conversation.

5              Do you see that?

6        A    Yes, I do.

7        Q    Did you have that conversation with

8    Willie?

9        A    We -- I don't think I specifically did.  I

10   sent -- I believe I sent Tiffany to talk with him

11   about it.

12              MR. PIERSALL:  All right.  That's all

13          I have for you today, so thank you.

14              MR. ABOOD:  Thank you.

15              MR. PIERSALL:  Pursuant to our

16          earlier conversations, we'll figure out

17          the logistics and wrap it up next time.

18              (Whereupon, the deposition was

19          adjourned at 4:56 p.m.)

20                    - - -

21

22                         _____

23                              WENDY F. DAVIS

24

25

1

2                  C-E-R-T-I-F-I-C-A-T-E

3

4        I, Teresa Genovese Mauro, a Notary Public in
and for the State of Ohio, duly commissioned and
5   qualified, do hereby certify that the within-named
Witness, **WENDY F. DAVIS**, was by me first duly sworn
6   to tell the truth, the whole truth and nothing but
the truth in the cause aforesaid; that the testimony
7   then given by her was by me reduced to stenotype in
the presence of said Witness, afterwards transcribed
8   upon a computer; that the foregoing is a true and
correct transcription of the testimony so given by
9   her as aforesaid.

10

11       I do further certify that this deposition was
taken at the time and place in the foregoing caption
12  specified and was completed without adjournment.

13

14       I do further certify that I am not a relative,
employee of or attorney for any of the parties in
15  the above-captioned action; I am not a relative or
employee of an attorney of any of the parties in the
16  above-captioned action; I am not financially
interested in the action; I am not, nor is the court
17  reporting firm with which I am affiliated, under a
contract as defined in Civil Rule 28(D).

18

19       IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my seal of office at Toledo, Ohio, on
20  this 20th day of March, 2023.

21

22                        _____
                          *Teresa G. Mauro*
                          TERESA GENOVESE MAURO
23  My Commission expires         Notary Public
June 8, 2023.            in and for the State of Ohio

24

25