## AFFIDAVIT OF JOHN ELLIOTT

State of Ohio   :
                :  SS
County of Lucas:

I, John Elliott, first being duly sworn, do hereby depose and state the following upon personal knowledge and information:

1. I am Senior Associate Vice President and Chief Human Resources Officer at The University of Toledo. I have held that position since September 2020, and I am employed on a set, two-year contract that expires in September 2022.

2. When I came on board at UT in October 2020, the first thing I did was assess the operations and effectiveness of all employees reporting to me, the processes in the Human Resources Department, governance issues, etc. I soon found that there was significant negative feedback from internal UT customers concerning Dreyon Wynn. For example, I was told that he was unprepared or late for meetings, that he did not have an agenda, and that it difficult for them to obtain from Mr. Wynn the labor expertise they needed to navigate the union and collective bargaining issues in their departments.

3. However, at the same time, I knew that the Human Resources Department had been under-resourced. In fact, assessing and correcting the Department's issues was why I was hired. I also knew that we would soon be hiring a new Executive Director of Labor/Employee Relations and HR Compliance, and I would want that individual to independently assess Mr. Wynn's performance (as well as the performance of the rest of the Department) before taking any actions.

4. In December 2020, Mr. Wynn asked me to pay him a stipend for the extra work he claimed to be doing. I denied his request. Mr. Wynn was a Director-level employee, which is an overtime-exempt position, for which he was paid a $95,000 salary. The nature of exempt work is that employees may work more than 40 hours per week. Given the pandemic and departmental staffing issues, many employees in the Department were working additional hours. So, Mr. Wynn would not have been unusual in that regard.

5. In January 2021, UT advertised for the new position of Executive Director of Labor/Employee Relations and HR Compliance. The search committee consisted of myself; Melissa Hurst (White); Jennifer Cherry (White), Senior Human Resources Consultant; and Dr. Willie McKether (African American), Vice President of Diversity and Inclusion. I had the ultimate hiring authority and, while the search committee made their recommends, I made the final decision.

6. We reviewed 8 applications and selected 3 individuals for interviews: Bethany Ziviski (White), Dreyon Wynn (African American), and Kevin West (African American). The search committee jointly interviewed each candidate over video, following a standard script of questions.

PLAINTIFF'S EXHIBIT 2

UT 00638

7. Ultimately, the search committee recommended Ms. Ziviski for the position. I concurred based upon my independent assessment of Ms. Ziviski as compared with Mr. Wynn and Mr. West. I believed that Ms. Ziviski had the broadest experience in human resources, having experience with labor relations and different industry sectors. I found her experience to be very valuable in assessing the current and future needs of the Human Resources Department. Because I am only employed by UT on a two-year, interim basis, it is important to consider succession planning.

8. I did not believe that Mr. Wynn was as knowledgeable as Ms. Ziviski in the areas in which I believe were necessary to resolve issues in the Department and then modernize UT's human resources functions, nor did I find his experience to be as broad-based as hers.

9. The resume Mr. Wynn submitted to the search committee listed his employment dates with the City of Cleveland as March 2019 to March 2020. I have since learned that Mr. Wynn was actually working for the City through at least October 2020 and possibly as late as early November 2020. Therefore, the information he provided to the search committee was false; therefore, falsifying his application. Had I known that fact at the time, or had that information come to light during his employment at UT, that would have disqualified him from further consideration for the position, and I would have terminated Mr. Wynn immediately.

10. When Ms. Ziviski started in January 2021, I asked her to assess all of the employees in the Department.

11. In January 2021, all employees who worked in UT's Human Resources were consolidated in one location. Before that, Human Resources employees were housed on both UT's Main Campus and the Health Science Campus. This consolidation, plus the fact we had hired six additional Director-level positions for the Department, necessitated some office moves to accommodate these employees, especially those who would be on-site full-time.

12. I moved Mr. Wynn's office to accommodate the new Director of HR Technology who would be on-site all week and with whom I was working closely on a daily basis to upgrade our HRIS systems. Mr. Wynn, on the other hand, was hardly on-site. His new office was still a private office, with a door, and even had a window (his old office did not). He rarely used the new office, or his old office.

13. Ms. Ziviski recommended to me that Mr. Wynn be terminated based on his lack of organization, communication, follow-up, and follow-through in the duties and responsibilities with which he was entrusted and the numerous outstanding grievances for which he was responsible. I concurred.

14. Ms. Ziviski and I called Mr. Wynn on January 26, 2021 and informed him that he was being terminated effective April 26, 2021. Before we could continue the conversation, Mr. Wynn hung up. He then called back to continue the conversation. I believe he ended our call so that he could set up a recording device before calling me back.

UT 00639

Case: 3:22-cv-01899-JRK Doc #: 29-2 Filed: 11/29/23 3 of 4. PageID #: 483

15. At the same time we called, Ms. Ziviski emailed Mr. Wynn a 90-day termination notice, which is consistent with UT policy. The termination notice expressly informed him that he was relieved of all duty.

16. At the time I made the decision to terminate Mr. Wynn, and at the time we called to inform him of that fact, I was unaware that Mr. Wynn had a filed a charge with the Ohio Civil Rights Commission or the Office of Federal Contractor Compliance Programs.

17. Since he was terminated, I have learned that Mr. Wynn was working full-time for the City of Cleveland as an HR Manager in the Public Health Department. On February 9, 2021, I emailed Mr. Wynn and offered him the opportunity to clarify or explain this. He has not done so.

18. UT policy requires written approval before an employee may work two jobs. Mr. Wynn never obtained approval to work for the City of Cleveland while working for UT. Had he asked for such approval, it would have been denied. We reasonably expect a highly compensated, Director-level employee such as Mr. Wynn to devote his full attention to UT's matters. Mr. Wynn was responsible for UT's labor relations. Labor relations is highly transactional, involving numerous MOUs, extensive documentation, handling grievances, arbitrations, and attending meetings. This takes considerable time and requires an employee's full engagement. I do not believe it is possible for an employee in Mr. Wynn's position to perform two full-time, human resource-function jobs. And the fact that there were numerous, ongoing, serious issues with Mr. Wynn's performance and handling of the responsibilities entrusted to him, which ultimately led to his termination, show that.

19. Further, had the search committee known that Mr. Wynn was working for the City simultaneously – without that approval or prior disclosure, he would have been immediately disqualified from further consideration and terminated. Had I learned that Mr. Wynn was working for the City of Cleveland at the same time he was working for the UT, I also would have terminated him.

20. I have also since learned that Mr. Wynn was also working for Cuyahoga Community College (Tri-C) at the same time he was working for UT (and the City of Cleveland), and during some of the same business hours. As with Mr. Wynn's work for the City of Cleveland, he never requested approval to work for Tri-C, which would have been denied. Had I known that Mr. Wynn was working for Tri-C without such approval, I would have terminated him.

21. I have reviewed Mr. Wynn's complaint filed with the OFCCP. I was unaware that Mr. Wynn has requested wage data from HRIS staff. Neither Mr. Wynn nor any HRIS employee mentioned that fact to me. I was also unaware of any investigation that Mr. Wynn may have been conducting concerning alleged wage or pay disparities or discrimination. Mr. Wynn never mentioned any such investigation or issues to me.

22. I am also unaware of any salary discussions or disclosures that Mr. Wynn may have had with other co-workers in the Department. Employees' salaries at UT are a public record.

3

UT 00640

Given that, I fully presume and expected and believed that employees were discussing their pay with co-workers and aware of what others were being paid. That made no difference in – and did not factor into – any decisions that I made.

AFFIANT FURTHER SAYETH NAUGHT.

*John Elliott*
John Elliott

The foregoing instrument was acknowledged before me this __14th__ day of July 2021 by *Kelly R McLaughlin*.

KELLY R MCLAUGHLIN
Notary Public
State of Ohio
My Comm. Expires
October 5, 2025

4

UT 00641