**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| DREYON WYNN, | ) | Case No. 3:22-CV-01899 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF TOLEDO, | ) | |
| | ) | |
| Defendant. | ) | |

---

**MOTION FOR SUMMARY JUDGMENT OF**
**DEFENDANT UNIVERSITY OF TOLEDO**

---

DAVE YOST (0056290)
Attorney General of Ohio

Drew C. Piersall (0078085)
Scott H. DeHart (0095463)
ZASHIN & RICH CO., L.P.A.
17 South High Street, Suite 900
Columbus, Ohio 43215
Phone:  (614) 224-4411
Fax:  (614) 224-4433
*dcp@zrlaw.com*
*shd@zrlaw.com*

*Attorneys for Defendant*
*University of Toledo*

## <u>MOTION FOR SUMMARY JUDGMENT</u>
## <u>OF DEFENDANT UNIVERSITY OF TOLEDO</u>

Pursuant to Federal Rule of Civil Procedure 56, Defendant University of Toledo moves for summary judgment on the two remaining claims Plaintiff Dreyon Wynn asserts against it:  race discrimination and retaliation under Title VII of the Civil Rights Act of 1964.  As explained in the memorandum in support that follows, no material issues of disputed fact exist, and Defendant is entitled to judgment as a matter of law on Plaintiff's claims.  Further, Defendant is entitled to judgment as a matter of law on its defense of after acquired evidence.

Respectfully submitted,

DAVE YOST (0056290)
Attorney General of Ohio

<u>/s/ Drew C. Piersall</u>
Drew C. Piersall (0078085)
Scott H. DeHart (0095463)
ZASHIN & RICH CO., L.P.A.
17 South High Street, Suite 900
Columbus, Ohio 43215
Phone:  (614) 224-4411
Fax:  (614) 224-4433
dcp@zrlaw.com
shd@zrlaw.com

*Attorneys for Defendant University of Toledo*

## TABLE OF CONTENTS

MOTION FOR SUMMARY JUDGMENT........................................................................ i

TABLE OF CONTENTS........................................................................................... i

TABLE OF AUTHORITIES ..................................................................................... ii

MEMORANDUM IN SUPPORT............................................................................... 1

I.      Introduction............................................................................................................ 1

II.     Statement of Facts................................................................................................. 3

     A.    Plaintiff's Employment History with UT. ................................................... 3

     B.    Multiple Concerns with Plaintiff's Performance Quickly Emerge............................. 4

     C.    HR Modernization is Identified as an Initiative by UT President Postel and John Elliott is Hired to Implement the Modernization. ........................................................... 7

     D.    Plaintiff Applies for a Promotion as Executive Director of Labor/Employee Relations and HR Compliance, but is Unsuccessful.................................................................. 8

     E.    Bethany Ziviski is hired as the Executive Director of Labor/Employee Relations and HR Compliance and it Immediately Becomes Clear that Plaintiff Knows Nothing about Basic Labor Matters. ................................................................................................. 9

     F.    Plaintiff is Notified of his Termination on January 26, 2021. .................................... 11

     G.    Plaintiff Refuses to Return his UT-Issued Laptop and is Arrested............................ 11

III.    Law and Argument. ........................................................................................... 14

     A.    Plaintiff's Failure-to-Promote Claim Fails. .......................................................... 15

     B.    Plaintiff's Termination Claim Fails. .................................................................... 18

     C.    Plaintiff's Post-Termination Arrest Claim Fails. ..................................................... 22

IV.   Plaintiff's Potential Recovery is Barred by the After-Acquired Evidence Doctrine. ....... 29

V.    Conclusion. ........................................................................................................ 33

CERTIFICATE OF SERVICE ................................................................................ 34

# TABLE OF AUTHORITIES

## Cases

*Argyropoulos v. City of Alton*, 539 F.3d 724 (7th Cir.2008) ......................................................... 23

*Blizzard v. Marion Tech. Coll.*, 698 F.3d 275 (6th Cir. 2012) ...................................................... 24

*Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304 (6th Cir. 1989) ...................... 23, 24

*Browning v. Dep't of Army*, 436 F.3d 692 (6th Cir. 2006) ......................................................... 18

*Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006) ....................................................... 23

*Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339 (6th Cir. 2012) ............................................. 21

*Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009) ..................................................... 20, 21

*Escher v. BWXT Y-12, LLC*, 627 F.3d 1020 (6th Cir. 2010) ....................................................... 26

*Gibson v. United Airlines, Inc.*, 783 F.Supp.2d 983 (E.D. Mich.2011) ...................................... 24

*Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595 (6th Cir. 2001) ....................................... 20

*Hedrick v. W. Res. Care Sys.*, 355 F.3d 444 (6th Cir. 2004) ...................................................... 18

*Jocham v. Tuscola County*, 239 F. Supp.2d 714 (E.D. Mich. 2003) .......................................... 24

*Khalaf v. Ford Motor Co.*, 973 F.3d 469 (6th Cir. 2020) ........................................................... 24

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014) ....................................................... 23

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106 (6th Cir. 2001) ........................... 20

*Mansfield v. City of Murfreesboro*, 706 F. App'x 231 (6th Cir. 2017) ....................................... 28

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078 (6th Cir. 1994) ................................. 21

*McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352 (1995) ................................................. 29

*Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000) ....................................................... 27

*Proffit v. Metro Gov't of Nashville & Davidson Cnty.*, 150 Fed. Appx. 439 (6th Cir. 2005) ...... 26

*Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806 (6th Cir. 2011) ............................... 15, 17, 18, 20

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599 (6th Cir. 2019) ....................................... 28

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) ..................................................... 20

*Smyer v. Kroger Ltd. P'ship I*, S.D.Ohio No. 3:20-cv-114, 2022 U.S. Dist. LEXIS 125389 (July
    14, 2022) ................................................................................................................................. 23

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ................................................... 15, 19

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016) .................................... 18

*Tibbs v. Calvary United Methodist Church*, 505 F.App'x 508 (6th Cir. 2012) ...................... 21, 23

*Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ................................................. 23

*Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463 (6th Cir. 2012) ............................................ 27

*Watson v. Lowe's Home Ctrs., Inc.*, E.D. Mich. No. 04-70491, 2009 U.S. Dist. LEXIS 22473
    (Mar. 19, 2009) ........................................................................................................................ 24

*WooYoung Chung v. Berkman*, N.D. Ohio No. 1:13 CV 1354, 2014 U.S. Dist. LEXIS 79532
    (June 11, 2014) ........................................................................................................................ 17

*Zandvakili v. Univ. of Cincinnati*, S.D. Ohio No. 1:20-cv-902, 2023 U.S. Dist. LEXIS 56753,
    (Mar. 30, 2023) ........................................................................................................................ 17

## Statutes

Title VII of the Civil Rights Act of 1964 ................................................................... i, 14, 15, 23

## Rules

Fed. R. Civ. P. 56 ........................................................................................................................ i

**MEMORANDUM IN SUPPORT**

## I.    <u>Introduction.</u>

Plaintiff Dreyon Wynn ("Plaintiff") worked for Defendant University of Toledo's ("UT") Human Resources Department as the Director of Labor/Employee Relations and HR Compliance for approximately ten months before his termination. It suffices to say that Plaintiff did not excel in his role – by the time Plaintiff was let go, he had developed a reputation with UT employees of being unreliable and not credible.  In fact, the entire HR Department was floundering, so much so that UT's newly appointed President, Dr. Gregory Postel, identified a modernization of the Human Resources Department as a point of focus for his tenure, which began in July 2020.  Accomplishing this goal required a dramatic shake-up in the HR Department – the Chief Human Resources Officer, Plaintiff's supervisor, was terminated in September 2020 and replaced, as were other high-ranking HR officers. In their place, Dr. Postel selected two of his former colleagues to run the Department (John Elliot and Melissa Hurst), and Bethany Ziviski was chosen to serve as the new Executive Director of Labor/Employee Relations and HR Compliance.

Ziviski started with UT in January 2021 and immediately recognized Plaintiff's performance deficits.  Ziviski observed Plaintiff's disorganized and dysfunctional manner of work, characterized by interoffice strife and inaccurate responses to important communications.  Ziviski tried to get a sense of how Plaintiff spent his 8-hour workday, and requested that Plaintiff send her a list of all outstanding grievances with each union at UT.  Despite numerous attempts, Plaintiff was unable to provide basic information regarding labor matters.  This was the proverbial straw that broke the camel's back – Ziviski recommended to John Elliott, the recently-appointed Chief Human Resources Officer, that Plaintiff be terminated due to poor performance.  For Elliott's part, upon his hiring in October 2020, he conducted an evaluation of HR's operations and "no one had

1

anything positive to say about [Wynn's] performance." (Elliott Dep. 27). He did not let Plaintiff go at that time because he wanted to allow Ziviski to conduct her own evaluation when she arrived three months later.

On January 26, 2021, Elliott and Ziviski informed Plaintiff that he was terminated from his position pending a 90-day notice period. Plaintiff was informed that he was not to continue to work during his 90-day notice period and was relieved of all his duties. He was directed to return his UT-issued laptop on February 1, 2021, but Plaintiff refused to do so, claiming he had "proprietary interests" in the machine, which he admits he did not. Plaintiff was repeatedly directed to turn over all UT property, but Plaintiff continually refused. He insisted that he was permitted to retain the laptop until his last official day of work on April 26, 2021, despite Plaintiff having no further need for the computer (not to mention that his UT email account was disabled). Nonetheless, UT took no adverse actions against Plaintiff during this period. April 26th came and went with no sign of Plaintiff or the computer. Not surprisingly, UT considered the computer stolen at this juncture and reported its loss to the UT Police Department, which resulted in the issuance of a warrant. Since the computer was valued at over $1,000, the warrant was of a felony level. Plaintiff finally returned UT's laptop on May 27, 2021, a full month after his last "official" day of employment, and *four months* after he was directed to return the device. However, because of the outstanding felony warrant for his presumed theft of that device, Plaintiff was arrested. He was held for a few hours in jail and the charges were subsequently dropped.

Plaintiff's main contentions in this lawsuit are that he was separated from UT due to his race, and/or due to retaliation for engaging in protected activities. This could not be further from the truth: Plaintiff was terminated because he could not handle the work and could not provide answers to the most basic labor-related questions despite multiple, failed attempts. Plaintiff's race

2

was irrelevant to his demonstrated inability to perform the requirements of his job, and Plaintiff admits that any protected activity he engaged in was not communicated to Ziviski (who recommended his removal), or Elliott (who made the removal decision). The bottom line is this: Plaintiff was terminated for poor performance during a period when the HR Department and its operations were under scrutiny to effectuate President Postel's modernization effort. UT's proffered reason for Plaintiff's termination is legitimate, nondiscriminatory, and not pretextual. Accordingly, UT is entitled to summary judgment on Plaintiff's claims.

UT also moves for summary judgment on its asserted defense of after-acquired evidence. Plaintiff would have been terminated for two independent reasons, had UT been aware of his transgressions during his employment. First, it is not in dispute that Plaintiff clandestinely worked for the City of Cleveland in a full-time capacity during the majority of his UT employment. Second, it is also not in dispute that Plaintiff lied in his resume regarding the dates of his employment with the City, when he submitted that resume for a promotion. Accordingly, even if any of Plaintiff's claims survive, he is barred from receiving front pay, back pay, or reinstatement.

## II.    Statement of Facts.

### A.    Plaintiff's Employment History with UT.

UT hired Plaintiff on March 25, 2020 as its Director of Labor/Employee Relations and HR Compliance, and he earned $96,500 annually. (Wynn II Dep. 8-9; Ex. L).[1] Plaintiff's primary function in this role was to provide leadership and insight into UT's labor negotiations and to ensure compliance with applicable labor laws and collective bargaining agreements.  Plaintiff

---

[1] Defendant conducted the deposition of Plaintiff over the course of two separate days. (Doc Nos. 31 & 32). The first volume of Plaintiff's deposition transcript is cited as "Wynn I Dep. __" and the second volume is cited as "Wynn II Dep. __." Plaintiff conducted the depositions of John Elliott, Jeffrey Newton, and Bethany Ziviski (Doc. Nos. 29, 30, and 33). Defendant utilized lettered exhibits, while Plaintiff utilized numbered exhibits. Citations to associated deposition exhibits are cited herein as "Ex. __."

oversaw labor negotiations between UT and four unions: the Fraternal Order of Police ("FOP"), Communications Workers of America ("CWA"), American Federation of State, County, and Municipal Employees ("AFSCME"), and University of Toledo Police Patrolman's Association ("UTPPA"). (Wynn I Dep. 24-26; Wynn II Dep. 11-13; Ex. M). Plaintiff negotiated two labor contracts during his tenure: one with CWA, and one with FOP. (Wynn II Dep. 14).

Plaintiff reported to the Associate Vice President and Chief Human Resources Officer. When he was hired, Wendy Davis held this job. After UT terminated Davis in September 2020, Plaintiff reported to John Elliott for three months, and then reported to Bethany Ziviski when UT hired her in January 2021. (Wynn II Dep. 10). Ziviski reported to Elliott. (Ziviski Ex. 17). Elliott, in turn, reported to UT's Executive Vice President of Finance and Administration and Chief Financial Officer, Matthew Schroeder. (Elliott Ex. 1). Plaintiff was an unclassified, or "at will" employee, the entirety of his UT employment. (Wynn I Dep. 66-67; Ex. A).

Plaintiff did not often work physically at UT, as his employment began in March 2020 when COVID lockdowns began. After the first three months of his employment, he began working in person at UT two days per week. (Wynn II Dep. 115).

### B.    Multiple Concerns with Plaintiff's Performance Quickly Emerge.

Within a few months of being hired, UT HR customers identified issues with Plaintiff's performance. As UT's Labor Director, Plaintiff was responsible for the preparation and presentation of UT's position in arbitrations, mediations, and agency proceedings and in representing UT as the employer in its relationship with non-faculty public collective bargaining agreements. (Ex. M). As with any in-house labor position, Plaintiff had to effectively navigate relationships between management and labor to advance UT's interests while accommodating labor's interests to the extent possible with efficient UT operations. To that end, it was vitally

important that Plaintiff maintain harmonious working relationships with management and union representatives. On numerous occasions, he failed to do so. An illustrative list includes:

- On June 30, 2020, UT Police Chief Jeffrey Newton sent an email to Plaintiff regarding COVID-related budget cuts within the Police Department. (Ex. KK). In this email, he expressed frustrations with Plaintiff's handling of the negotiations with the police union related to the budget cuts, and concluded with "Again, I'm at a total loss.  I've been chief for 16 years and for the first time feel like I have no control over the management of the department."  (Ex. KK, p. 2).  Chief Newton was required to cut $750,000, which necessarily impacted personnel.  (Newton Dep. 12).  Given the "unprecedented" nature of the cuts, Newton looked to Plaintiff to "hold our hand through this."  *Id.*  Plaintiff did not do so; to the contrary, he allowed the union attorney to dictate the cuts and "Dre hardly provided any support at all. … **So we felt very unsupported.  And that unfortunately was kind of a general theme."**  (Newton Dep. 13).

- On July 27, 2020, Plaintiff scheduled a mediation over a union member's grievance without so much as notifying Chief Newton.  (Newton Dep. 10-12; Ex. BBB). Newton only learned of the mediation when his officers began requesting the day off to attend.  (Newton Dep. 10-11).  Newton would have a "significant role" at the mediation, and no one from police command was represented.  *Id.* The union board attended the mediation, along with the mediator from Columbus.  Newton is physically present for all labor mediations involving the Police Department – this was the first time in his career that he was not invited to such a proceeding. (Newton Dep. 10-12).  Newton emailed Plaintiff as soon as he found out about the mediation.  He stated:  "Surprised to see the Union attorney and 4 union members will be at a mediation today that police management knows nothing about…"  (Ex. BBB).

- On August 12, 2020, Plaintiff (to borrow his own term) "rebuked" Chief Newton for making decisions that Plaintiff felt put UT in a bad legal position.  Plaintiff stated, "I recommend you compromise somewhere," "The University is in this predicament because of the unilateral actions you made," and "My hope is that you can put your personal feelings aside and do what is best for the University…"  (Ex. LL).  This caused Chief Newton to email his supervisor questioning whether Plaintiff was on UT's side or the Union's side. (Ex. LL).  Plaintiff does not see any issue with the manner in which he communicated with the Police Chief. (Wynn II Dep. 173).

- Plaintiff's discourteous communication was not limited to interactions with Chief Newton.  In July 2020, UT and CWA were engaged in a dispute relating to COVID-related layoffs for CWA workers. (Wynn II Dep. 155-58; Ex. JJ).  The CWA liaison, Kathy Sullivan, emailed Plaintiff's direct report Dan Powell to request information relating to these layoffs. After Powell failed to timely provide that information, Sullivan reiterated the request to Plaintiff. Plaintiff indicated that he

would have the information the next day but failed to provide the information. Sullivan sent a follow-up email to Plaintiff a week later, then another follow-up email later that week due to Plaintiff's failure to respond.  (Ex. JJ). Receiving no response from Plaintiff despite her repeated requests, and the passage of several weeks, Sullivan (unsurprisingly) asked why UT was stalling in providing the information.  Plaintiff snapped at Sullivan, telling her "My recommendation to you is… [sic] don't accuse people of things that are not true, I am not stalling. Making false accusations are [sic] not going to help you with getting the information you requested." (Ex. JJ). When asked about this delay and his choice of language, Plaintiff indicated that he did not believe it was a "performance issue," although he conceded that Sullivan's accusations were accurate. (Wynn II Dep. 156-57).

- On October 2, 2020, Plaintiff again used improper language with Sullivan.  Yet again, Plaintiff failed to provide Sullivan with information, which caused Sullivan to question the purported "open lines of communication" and transparency between CWA and Labor (i.e., Plaintiff).  (Ex. MM).  Plaintiff again went on the attack, stating:  "I suggest next time you call me rather than putting false accusations in an email to fit a narrative you conjured up in your mind. You are treading a fine line Kathy…I suggest you cease and desist with your false accusations."  (Ex. MM). And again, Plaintiff has no issue with his communication style because he claimed Sullivan was lying about him, although the exact nature of the lie remains to be seen. (Wynn II Dep. 174-75).  "There's nothing wrong with that.  I'm direct.  What am I supposed to say?"  (Wynn II Dep. 175).

- In November 2020, Plaintiff served as a hearing officer related to a Police Department vacation time grievance. Plaintiff issued a grievance response misstating a simple fact detrimental to UT's position: he claimed that Police Chief Newton had presented no documentation during the hearing, when, in fact, he had introduced the "smoking gun" that disposed of the union's grievance.  (Newton Dep. 26-27).  Chief Newton pointed this out to Plaintiff.  (Ex. SS, p. 2).  Plaintiff concedes Chief Newton was accurate.  (Wynn II Dep. 190; Ex. SS, p. 4), but claimed he is "making a big deal out of nothing."  (Wynn II Dep. 191).

- In November 2020, Plaintiff agreed to a Letter of Agreement that placed a member of one bargaining unit (CWA) into a position in another bargaining unit (AFSCME) in direct violation of the AFSCME contract and state collective bargaining law. Plaintiff ignored, and then played down this fact, saying "how would the others know" that the employee was making more than the bargained-for amounts for that position.  (Ex. PP).

- Elliott's assistant had been looking for Plaintiff at the request of another employee. Plaintiff was not responding to emails, his whereabouts were unknown, and Plaintiff had noted on his calendar that he was off that day and the next without reporting it in HR's time off system.  When confronted, as he was prone to do, Plaintiff accused Elliott's assistant and his colleague of making "false statements" and "basically lying." (Ex. TT; Wynn II Dep. 193).  Accusing your boss's assistant of lying is not indicative of professional communication.

6

### C.     HR Modernization is Identified as an Initiative by UT President Postel and John Elliott is Hired to Implement the Modernization.

Upon his hire in July 2020, President Postel announced that one of his goals was HR modernization.  (Wynn II Dep. 140).  It is not in dispute that UT's HR Department was not a high-functioning unit at the time of President Postel's arrival. (Elliott Ex. 2, ¶3; Davis Dep. 109).[2]  More to the point, Schroeder terminated Davis' employment on September 18, 2020 because she was not capable of implementing President Postel's modernization initiative.  (Davis Dep. 113).  Elliott replaced Davis in October 2020 (Elliott Dep. 13), and the reason Elliott was hired was to "assess[] and correct[] the Department's issues."  (Elliott Ex. 2, ¶3).

Upon his hire, "the first thing [Elliott] did was assess the operations and effectiveness of all employees reporting to [him], the processes in the Human Resources Department, governance issues, etc.  I soon found that there was **significant negative feedback from internal UT customers concerning Dreyon Wynn**.  For example, I was told that he was **unprepared or late for meetings, that he did not have an agenda, and that it was difficult for them to obtain from Mr. Wynn the labor expertise they needed to navigate the union and collective bargaining issues in their departments**."  (Elliott Ex. 2, ¶2).   "Every person I spoke with when I got there gave Dre a negative review."  (Elliott Dep. 26).  "[N]o one had anything positive to say about his performance."  (Elliott Dep. 27).

Elliott provided specifics:  he received negative feedback from Police Chief Newton, Director of Facilities Jason Toth, Monecca Smith[3] (the Chief Nursing Officer for UT Medical

---

[2] The parties have agreed and stipulated that depositions taken in the case of *Wendy Davis v. Univ. of Toledo* (Case No. 3:22-cv-301, N.D. Ohio) may be utilized in the present case.  Davis' deposition taken in that case is Doc. No. 28 in this case.

[3] Smith contacted Jennifer Cherry on November 3, 2020 to express frustration with "the lack of communication and direction on several labor grievances."  (Ex. OO).  Cherry memorialized these concerns in an email to Hurst.  (Ex. OO).  Plaintiff's response was to claim that "[Smith] doesn't dictate to me how to do my job."  (Wynn II Dep. 181).

Center), and Jennifer Cherry (Senior HR consultant assigned to clinical).  (Elliott Dep. 10-11).  These individuals had similar complaints that can be distilled down to one simple issue: "none of them found him to be reliable or competent in the area of labor relations."  *Id.*  Things were so bad that the CEO of UT's Medical Center, Rick Swaine, asked Elliott not to assign Plaintiff to a particular labor issue because of his executives' concerns with Plaintiff's lack of competence/reliability.  (Elliott Dep. 11-12).

Elliott shared these concerns with Plaintiff.  (Elliott Dep. 27).  But Elliott did not take any action at that time because he knew that he would soon be hiring a new Executive Director of Labor/Employee Relations and HR Compliance (which was filled by Ziviski in January 2021), and he wanted this person to independently assess Plaintiff's performance.  (Elliott Ex. 2, ¶3).  It was important to Elliott that Ziviski conduct her own evaluation since she would oversee this area.  (Elliott Dep. 27).

### D. Plaintiff Applies for a Promotion as Executive Director of Labor/Employee Relations and HR Compliance, but is Unsuccessful.

UT posted the "Executive Director of Labor/Employee Relations and HR Compliance" vacancy and convened a search committee to evaluate the qualifications of each applicant.  The search committee consisted of Elliott (Caucasian); Melissa Hurst (Caucasian), UT's Executive Director of Talent Strategy and Development); Jennifer Cherry (Caucasian), Senior HR consultant assigned to clinical; and Dr. Willie McKether (African-American), UT's Vice President of Diversity and Inclusion.  (Elliott Ex. 2, ¶5).  The search committee made recommendations, but the ultimate hiring authority was Elliott.  *Id.*  The committee received eight applications, and selected three employees for interviews:  Plaintiff, Kevin West Director, Faculty Labor Relations; (African-American), and Ziviski (Caucasian). (Elliott Ex. 2, ¶6).

The three interviews were conducted on November 16, 2020.  (Wynn II Dep. 60; Ex. R).

Extensive notes were maintained by the search committee members.  (Ex. R).  Not a single search committee member voted to consider Plaintiff further for the role, whereas all four members voted to advance West, and three voted to advance Ziviski (McKether voted against advancing Ziviski).  (Ex. R; Wynn I Dep. 56-57).  In other words, **not a single member of the search committee believed that Wynn would be a good fit for the role**.  Elliott believed that Ziviski was the strongest candidate because she "had the broadest experience in human resources, having experience with labor relations and different industry sectors."  (Elliott Ex. 2, ¶7).  Moreover, Elliott was on a fixed 2-year contract, and he desired to have someone in place to succeed him when he left UT.  And that is what happened:  Ziviski was named CHRO after Elliott's designed 2-year stint.  (Elliott Ex. 2, ¶7; Wynn I Dep. 56).

**E.   Bethany Ziviski is hired as the Executive Director of Labor/Employee Relations and HR Compliance and it Immediately Becomes Clear that Plaintiff Knows Nothing about Basic Labor Matters.**

Ziviski was hired on January 11, 2021 as Executive Director of Labor/Employee Relations and HR Compliance.  (Ziviski Dep. 4, 8-9).  She served as Plaintiff's supervisor and assessed all employees in the HR Department, including Plaintiff.  (Ziviski Dep. 15-16; Ziviski Aff. ¶2).  Ziviski encountered any number of performance deficits, including:

- Ziviski requested that Plaintiff provide her with a list of all outstanding grievances, including CWA.[4]  Plaintiff initially provided her with a list of five CWA grievances on January 11, 2021.  Two of them were UTPPA grievances.  (Ziviski Aff. ¶7).  On January 14, 2021, Plaintiff provided her with a list of 12 CWA grievances.  (Ziviski Aff. ¶9).  On January 15, 2021, Ziviski spoke with CWA liaison Kathy Sullivan, who informed her that they were "buried" with around 35 grievances.  And Plaintiff was aware of this because Sullivan represented to Ziviski that she had met with him about the stack of grievances and Plaintiff wanted to hear them the week of January 11, 2021.  (Ziviski Aff. ¶10).  On January 26, 2011, Plaintiff emailed Ziviski and indicated that there were 35 pending grievances.  This was the correct number.  (Ziviski Dep. 16-18; Ziviski Aff. ¶11).

---

[4] Not surprisingly, Ziviski was also communicating with the unions to advise them that she was now employed at UT and what her role would be going forward.  The unions were providing Ziviski with different numbers of pending grievances than what Plaintiff was providing.  (Ziviski Dep. 16).

Plaintiff's excuse for failing to identify the correct number of CWA grievances was that departing employee Dan Powell had received them from Sullivan in **July 2020** but had not logged them. (Wynn II Dep. 203-05, 247). It is not entirely clear how it is possible that Plaintiff was unaware of the existence of that many grievances for half a year. In any event, Ziviski located all the grievances sitting in order on top of Powell's former desk. (Ziviski Aff. ¶11). Plaintiff even doubled down on his assertion on January 20, 2021, and indicated that Sullivan's (correct) estimate was wrong. (Ex. XX). But Plaintiff conceded at his deposition that Sullivan was right, and he was wrong. (Wynn II Dep. 203). "[A]t that point in time, he was the only person responsible for grievances at the University of Toledo, so it was really his responsibility to know how many grievances were pending and not somebody else's responsibility." (Ziviski Dep. 20).

- On January 13, 2021, Ziviski requested that Plaintiff provide her with a list of all CWA employees working at the Main Campus Medical Center ("MCMC") (Ziviski Aff. ¶12). In response, Plaintiff provided Ziviski with a list of all CWA employees employed by UT, not just those employed at the MCMC. (Ziviski Aff. ¶13). Plaintiff then tried again and sent Ziviski a list of every custodial worker on UT's Main Campus. (Ziviski Aff. ¶14). On January 14, 2021, Plaintiff provided yet another list. This one identified 49 CWA employees that were employed at the MCMC. (Ziviski Aff. ¶15). This list was inaccurate – only one CWA employee worked at the Medical Center. *Id.*

- Ziviski observed that Plaintiff had little organization of pending grievances, arbitrations, and executed memoranda of understanding that he was supposed to be overseeing. When Ziviski learned that he was storing these documents only on his personal flash drive, she directed him to store them on UT's shared HR network directory so all HR and Labor staff could have access and because of UT's public records obligations. (Ziviski Dep. 61; Ex. XX). Plaintiff refused, and told her he would store only *finalized* documents and *open grievances* in the shared directory. (Ex. XX). Ziviski had to follow up and again instruct him to store **all** grievances, not just the open ones. (Ex. XX). Again, Plaintiff did not view this as a "performance issue," but believed that Ziviski was being "minute and petty." (Wynn II Dep. 210).

- Ziviski learned that Plaintiff had coordinated a new hire without discussing it with employment staff and without securing a memorandum of understanding with the union. Standard pre-hire documentation was not completed. This was also unusual given that Plaintiff had earlier told a union representative that he was "labor relations not employment and do not post or fill vacancies." (Ziviski Aff. ¶25)

- The HR Department was contacted in **July 2020** by the Medical Center regarding the potential termination of an employee who was physically unable to work. Lisa Albain, HR Consultant, was tasked with handling the matter. In **October 2020**, Albain emailed Plaintiff with the pertinent information and asked for his advice on

termination options. Plaintiff did not respond. On **November 5, 2020**, Albain again emailed Plaintiff asking for advice. Plaintiff again did not respond. In January 2021, six months after the Medical Center expressed their desire to terminate the employee, and over three months after Albain made initial contact with Plaintiff, she *again* emailed Plaintiff.  Again, Plaintiff failed to provide advice. (Ex. HHH). Plaintiff has no recollection of the incident. (Wynn II Dep. 248-49).

- In another situation, an internal UT customer was upset that Plaintiff did not call her when she was told he would, expressed concern over needing to make a decision on an employee matter, and was confused over why he was again presenting an option they had rejected. Plaintiff told her he took offense to the tone of her email and use of all caps.  Plaintiff was unaware there was a signed last chance agreement involving that employee, a fact that he should have known or investigated before advising his internal customer on its options.  (Ex. DDD).

- UT retained outside counsel to represent it in labor negotiations with CWA. Plaintiff admittedly used this attorney as a scribe – he limited her role to taking notes.  (Ziviski Dep. 21-22; Wynn II Dep. 228).

- Plaintiff did not invite Ziviski or the negotiating committee for FOP negotiations scheduled for January 29, 2021, despite Ziviski's request that he do so.  (Ziviski Dep. 22; Ziviski Aff. ¶24).

### F.     Plaintiff is Notified of his Termination on January 26, 2021.

Within just two weeks at UT, Ziviski had seen enough; she recognized that Plaintiff's employment was not sustainable. (Ziviski Aff. ¶28). It bears noting that Ziviski had previously held Wynn's position at UT, and unlike Wynn, she had performed successfully in that role.  Ziviski indisputably understood the expected level of performance. Ziviski recommended Plaintiff's removal to Elliott, who agreed and was the final decision maker.  (Ziviski Aff. ¶ 29; Elliott Dep. 24).  Plaintiff was presented with his 90-day notice of termination on January 26, 2021 by Ziviski and Elliott.  (Wynn I Dep. 68-69; Ex. A).  He was paid in full through April 26, 2021.  (Ex. A).

### G.     Plaintiff Refuses to Return his UT-Issued Laptop and is Arrested.

Plaintiff was explicitly informed that he was not to work through his 90-day notice and that UT would contact him if it needed anything further.  (Ex. A).  Since Plaintiff was relieved of his duties and his work email account was shut off as of January 26, 2021 (Wynn I Dep. 66), Plaintiff

11

had no need to utilize his UT-issued laptop computer.  To that end, Elliott's assistant called Plaintiff on February 1, 2021 and directed him to return the University's laptop.  (Ex. B, pp. 2-3).  Plaintiff emailed Elliott and Ziviski the same day, and stated:

> Thank you for contacting me today about my work laptop.
>
> However, why is the University requesting that I return the work laptop assigned to me when:
>
> 1. I am still an employee of the University of Toledo and Director of Labor/Employee Relations & HR Compliance.
> 2. I have proprietary rights.
>
> At this time, I am requesting the University of Toledo reactivate my work email account. *Id.*

On February 3, 2021, Elliott issued a direct order to Plaintiff to "return any University property in your [possession], including any files or documents and **the laptop currently in your possession, by February 5, 2021.**"  (Ex. B, pp. 1-2).  On February 4, 2021, Plaintiff responded and claimed that "not all" of the information contained on the laptop belongs to UT (but conceded this was not true as all information pertained to UT; Wynn I Dep. 71), and demanded that Elliott cite a Board of Trustees policy which provides him the authority to issue such a directive (which Plaintiff admits Elliott does not need; Wynn I Dep. 72-73).  Despite the directive from Elliott, and despite physically passing through Toledo during this notice period (Wynn I Dep. 96-97), Plaintiff admittedly had no intention of returning the laptop prior to April 26th, which was the last day of his 90-day notice period.  (Wynn I Dep. 97).

Plaintiff's refusal to return his computer continued for months and UT was ultimately forced to refer the matter to the UT Police Department. As referenced in the UT Police Report, Ziviski made the referral to the Police Department on April 9, 2021. (Ex. G, p. 2).  The case was assigned to Detective Zakrzewski.  (Newton Dep. 18-19).  On April 12, Det. Zakrzewski spoke with Plaintiff, who confirmed that he had the laptop in his possession.  (Ex. G, p. 2).  Plaintiff told

Det. Zakrzewski that "he was planning on returning his property on his 'official' last paid working day, which was 4/26/2021." *Id.*  Det. Zakrzewski asked Plaintiff to return the laptop prior to April 26, and Plaintiff agreed to do so and indicated he would contact Det. Zakrzewski with a time and date. *Id.*  Det. Zakrzewski attempted to contact Plaintiff on four subsequent occasions, each time leaving a voicemail (which he preserved):

> April 15 at 10:53
> April 19 at 12:15
> April 22 at 14:22
> April 26 at 10:17

Plaintiff did not return any of these voicemails.  (Ex. G, p. 2).  April 26th came and went, and Plaintiff did not return the computer.  According to Plaintiff, his failure to return the laptop was due to COVID.  (Wynn I Dep. 94).  Plaintiff admittedly did not inform anyone at UT that he could not return the laptop by the agreed-upon deadline due to COVID.[5]  (Wynn I Dep. 95).  Det. Zakrzewski waited another full week until May 3, 2020, but hearing nothing from Plaintiff, he sought and obtained a warrant for Plaintiff's arrest for the theft of the laptop.  (Ex. H). This was a "felony 4" level offense because the laptop was valued at $1,260.  (Ex. H).

On May 19, 2020, Plaintiff left Det. Zakrzewski a voicemail that indicated that he was passing through Toledo and he could drop the laptop off.  If the Detective was unavailable, Plaintiff could potentially drop it off on May 21.  (Ex. I). Det. Zakrzewski called Charging Party back half an hour later, and left a voicemail.  He explained to Plaintiff that he was unavailable and out of the office until the following week. The Detective requested that Plaintiff deliver the laptop on May 24th.  (Ex. I).

Det. Zakrzewski did not hear back from Plaintiff until May 27th, when Plaintiff returned

---

[5] Plaintiff had no answer as to why he simply could not place the laptop in the mail.  (Wynn I Dep.  85).  As for retuning it by the Feb. 3rd deadline imposed by Elliott, Plaintiff stated, "I don't live here.  And I'm not making a special trip to Toledo."  (Wynn I Dep. 84-85).

the laptop to the Police Department, or nearly four months after Elliott's initial deadline. (Ex. I). Det. Zakrzewski explained to Plaintiff that since he had failed to return the laptop by his last date of employment, a warrant was issued for felony theft. (Ex. J). Det. Zakrzewski explained that during their call on April 12th, Plaintiff agreed to reach out to him to arrange the return of the property prior to his last working day. (Ex. J). Plaintiff claimed his last working day was April 27th (which was wrong), and also claimed that he stated he would return the property on his last working day (but did not explain the one-month delay). Det. Zakrzewski also explained to Plaintiff that he left him four voicemails from April 15 – 26, but Plaintiff did not recall those. Plaintiff reiterated his deposition testimony: "I don't live here and I'm not making special trips." (Ex. J; Wynn I Dep. 84-85, 107). Det. Zakrzewski also reminded Charging Party of the voicemails they had exchanged on May 19th regarding the return of the laptop. (Ex. J).

Det. Zakrzewski had no discretion under Ohio law to ignore the outstanding felony warrant. (Newton Dep. 23-24). Plaintiff was booked into the Lucas County Jail, and released the same day. (Wynn I Dep. 105). Plaintiff subsequently appeared for two court hearings, and the charges were dropped. (Wynn I Dep. 124). Plaintiff is not aware of any other UT employees who were directed to return UT-issued equipment and refused to do so. (Wynn II Dep. 129).

## III.  <u>Law and Argument.</u>

Plaintiff brings two counts against UT under Title VII: race discrimination and retaliation. From what UT can discern from Plaintiff's Complaint (Doc. No. 6), Wynn alleges three discrete adverse employment actions: 1) UT's failure to promote him to the position now held by Bethany Ziviski; 2) his termination; and 3) his arrest for theft. Plaintiff's Complaint is not a model of clarity, and it is unclear which of these alleged adverse actions Plaintiff challenges on the basis of his race, or retaliation, or both. For the reasons set forth in more detail hereinafter, each of

14

Plaintiff's claims are specious.

This is not a direct evidence case (Wynn I Dep. 10), so Plaintiff must rely upon circumstantial evidence to prove race discrimination. A plaintiff attempting to prove race discrimination under Title VII through circumstantial evidence must use the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff must first establish his *prima facie* case by a preponderance of the evidence. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981). The burden then shifts to UT to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 254-56. If UT satisfies its burden, Plaintiff must then show not only that UT's articulated reason was a pretext, but that the real reason was unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). The ultimate burden of persuasion remains throughout this analysis on Plaintiff. *Burdine*, 450 U.S. at 253.

### A.     <u>Plaintiff's Failure-to-Promote Claim Fails.</u>

Plaintiff's first claim is that UT failed to promote him to Executive Director of Labor/Employee Relations and HR Compliance (now held by Bethany Ziviski), presumably based on his race.[6] To establish a *prima facie* case of race discrimination based on UT's failure to promote him, Plaintiff must establish that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion, (3) he was considered for and denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time Plaintiff's request for the promotion was denied. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). For the purposes of this motion, UT does not dispute the

---

[6] As far as UT can discern from the Complaint, Plaintiff does not allege that his failure-to-promote was retaliatory. Even if he did, such a claim would fail because Plaintiff admits that he never put Elliott, the promotion decision maker, on notice of any alleged discrimination. (Wynn II Dep. 141). To the extent Plaintiff alleges retaliation related to this claim, UT reserves the right to address it more substantively in its Reply.

first three prongs:  (1) Plaintiff is African-American; (2) he applied for and met the minimum qualifications of the position; and, (3) he was considered for and denied the promotion.  Plaintiff cannot establish prong four, however, because he and Ziviski were not similarly qualified.

Plaintiff concedes West was a superior candidate to him for the position (Wynn II Dep. 60), but preposterously claims that Ziviski did not possess the minimum qualifications for the job because she did not have 10 years of HR experience and her experience was not "progressive." (Wynn I Dep. 52-54).  Ziviski worked as a labor & employment attorney from 2004-2013, and then held a series of managerial-level HR positions from 2013-2020, when she applied for the UT position.  (Ziviski Ex. 19).  Her qualifications far surpassed Plaintiff's:  Elliott found that Plaintiff was not as "knowledgeable as Ziviski in the areas in which I believe were necessary to resolve issues in the Department and then modernize UT's human resources functions, nor did I find his experience to be as broad-based as hers." (Elliott Ex. 2, ¶8).

Ziviski is a superior candidate for any number of reasons.  First, per the job posting (Ex. O) as well as the position description (Ex. P, p. 3), "A law degree, Juris Doctorate, *is strongly preferred*."  Ziviski possesses this preferred qualification (along with nine years practical law firm experience).  (Ziviski Ex. 19).  Second, and perhaps most importantly, Ziviski did not have a history of poor performance, which Elliott immediately uncovered with respect to Plaintiff as soon as Elliott started working at UT.  Third, Ziviski had previously performed in the exact same position as Plaintiff for almost three years.  She had the added benefit of institutional knowledge and solid working relationships with key UT personnel developed during her prior tenure.  Fourth, Elliott did not find Plaintiff's experience to be as broad based as Ziviski. (Elliott Ex. 2, ¶8).  Fifth, the search committee vote speaks for itself:  none of the four were in favor of advancing Plaintiff, while three of four were in favor of advancing Ziviski.  *See, Zandvakili v. Univ. of Cincinnati,* S.D.

Ohio No. 1:20-cv-902, 2023 U.S. Dist. LEXIS 56753, at *12 (Mar. 30, 2023) (dismissing plaintiff's Title VII discrimination claim because the record supported a search committee's consensus that selected candidate was better qualified for Associate Dean position than plaintiff); *see also*, *WooYoung Chung v. Berkman*, N.D. Ohio No. 1:13 CV 1354, 2014 U.S. Dist. LEXIS 79532, at *33 (June 11, 2014), fn. 5 ("The fact that * * * the search committee recommended that CSU interview three Asian applicants who met the minimum qualifications for the * * * position indicates that the committee did not determine that Plaintiff did not meet the minimum qualifications for the position because of his race.")

Moreover, Ziviski was a known commodity at UT: she had a successful track record of working in the same position that Plaintiff held.  (Wynn I Dep. 56).  Elliott reached out to her, as he did with any number of other former UT HR employees, to ascertain why they left and to potentially have them return to UT given the lack of HR talent.  (Wynn II Dep. 62; Ziviski Dep. 11; Elliott Dep. 55-56).  Ziviski had left UT after her first stint because a position was located closer to her home and offered better pay.  (Ziviski Dep. 9).  Plaintiff had also become a known commodity at the time of his application, but as Elliott testified, he lacked Ziviski's successful track record:  the feedback given to Elliott about Plaintiff's performance was universally negative.

Even assuming *arguendo* that Plaintiff could establish a *prima facie* case, the burden shifts to UT to articulate a legitimate, nondiscriminatory reason for its actions.   UT meets this burden as Elliott's reasons for hiring Ziviski are set forth above.  "A plaintiff can refute the legitimate, nondiscriminatory reason … by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Provenzano*, 663 F.3d at 815.  "Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior

candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination." *Id.* Additionally, the Sixth Circuit has "afforded great flexibility to employers when selecting management personnel." *Browning v. Dep't of Army*, 436 F.3d 692, 698 (6th Cir. 2006) (internal citations omitted).

It is also well-settled that Plaintiff's belief he was more qualified than Ziviski is irrelevant. An employee's "subjective view of [his] qualifications in relation to those of other applicants, without more, cannot sustain a claim of discrimination." *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004).

Plaintiff cannot attack pretext through the methods set forth in *Provenzano* for the reasons explained above. His failure-to-promote race discrimination claim fails accordingly.

### B.     Plaintiff's Termination Claim Fails.

Plaintiff's second claim focuses on his termination.[7] To establish a *prima facie* case of race discrimination, Plaintiff must establish that he was: (1) a member of a protected class; (2) subject to an adverse employment action; (3) qualified for the position; and (4) replaced by a person outside the protected class or treated differently than similarly situated male employees. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016). For the purposes of this motion, UT does not dispute that Plaintiff can establish his *prima facie* case: (1) he is African-American; (2) he was terminated; (3) he met the minimum qualifications of his position; and, (4) he was replaced by a Caucasian employee (Lisa Simpson). Thus, the burden shifts to UT to show some legitimate, nondiscriminatory reason for his firing. *Burdine*, 450 U.S. at 254-56. If UT satisfies its

---

[7] Again, it appears that Plaintiff does not allege that his termination was retaliatory. Even if he did, it would fail because Plaintiff admits that he never put Ziviski, who made the termination recommendation, or Elliott, the decision maker, on notice of any alleged discrimination. (Wynn II Dep. 141). To the extent Plaintiff alleges retaliation related to this claim, UT reserves the right to address it more substantively in its Reply.

burden, Plaintiff must then show not only that the articulated reason was a pretext, but that the real

reason was unlawful discrimination. *Hicks*, 509 U.S. at 511.

Here, UT can show a litany of legitimate, non-discriminatory reasons for Plaintiff's

termination.  The Facts Section describes these incidents in greater detail, but a sampling includes:

- In July 2020, Plaintiff scheduled a mediation over a union member's grievance without including the Police Department's management team.

- In August 2020, he rebuked Police Chief Newton for making decisions that Plaintiff felt put UT in a bad legal position and asked him to put his personal feelings aside, causing the Director to question whether Plaintiff was on UT's side or the Union's side.

- In October 2020, despite needing a good working relationship with a CWA union representative, Plaintiff responded to her with hostility, chastising her for making "false accusations" and told her she was "treading a fine line."26

- In November 2020, Plaintiff issued a grievance response misstating facts detrimental to UT, stating that management had presented no documentation during a hearing, when in fact, they had.

- In November 2020, Plaintiff negotiated a memorandum of understanding (MOU) with a bargaining unit that he lacked authority to agree to; once it was presented to UT's management, the MOU was rejected.

- In November 2020, he agreed to a Letter of Agreement that placed a member of one bargaining unit (CWA) into a position in another bargaining unit (AFSCME) in direct violation of the AFSCME contract and state collective bargaining law. Plaintiff ignored, and then played down this fact, saying "how would the others know" that the employee was making more than the bargained-for amounts for that position.

- Elliott's assistant had been looking for Plaintiff at the request of another employee; when Elliott asked Plaintiff about it, he defensively accused Elliott's assistant and his colleague of making "false statements."

These incidents -- combined with Elliott's receipt of multiple negative reports regarding

Plaintiff, and Plaintiff's failure to provide Ziviski with basic labor relations information -- resulted

in Ziviski's recommendation and Elliott's decision to terminate his employment.  Plaintiff was a

poor communicator, he was disorganized, he was needlessly combative with other UT employees

and stakeholders, and he had no idea what was going on in his own department. Any of these reasons standing alone would be sufficient to terminate Plaintiff's employment; taken in combination, UT's only reasonable choice was to separate Plaintiff. Therefore, the burden shifts back to Plaintiff to show that these nondiscriminatory reasons for his firing were pretext.

A court "may not reject an employer's explanation [of its action] unless there is sufficient basis in the evidence for doing so." *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 600 (6th Cir. 2001). "[It] is not enough […] to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) (emphasis original) (internal quotations omitted).  Therefore, not every evidentiary conflict regarding an employer's non-discriminatory reason entitles a plaintiff to a trial. Rather, the circumstances of the conflicting evidence must suggest that the employer acted for discriminatory reasons. *Braithwaite v. Timken Co.*, 258 F.3d 488 (6th Cir. 2001).  Plaintiff is required to show "more than a dispute over the facts upon which the discharge was based."  *Id.* at 494.  Plaintiff must show that UT did not "honestly believe" in the stated reason.  *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir 2001) ("As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.").

As set forth above, *Provenzano* identifies three ways a plaintiff can show pretext. Plaintiff's ultimate burden at this stage is to "produce sufficient evidence from which a jury could reasonably reject [Defendant's] explanation of why it fired [him]." *Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 (6th Cir. 2009) (citation omitted).  "[T]he question is not whether the employer's reason for a decision [is] right but whether the employer's description of its reasons is honest."

*Tibbs v. Calvary United Methodist Church*, 505 F. App'x 508, 514 (6th Cir. 2012).  To carry his burden on summary judgment, "[Plaintiff] must produce sufficient evidence from which a jury could reasonably reject [Defendant's] explanation of why it fired her." *Chen,* 580 F.3d at 400.

No matter which *Provenzano* method Plaintiff attempts to employ, his arguments attempting to establish pretext are without merit.  A plaintiff using the first method must present evidence showing defendant's stated reason for the adverse employment action never occurred. *See Chattman v. Toho Tenax Am., Inc*., 686 F.3d 339, 349 (6th Cir. 2012).  Plaintiff is unable to mount an argument that would pass a straight-face test – he has not even attempted to impeach Elliott's testimony detailing numerous complaints from numerous individuals across campus.  Nor can he reasonably dispute Ziviski's testimony and emails that he had no clue about the status of various labor matters that he was responsible for. The first method is an uphill climb for Plaintiff.

This same analysis applies to the second factor, which requires a plaintiff to show that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (reversed on other grounds).  Any evidence produced by Plaintiff could not conceivably overcome the mountain of evidence submitted by UT detailing his misconduct.  More likely, any evidence produced by Plaintiff will amount to little more than conclusory allegations of UT's motives unsupported by fact.  The second method generally requires the employee to *admit* the performance failings and misconduct while otherwise impeaching the employer's 'true' motives; but consistently throughout his deposition, Plaintiff refused to concede fault in *any* communications with various UT HR customers and instead deflected blame onto others.  Accordingly, any potential arguments raised under the second method would be specious and self-contradictory.

This leaves Plaintiff to employ the third method, requiring him to show evidence that other employees were not terminated, despite engaging in substantially identical conduct. *See Chattman*, 686 F.3d at 349. Accordingly, Plaintiff must show that other UT employees who were disorganized, lacked communication skills, fought with internal/external stakeholders, and had an overall poor reputation within the university were not terminated.  Plaintiff cannot show another employee engaged in such misconduct, much less a Caucasian employee who was not fired for the same.

Rather than showing a comparable employee engaged in substantially identical conduct – because he cannot do so – Plaintiff will likely argue that other UT employees received more favorable treatment *pre-termination*. In his Amended Complaint, Plaintiff asserts that he was terminated without being placed on a personal-improvement-plan ("PIP"), and that he was discharged without an opportunity to transfer to a different position within UT. (Doc. No. 6, ¶47). None of these allegations speak to the *reasons* for Plaintiff's termination, they simply express his frustration about the *handling* of his termination.  Therefore, Plaintiff has failed to even *plead* the existence of other employees treated better than him on account of their race.

Plaintiff was specifically asked at his deposition how employees in similar situations were treated differently than him. His response was identical to the allegations of his Complaint – he claimed that he was treated differently because he was not given the chance to improve his performance, unlike his colleague Theresa Kovacs.  (Wynn II Dep. 102-04)  It remains to be seen how Plaintiff will utilize Kovacs as a true disparate treatment comparator.

As such, Wynn cannot show that the reasons for his termination offered by UT were pretextual and UT is therefore entitled to summary judgment on Wynn's race discrimination claim related to his termination.

C.    **Plaintiff's Post-Termination Arrest Claim Fails.**

Plaintiff contends that his post-termination arrest for failing to return his UT-issued laptop was retaliatory.[8]  Since he has no direct evidence of retaliation (Wynn I Dep. 10-11, 28-29, 40), his claim is analyzed using the *McDonnell Douglas* framework.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).  He must demonstrate a *prima facie* case by showing:

> "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action."

*Id.* "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id.* at 731 (quoting *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

UT does not contest, for purposes of this summary judgment motion, the third prong of the test, *i.e.,* that an arrest on a felony warrant would constitute a material adverse action.[9]  However, Plaintiff faces an insurmountable uphill climb on the remaining three prongs.

With respect to the first prong, protected activity can be shown in one of two ways:  by opposing an unlawful practice ("opposition clause"); or assisting or participating in an investigation, proceeding or hearing ("participation clause").  *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989).  Plaintiff's operative pleading (i.e., his Amended

---

[8] Plaintiff's Amended Complaint alleges his arrest was discriminatory on the basis of race.  "However, post-termination actions * * * cannot be the standalone basis for a race discrimination claim." *Smyer v. Kroger Ltd. P'ship I*, S.D. Ohio No. 3:20-cv-114, 2022 U.S. Dist. LEXIS 125389, at *34 fn.5 (July 14, 2022). "A discrimination claim necessarily requires proof that the discriminatory intent was formed prior to the adverse employment action." *Id.*, citing *Tibbs v. Cavalry United Methodist Church*, 505 F. App'x 508, 515 (6th Cir. 2012) (memoranda written after termination were not relevant to show discriminatory intent).

[9] There is a dearth of controlling case law that addresses whether an arrest constitutes an adverse action for purposes of a Title VII retaliation claim. *See, Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir.2008) (an arrest on a felony charge "could well dissuade a reasonable worker from making or supporting a charge of discrimination") (quoting *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 57 (2006)).

Complaint) alleges *neither* type of activity.[10]  Instead, Plaintiff alleges in cursory fashion that he

"warned management, on several occasions, that actions management had taken or planned to take

were discriminatory." (¶ 72).  In his pleading, Plaintiff identifies a factual predicate for only a

*single* instance of purported protected activity: his interactions with Chief Newton concerning a

possible unfair labor practice under Ohio Revised Code Chapter 4117, and Chief Newton

subsequently expressing to Davis his frustrations with Plaintiff's handling of that situation.  As

Davis explained in her deposition, the issue concerning Plaintiff cautioning Newton had nothing

to do with *discrimination;* rather, it was an issue concerning Chief Newton's alleged violation of

a collective bargaining agreement.  (Davis Dep. 180).  Plaintiff had encouraged Chief Newton to

settle that matter, and Chief Newton disagreed.  Chief Newton then contacted Davis and

purportedly stated: "[Wynn] is not for the university; he's telling me that I need to settle this, and

I said, you do need to settle this. And he said, well, I'm sick of him and that mother fucker needs

to be fired."  (Davis Dep. 134).

"For a plaintiff to demonstrate a qualifying 'protected activity,' he must show that he took

an '**overt stand** against suspected illegal discriminatory action.'" *Khalaf v. Ford Motor Co.*, 973

F.3d 469, 489 (6th Cir. 2020) (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir.

2012) (emphasis added)).  *See also, Booker*, 879 F.2d at 1313 (holding that complaints about

---

[10] Defendant anticipates that Plaintiff will attempt to introduce -- via his opposition to this summary judgment motion – other examples or instances of protected activities.  But Plaintiff has already admitted that UT's decisionmakers were unaware of said activities, and as importantly, ***none of these activities were identified in Plaintiff's complaint and are not properly raised in motion practice***. *See.*, *Gibson v. United Airlines, Inc*., 783 F.Supp.2d 983, 987 (E.D. Mich.2011), fn. 4 ("Although Plaintiff also contends that his participation in internal investigations and assistance with claims filed with the Michigan Department of Civil Rights are also protected activities * * *[,] these are not identified as protected activities in the Complaint") and *Watson v. Lowe's Home Ctrs., Inc*., E.D. Mich. No. 04-70491, 2009 U.S. Dist. LEXIS 22473, at *27 (Mar. 19, 2009) ("Plaintiff did not identify this instance of protected activity in her complaint, but instead raises it for the first time in her response to Defendant's summary judgment motion") citing *Jocham v. Tuscola County*, 239 F. Supp.2d 714, 732 (E.D. Mich. 2003) (expressing the court's disapproval of the plaintiffs' attempt in that case to "amend their complaint through a response brief")).

"ethnocism" were too vague to constitute protected activity)).  Advocating to settle a grievance because of a potential violation of a collective bargaining agreement and/or applicable state labor law(s) does not constitute "opposition" to any employment practice **made unlawful** by Title VII. With respect to the allegations in Plaintiff's complaint, he fails to identify any protected activity, and his retaliation claim fails accordingly.

Moreover, Plaintiff's own witness expressly disavowed this theory of retaliation.  Plaintiff alleges that "[b]ecause of these warnings, Mr. Wynn's supervisor, Wendy Davis was told to discipline or terminate Mr. Wynn's employment," and that Davis refused to do so. (¶ 73-74). Plaintiff (without any supporting evidence) ascribes this covert retaliatory directive not to Ziviski (who made the termination recommendation) or to Elliott (who effectuated the termination recommendation), but to Elliott's supervisor, Matthew Schroeder.  But Davis has testified that **this alleged directive never existed**.  The alleged venting by Chief Newton did not go any further -- Davis admitted that Schroeder did not ask her to discipline or terminate Plaintiff.  (Davis Dep. 136).  When asked repeatedly how she was told to discipline/terminate Plaintiff, Davis admittedly did not "have an answer."  (Davis Dep. 134-36).  She could not recall any instructions issued by Schroeder regarding Plaintiff that she refused to follow, and she admitted that Schroeder never instructed her to discipline nor terminate Plaintiff.  *Id.*  Furthermore, Plaintiff readily admits that Chief Newton did not possess the authority to terminate him (Davis Dep. 178), nor did anyone request that he be disciplined for the interaction with Newton.  (Davis Dep. 173).  Davis explicitly confirmed that the seed of Plaintiff's retaliation claim did not ever occur – Schroeder never tried to interfere with Plaintiff's alleged protected activities.  (Davis Dep. 173).

Plaintiff's floundering retaliation claim *utterly* collapses on the second prong.  "[T]o establish actionable retaliation, the relevant decision maker, not merely some agent of the

defendant, must possess knowledge of the plaintiff's protected activity."  *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1026 (6th Cir. 2010).  "Where the decisionmaker denies having knowledge of the alleged protected activity, the plaintiff must do more than 'offer[] only conspiratorial theories -- or flights of fancy, speculations, hunches, intuitions, or rumors.'" *Proffit v. Metro Gov't of Nashville & Davidson Cnty.*, 150 F. App'x 439, 443 (6th Cir. 2005) (internal quotations and citations omitted).  It is not entirely clear to whom Plaintiff attributes his arrest (and the corresponding retaliatory motive).[11]  But it cannot be Ziviski (who recommended his removal – Ziviski Aff. ¶ 29) or Elliott (who made the termination decision – Elliott Dep. 24).  Plaintiff has repeatedly averred that he never informed either of his supervisors about his purported protected activity.  "[…] as an HR professional, I would not go to another person and say I think you are discriminating against me […]. **I would never do anything at work like that to jeopardize my ability to do my job**, and that would have done that." (Wynn I Dep. 17).

Perhaps most damning for Plaintiff's retaliation case is the following exchange:

"Q:   I presume you did not share any discrimination or retaliation concerns with Matt [Schroeder, Elliott's supervisor]?
A:    No. […]
Q:   **Did you ever share discrimination or retaliation concerns with Elliott prior to your termination?**
A:    **No**.
Q:    Same question for Ziviski.
A.    **No.**

(Wynn II Dep. 141). To reiterate, **Plaintiff told no decisionmaker of his purported protected**

---

[11] As best UT can discern, Plaintiff ascribes fault for all three of his alleged adverse actions to Elliott's supervisor, Matthew Schroeder.  Despite hardly ever communicating with Schroeder (Wynn II Dep. 140-41), and despite the fact that Schroeder never made any racially inappropriate comments to him (Wynn I Dep. 9-10), Plaintiff believes Schroeder made "racist" decisions, is the "puppet master" behind his termination, and that Elliott ran every personnel decision by him. (Wynn II Dep. 148).  Plaintiff believes Schroeder was involved in his termination decision, despite admitting he has no proof to demonstrate this.  (Wynn II Dep. 148-49).  Plaintiff also asserts that Schroeder made the decision to hire Ziviski, and that it was "racist." (Wynn II Dep. 244).  Again, he admits he has no proof to demonstrate this.  *Id.*

**activity.** Both Ziviski and Elliott echo this fact. (Ziviski Aff. ¶ 29; Elliott Ex. 2, ¶21).

Further, Plaintiff presumably does not ascribe any retaliatory motive to the arresting officer, Detective Zakrzewski.  It is not in dispute that Det. Zakrzewski handled the investigation into Plaintiff's refusal to return the UT-issued laptop (Newton Dep. 18-19) and swore out the warrant for Plaintiff's arrest.  (Ex. H).  And there is no evidence that Det. Zakrzewski had any knowledge of Plaintiff's alleged protected activities.  Plaintiff's demonstrated failure to establish that any of these individuals were aware of his alleged protected activity is dispositive of his retaliation claim; this fatal defect begins and ends the analysis.

With respect to the fourth element, Plaintiff cannot demonstrate a causal connection between any purported protected activity and his arrest due to his admitted failure to return the laptop in response to a directive issued by Elliott, as well as an agreed-upon return date he arranged with Det. Zakrzewski.  "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (internal citation omitted).   And when a plaintiff relies on temporal proximity (which remains to be seen in this case), an "intervening legitimate reason to discipline" her "extinguishes any inference" of a causal connection.  *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012).

As set forth in the Facts section, Plaintiff admittedly received a direct order from Elliott to return his laptop, and he refused to do so prior to April 26th.  Plaintiff then made arrangements with Det. Zakrzewski to return the laptop on April 26th.  He then missed that deadline by a month without informing anyone at UT that he could not return the laptop by the agreed-upon deadline due to COVID.

Clearly, Plaintiff's failure to return the laptop by the agreed-upon date constitutes an intervening and legitimate reason for Det. Zakrzewski to cause an arrest warrant to be issued. The intervening reason to seek Plaintiff's arrest breaks any causal chain between the (unclear) protected activity and the adverse action, negating any inference of a causal connection premised on temporal proximity. Plaintiff is not free to ignore directives from his boss, and to blow deadlines agreed upon with the police without offering any explanation whatsoever. Plaintiff's gamesmanship had consequences – but responsibility lies at the feet of Plaintiff, not UT.

Even assuming *arguendo* that Plaintiff could establish a *prima facie* case, UT then must articulate a legitimate, non-retaliatory reason for the adverse action. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019) (citing *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 236 (6th Cir. 2017)). The burden then shifts back to the plaintiff to must that the defendant's articulated reason is actually pretext for retaliation. *Redlin, supra,* 921 F.3d at 614 (citing *Mansfield*, 706 F. App'x at 236). The legitimate reason Det. Zakrzewski issued the arrest warrant was because Plaintiff missed the laptop return deadline, and offered zero explanation for his failure to do so. The value of the laptop exceeded a $1,000 threshold that made its unlawful retention a felony. Arrests on a felony warrant are mandatory, not discretionary, under Ohio law. *See* Ohio Rule of Criminal Procedure 4(A)(2); (Newton Dep 23-24). This issue is simple and straightforward. It remains to be seen how Plaintiff will attack this reason.

Plaintiff's retaliation claim fails for four straightforward reasons. First, he failed to engage in protected activity as described in the "four corners" of his Amended Complaint and this was confirmed by Wendy Davis. Second, the decision makers were, by Plaintiff's own admission, unaware of any alleged protected activity. Third, there is no causal connection due to Plaintiff's intervening event of failing to return the laptop by the agreed-upon deadline. Fourth, he simply

cannot prove pretext.  Accordingly, his retaliation claim must be dismissed.

**IV.    Plaintiff's Potential Recovery is Barred by the After-Acquired Evidence Doctrine.**

Even if Plaintiff were to prevail on any of his claims – which he cannot – his recovery would nevertheless be barred by the after-acquired evidence doctrine.  In *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 362 (1995), the Supreme Court held that when an employer discovers evidence of the plaintiff's misconduct after an adverse action, the plaintiff's recovery shall be limited.  The after acquired evidence doctrine cuts damages when "the wrongdoing was of such severity that the employee in fact would have been terminated [the employee] on those grounds alone if the employer had known of it at the time of the discharge." *Id.*, at 362-63.  In *McKennon*, the Court found that as a general rule, in cases where, after termination, it was discovered that the employee engaged in wrongdoing, neither reinstatement nor front pay is an appropriate remedy. *Id* at 362. Additionally, the Court concluded that the "beginning point in the trial court's formation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." *Id*.

Within two weeks of Plaintiff's notice of separation date, UT learned that Plaintiff had been working a separate full-time job for the City of Cleveland **for the majority of his tenure with UT**.  Plaintiff's outside employment provided two distinct bases for his termination: (1) the outside employment was an unapproved impingement on his UT responsibilities, in direct violation of UT's Outside Employment policy (Ex. T); (2) Plaintiff **falsified his resume** when he applied for the Executive Director promotion in October 2020, stating his employment with Cleveland ended in March 2020.  Either of these reasons alone would be factually and legally sufficient for Plaintiff's termination.  Had UT been aware that Plaintiff was working for a second employer on a full-time basis in violation of the Outside Employment policy and/or lied on his resume submitted

for a potential promotion, UT would have terminated his employment. (Elliott Ex. 2, ¶17-19).

Plaintiff worked for UT from March 25, 2020 until he was notified of his termination on January 26, 2021.  It is not in dispute that Plaintiff worked for the City of Cleveland while working for UT.  Plaintiff began working for Cleveland on March 25, 2019, in the position of HR Manager in the Department of Health.  (Wynn II Dep. 88-89; Ex. W).  He resigned his employment with Cleveland effective November 6, 2020.  (Wynn II Dep. 90; Ex. X). UT maintains an Outside Employment policy, which states:  "An employee may not undertake any other type of employment which clearly impinges upon or detracts from his/her availability and ability to perform requirements of the University position unless authorized by the appropriate vice president."  (Ex. T).  Plaintiff was aware of the existence of this policy during his employment.  (Wynn II Dep. 74). Further, UT's Standards of Ethical Conduct policy is clear: "Employees are expected to take all reasonable precautions and seek appropriate guidance to ensure that their outside interests do not place them in conflict with carrying out their duties and responsibilities as UToledo employees. Employees must disclose outside interests in accordance with UToledo policies so that they can be reviewed and managed or eliminated, as appropriate."  (Ex. S, p. 3).

Plaintiff maintains that Wendy Davis approved his request to work for Cleveland.  (Wynn I Dep. 55).[12]  This is a lie, as confirmed by Davis herself:

> Q: Did [Wynn] seek permission to work for the City of Cleveland at the same time he was working for the University of Toledo?
> A: I don't recall that.
> Q: **Are you aware since that time that he worked at the City of Cleveland while he worked for UT?**
> A: **I just became aware yesterday.**

(Davis Dep. 203-04).  This deposition took place on February 21, 2023; therefore, Davis learned

---

[12] Plaintiff also taught courses for Cuyahoga Community College during his employment with UT.  Although no one else at UT was aware of it and it was not memorialized, Plaintiff and Davis now claim that Davis approved the CCC employment. (Wynn II Dep. 79-82; Ex. U).

of Plaintiff's Cleveland employment *more than two years* after she was separated from UT.

Plaintiff claims that the City was shut down due to COVID during March – May 2020, and he was not expected to perform any work. (Wynn II Dep. 51). He claims that upon the City's reopening in May 2020, he reported to the office two days per week, for four hours per day and was given nothing to do. (Wynn II Dep. 70-71). Plaintiff's assertion is not based in fact. After learning of Plaintiff's outside employment, UT filed a public records request with the City of Cleveland and obtained Plaintiff's work log. (Ex. BB). It demonstrates that Plaintiff was expected to work for Cleveland from 7:30 AM until 4:30 PM and that Plaintiff regularly attended meetings for the City. For example, Plaintiff marked himself out of the office on UT's calendar and cancelled a meeting with an employee on August 19 to conduct an FMLA training with the City of Cleveland. (*See*, Exhibit BB). Plaintiff's claim that he performed no work for Cleveland and simply sat in an office for 8 hours per week (and performed zero work in or out of the office) is a clear factual misrepresentation, and it defies common sense.

Even taking Plaintiff at his word; however, his assertion is of no import. The UT Outside Employment policy does not exempt minimal intrusion on UT work duties – it requires **mandatory reporting and approval**. Plaintiff claims the eight-hour time block he "worked" for the City of Cleveland fell on Tuesdays and Wednesdays between 10 AM and 2 PM. (Wynn II Dep. 77). Simply stated, Plaintiff was expected to work for UT during those same hours. As such, Plaintiff's job with the City required him to work during the hours he was expected to be working for UT.

Plaintiff's misrepresentation about his employment with Cleveland was not a simple discrepancy; it was an affirmative attempt at subterfuge. Plaintiff violated UT's Outside Employment policy by *omission*, i.e., his failure to disclose and obtain prior approval. But Plaintiff also, separately and distinctly, deceived UT by *commission*. Specifically, in October 2020 Plaintiff

committed resume fraud when he applied for the Executive Director role.   When he submitted his application for the position, his resume affirmatively represented that his work with Cleveland ended in March 2020. (Wynn II Dep. 94; Ex. Z).  In fact, Plaintiff submitted his resignation to the City on October 26, 2020. (Ex. X).

Plaintiff submitted his notice of resignation to the City of Cleveland on October 26, 2020. (Ex. X).  Plaintiff submitted his application for the UT Executive Director position on October 27, 2020. (Ex. Q).  While Plaintiff claims the final date on his resume was "an error," (Wynn II Dep. 94), it is ***inexplicable*** how that purported mistake was made when he tendered his resignation to Cleveland ***one day before*** applying for the Executive Director role at UT.

The fact that Plaintiff had been working simultaneously for UT and for the City of Cleveland is critically important. Plaintiff represented to the search committee that he stopped working for the City in March 2020 (seven months before he actually did).  All of the action verbs describing his duties with the City are in past tense (e.g., "Manage**d**," "Conduct**ed**," "Negotiate**d**," etc.). However, Plaintiff had been working for the City as its HR Manager for the Public Health Department **through November 6, 2020**.  Plaintiff overtly lied to the UT search committee.

Plaintiff's resume fraud would have been a permissible reason for his termination, standing alone. *See Moos v. Square D. Co.*, 72 F.3d 39, 43 (6th Cir. 1995) (finding the Sixth Circuit has a strong policy of "denouncing" and "condemning resume fraud" in the after-acquired evidence context) (citations omitted).  Elliott, in his capacity as Chief Human Resources Officer, would have terminated Plaintiff for two distinct reasons:  (1) he was working for a second employer on a full-time basis in violation of UT's Secondary Employment policy; and, (2) he lied on his resume submitted for a potential promotion. (Elliott Ex. 2, ¶17-19).

Elliott learned of Plaintiff's employment with the City of Cleveland on **February 9, 2021**,

and immediately emailed Plaintiff to provide him with an opportunity to explain or clarify any facts regarding his secondary employment. (Ex. AA). Not surprisingly, Plaintiff did not respond (nor did he claim that Davis approved his employment at that time). (Wynn II Dep. 95). Therefore, in the unlikely event that this Court denies summary judgment as to any of Plaintiff's claims, UT is entitled to an order that, should Plaintiff prevail on such claims hereafter, he is not entitled to reinstatement or front pay. Further, Plaintiff would be entitled to **zero backpay**, as Plaintiff was paid in full through his "official" termination date of April 26, 2021. (Ex. A).

## V.   Conclusion.

For the foregoing reasons, no dispute of material fact exists and Defendant's summary judgment motion is fully supported as a matter of law. Accordingly, Defendant asks the Court to grant summary judgment in its favor on Plaintiff's claims of race discrimination and retaliation.

Respectfully submitted,

DAVE YOST (0056290)
Attorney General of Ohio

/s/ Drew C. Piersall
Drew C. Piersall (0078085); *dcp@zrlaw.com*
Scott H. DeHart (0095463); *shd@zrlaw.com*
ZASHIN & RICH CO., L.P.A.
17 South High Street, Suite 900
Columbus, Ohio 43215
Phone: (614) 224-4411
Fax: (614) 224-4433

*Attorneys for Defendant University of Toledo*

## **CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1(f)**

Pursuant to Local Rule 7.1 (f), Drew C. Piersall, as trial counsel for Defendant in this case, hereby certifies that the within case is assigned to the standard track, and that the page limitation has been extend to thirty-five pages by order of this Court.  (See Order [non-document] dated November 28, 2023).  The preceding memorandum is not in excess of thirty-five pages in length.

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)

## **CERTIFICATE OF SERVICE**

This will certify that the foregoing was filed electronically on December 1, 2023.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)

34